1   JAMES D. HENDERSON (SBN 104150)
    jdhjunior@aol.com
2   **LAW OFFICES OF JAMES D. HENDERSON**
    2530 Wilshire Boulevard
3   Second Floor
    Santa Monica, California 90403
4   Telephone:    310-264-1898
    Facsimile:    310-264-4755
5
    Attorneys for Defendant
6   HENRY WALTHER

7

8                    UNITED STATES DISTRICT COURT

9                   CENTRAL DISTRICT OF CALIFORNIA

10

11  UNITED STATES OF AMERICA,            Case No. CR 07-00070-DDP

12            Plaintiff,                 **DEFENDANT'S SENTENCING**
                                         **MEMORANDUM**
13        v.

14  HENRY WALTHER,                       Date:    December 4, 2009
                                         Time:    2:30 p.m.
15            Defendant.

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page No.

I.     INTRODUCTION/BACKGROUND ................................................................. 1

II.    THE PLEA AGREEMENT ......................................................................... 2

III.   THE PRESENTENCE REPORT AND THE
       GOVERNMENT'S POSITIONS ................................................................. 2

       a)    The Loss Calculation ................................................................. 2

       b)    The Mail Fraud Scheme Was Not Sophisticated ................................ 12

       c)    The Suggested Money Laundering Enhancement ............................... 13

       d)    Vulnerable Victims .................................................................. 14

       e)    The Defendant's Role ............................................................... 16

       f)    United States v. Booker And Its Progeny ........................................ 18

IV.    THE DEFENDANT'S COOPERATION ......................................................... 18

V.     DOWNWARD DEPARTURES AND THE APPROPRIATE
       SENTENCE ............................................................................................. 19

       a)    Extraordinary Family Circumstances ............................................. 19

       b)    The Loss Calculation Significantly Overstates the Seriousness
             of This Defendant's Involvement ................................................. 22

       c)    Involvement of the Defendant's Son ............................................. 24

       d)    The Defendant's Extraordinary Charitable Activities ......................... 26

       e)    Combination of Factors ............................................................. 32

VI.    RESTITUTION/FINE ............................................................................... 33

VII.   CONCLUSION ....................................................................................... 35

# TABLE OF AUTHORITIES

**Page No.**

## CASES

Koon v. United States, 518 U.S. 81 (1996)............................................................. 20

United States v. Alba, 933 F.2d 1117 (2d Cir. 1991).............................................. 20

United States v. Booker, 543 U.S. 220 (2005)........................................................ 18

United States v. Cook, 938 F.2d 149 (9th Cir. 1991) ............................................. 32

United States v. Corry, 206 F.3d 748 (7th Cir. 2000)............................................. 24

United States v. Crouse, 145 F.3d 786 (6th Cir. 1998) .......................................... 26

United States v. DeMasi, 40 F.3d 1306 (1st Cir. 1994).......................................... 26

United States v. Desmond, 2008 U.S. Dist. Lexis 19602 (No. 05
    CR-792-4, March 11, 2008)........................................................................... 23

United States v. Forchette, 220 F.Supp. 914 (E.D. Wis. 2002) .............................. 23

United States v. Gall, 128 S.Ct. 586 (2007)............................................................ 18

United States v. Gonzalez-Bello, 10 F.Supp.2d 232 (E.D.N.Y.
    1998) ............................................................................................................... 32

United States v. Jackson, 95 F.3d 500 (7th Cir. 1996) ........................................... 14

United States v. Johnson, 964 F.2d 124 (2d Cir. 1992).......................................... 20

United States v. Monaco, 23 F.3d 793 (3d Cir. 1994)...................................... 25, 26

United States v. Pena, 930 F.2d 1486 (10th Cir. 1991) .......................................... 20

United States v. Randall, 162 F.3d 557 (9th Cir. 1998) ......................................... 14

United States v. Rioux, 97 F.3d 648 (2d Cir. 1996) ............................................... 32

United States v. Rita, 127 S.Ct. 2456 (2007) ......................................................... 18

United States v. Rivera, 944 F.2d 1563 (11th Cir. 1991) ......................................... 5

United States v. Rivera, 994 F.2d 942 (1st Cir. 1993)............................................ 20

United States v. Ruff, 535 F.3d 999 (9th Cir. 2008)............................................... 18

United States v. Sclamo, 997 F.2d 920 (1st Cir. 1993) ............................... 20, 21, 22

United States v. Serafini, 233 F.3d 758 (3d Cir. 2000) .......................................... 26

United States v. Shrewsberry, 980 F.2d 1296 (9th Cir. 1992)................................ 20

United States v. Singh, 54 F.3d 1182 (4th Cir. 1995)............................................. 14

1  | United States v. Smith, 39 F.3d 119 (6th Cir. 1994) ........................................ 14, 15
2  | United States v. Sutherland, 955 F.2d 25 (7th Cir. 1992) ..................................... 14
3  | United States v. Woods, 159 F.3d 1132 (8th Cir. 1998).................................. 26, 32

4
5  **STATUTES**

6  | 18 U.S.C. § 2 ........................................................................................... 1
7  | 18 U.S.C. § 1341 ............................................................................... 1, 13
8  | 18 U.S.C. § 1956 ............................................................................... 1, 13
9  | 18 U.S.C. § 3553 ................................................................................... 18

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1      NOW COMES the Defendant Henry Walther, by and through his counsel-of-

2  record, James D. Henderson, and files this memorandum relating to his sentencing in

3  this cause.  Sentencing is presently set for December 4, 2009, at the hour of 2:30 p.m.

4  before the Honorable Dean D. Pregerson, United States District Judge.

5  **I.**

6  **INTRODUCTION/BACKGROUND**

7      The Defendant Henry Walther was charged via a two count Information on

8  January 31, 2007, with mail fraud, money laundering, and aiding and abetting in

9  violation of Title 18, United States Code, §§ 1341, 1956, and 2, respectively.  More

10  specifically, as set forth in some detail in the factual statement section of the defendant's

11  previously filed written plea agreement, Henry Walther was a Santa Monica based CPA

12  and tax attorney retained from the early 1990s until late 2006, by three individuals who

13  resided in San Jose, Costa Rica.  These individuals, Dennis Emmett, James Ray

14  Houston, and Houston's son who is known as "Sonny Vleisides," ran what was

15  represented as a lottery business utilizing an unimaginative concept.  Potential

16  customers throughout the United States were mailed solicitations for entries in lotteries

17  throughout the world.  Customers would mail either checks, cash, or credit card

18  payments to Amsterdam.  Checks, but not the cash or credit card proceeds, were then

19  forwarded to Henry Walther in Santa Monica for processing.  Henry Walther would then

20  process the checks into bank accounts, pay winners as directed by his clients, or

21  otherwise cause checks to be sent to vendors or employees of his clients pursuant to

22  their instructions.  Sometime subsequent to Henry Walther's representation of Mr.

23  Emmett, Mr. Houston, and Mr. Vleisides, there came a point which the defendant

24  acknowledges and which is further discussed below, where Henry Walther should have

25  recognized that the lottery concept being marketed was not as represented.  Despite this

26  knowledge, Defendant Walther continued to provide services to his clients and their

27  business as if it were wholly legitimate (Count One).  This assistance consisted of

28  continued accounting services and the mailing out of checks, pursuant to client

1

1  direction, including a July 3, 2006, $5,500 check from the proceeds of the charged
2  fraud, sent to Leo Yahuda Eisen in San Jose, Costa Rica (Count Two). On March 6,
3  2007, the defendant entered a plea of guilty to the two count Information pursuant to the
4  above-mentioned plea agreement which was executed on January 31, 2007.

## II.

## THE PLEA AGREEMENT

7  Initially, it is noted that this defendant's plea agreement leaves open for argument
8  the appropriate advisory Sentencing Guidelines calculations and does not limit the
9  presentation by the defendant of various Guidelines adjustments, detailed below, which
10  the defendant has indicated to the Government it will be bringing to the attention of the
11  court. In numbered paragraphs 17(f) and (g) of the plea agreement, the Government has
12  agreed to bring to the court's attention all assistance and cooperation provided by the
13  defendant, and to recommend a Sentencing Guidelines § 5K1.1 offense level reduction
14  dictated by the nature and quantity of the defendant's assistance. Mr. Walther's truly
15  substantial assistance/cooperation is discussed in Section IV below.

## III.

## THE PRESENTENCE REPORT AND THE GOVERNMENT'S POSITIONS

18  The United States Probation Office in its presentence report recommends a
19  sentence of 24 months home confinement with electronic monitoring. It is noteworthy
20  that this recommendation is made without consideration of the extent or value of the
21  defendant's cooperation and assistance to federal law enforcement; a relevant task
22  which, of necessity, involves facts to which the Probation Office is not privy. The
23  presentence report does contain conclusions as to various offense level enhancement
24  issues which have been previously raised by the Government. The defendant's position
25  on these issues is as follows:

26        a)    The Loss Calculation
27  As noted in numbered paragraphs 28 and 47 of the presentence report, the
28  Government has estimated the loss figure for Guidelines purposes at between

2

$14,000,000 and $20,000,000. This is the figure calculated by the Government based on a full accounting since the year 2000. The figure represents the amount gambled by prospective lottery players for the final six years of customers responding to misleading solicitations. The Government apparently advances this figure on the premise that the Defendant Henry Walther is criminally responsible for the entire investment amount because he has admitted to being, at the least, an aider and abettor. This calculation for the Defendant Henry Walther, however, contains significant problems and appears to be unsupportable. The presentence report, in numbered paragraph 49, is in agreement with undersigned counsel that the appropriate Guidelines loss figure attributable to Henry Walther is between $1,000,000 and $2,500,000. As a result, the drafting Probation Officer has applied a 16 level increase for a loss attributable for Guidelines purposes to Henry Walther. The defendant was not involved in the entirety of the scheme, and did not know that it was fraudulent during virtually any of the time period he worked for the perpetrators. This fraudulent scheme had been ongoing since 1990, long before the defendant's involvement. Therefore, the lower loss amount is seen as a more accurate description of the defendant's accountability. The basis for this conclusion and for a calculation of an appropriate loss figure of $1,100,000 is set forth below.

First, as is at least partially apparent from the factual basis contained in the plea agreement, this defendant's plea was based on his admission that there came a time when he knew or should have known the investors/lottery players were being solicited via misrepresentations. The Government has basically taken the position that in order to limit the loss figure the burden is on the defense to demonstrate a lack of criminal responsibility for the entire loss amount. Otherwise, the Government reasons, the defendant is as responsible as every other scheme participant, including the principals who devised and implemented it without defendant's participation or input. While the Government may be misplacing who has the burden on this issue, the limited culpability of Henry Walther can easily be demonstrated.

3

1    As already noted, the defendant originally was retained to perform limited legal

2    work relative to their lottery business in the early 1990s by Costa Rican based clients

3    Dennis Emmett and James Ray Houston. Henry Walther had known Dennis Emmett

4    since the 1970s and believed him to be eccentric and extremely bright but not dishonest.

5    Dennis Emmett introduced the defendant to James Ray Houston as a former candidate

6    for Governor in the State of Nevada. The legal work for Emmett and Houston consisted

7    essentially of minor legal matters such as letter writing and arranging for the refund of

8    money to the few investors who occasionally requested that their funds be returned.

9    Such requests were routinely granted. In approximately 1998 or 1999, Henry Walther

10   was requested by Emmett and Houston to expand his role and handle certain accounting

11   aspects of their American banking. Because of the Government's presumption here that

12   the Defendant Walther had criminal knowledge of the mail fraud scheme from the

13   inception of his accounting involvement, and because the Government's loss calculation

14   in its pleadings are measured from the year 2000, undersigned counsel submitted Mr.

15   Walther to a polygraph examination on January 22, 2007. The examination was

16   administered by Jack Trimarco, the former Polygraph Unit Chief for the Federal Bureau

17   of Investigation at the Los Angeles Field Office (1990-98) and the former Inspector

18   General for the United States Department of Energy Polygraph Program (1999-2001).

19   Mr. Trimarco was a Special Agent with the F.B.I. from 1978 to 1998. Mr. Trimarco's

20   polygraph, in fact, formed the basis of various charging, sentencing and forfeiture

21   decisions in the Los Angeles Office of United States Attorney and other offices, for

22   many years. His resume is attached hereto as Exhibit "A." Mr. Trimarco's polygraph

23   examination of Henry Walther showed that Mr. Walther, contrary to the Government's

24   presumption, did not know from the inception of his accounting involvement with

25   Dennis Emmett and James Ray Houston that they were perpetrating a fraud.[1] The

26

27

28   [1] See attached Exhibit "B," the report prepared by Mr. Trimarco of the January 22, 2007, polygraph examination of Henry Walther.

question thus becomes: exactly when did Henry Walther's culpability actually begin? Such is obviously a difficult date to pinpoint in a situation where the defendant's plea is based on the admission that there was a time when he should have known that at least some criminal behavior was involved.[2] The defendant has been consistent that the time was in approximately April of 2006. The defendant and undersigned counsel have spent dozens of hours reviewing e-mails, client files, and bank records, attempting to determine precisely from when it was that Mr. Walther's criminal culpability should be measured. Analysis of the defendant's e-mail traffic, coupled with statements obtained from the principal participants in the lottery/mail fraud scheme which are referenced in a declaration from undersigned counsel (attached Exhibit "C"), and which accompany said declaration, appears to indicate that the equitable date from which to measure the Defendant Walther's culpability is April of 2006. This is the date agreed to by the parties in the plea agreement.

As illustrated by Exhibit "C," on July 8, 2006, undersigned counsel interviewed James Ray Houston and his son (Sonny Vleisides), for approximately 45 minutes at the Intercontinental Hotel in San Jose, Costa Rica. During that interview, counsel informed both Houston and Vleisides that an investigation was being conducted of their lottery business by the U.S. Attorney's Office in Los Angeles and that he (the undersigned) was representing Henry Walther and had been informed by Mr. Walther that Mr. Houston and Mr. Vleisides were the ones who could provide the best information and answers about the details of their business. At no time during this initial meeting was counsel ever informed that misrepresentations had been made in the mailed solicitations to potential lottery players or that any of the money obtained was not actually utilized to purchase lottery tickets. Undersigned counsel was informed by James Ray Houston,

---

[2] As the court knows, this is a proper basis for a guilty plea pursuant to Ninth Circuit cases such as United States v. Rivera, 944 F.2d 1563, 1570 (11th Cir. 1991), which holds that "if a party has suspicion aroused but then deliberately omits to make further inquiries because he wishes to remain in ignorance, he is deemed to have knowledge."

however, that if anything was wrong with the business, it was he who should take responsibility as it was he who set up the business even though his son was now, and had been, essentially running it for some time as a result of his (Houston's) medical problems.[3]   Counsel was also informed that the business in question was, in fact, a lottery business which pooled the plays of customers who were solicited from mailing lists obtained from companies which sold and rented such lists on the open market. Both Mr. Houston and Mr. Vleisides expressed puzzlement as to why the U.S. Government was conducting a fraud investigation because, in their view, no customers were ever cheated.  Counsel inquired as to whether they were aware of the U.S. statute which prohibited lottery advertisements and both professed that they were not.  Mr. Houston further commented that the business specifically was set up to play foreign lotteries so as not to violate U.S. gaming laws and that was why customer entries were directed to Europe.  Towards the end of the meeting counsel inquired as to what part Henry Walther played in the business and was informed by Mr. Houston that it was negligible.  Mr. Walther's role was described as merely providing occasional legal services of an unsubstantial nature and, for the past several years as handling American banking and accounting.  It was explained by Mr. Houston that Henry Walther was uninvolved in the day-to-day operations of the business, that he was just the lawyer, and that Mr. Walther had not been made aware of the foreign details of how the business was actually run.  At the close of the meeting, undersigned counsel inquired of Mr. Vleisides as to whether he could provide materials showing exactly how the business operated and he responded that he would drop off such materials at the hotel before counsel departed Costa Rica.[4]   Counsel also inquired of both Mr. Houston and Mr. Vleisides as to whether, if necessary, they would be willing to come to the United States in order to

---

[3] Mr. Houston arrived at the meeting in a wheelchair pushed by Sonny Vleisides and appeared to be in frail health.  It was stated at the meeting that Mr. Houston suffered from a stroke and was partially paralyzed.

[4] No such materials were ever provided.

6

1   explain to the U.S. Attorney's Office the operations of the business and Henry Walther's
2   minimal involvement in it.  Both responded that they would not.

3   As further explained in Exhibit "C," counsel's next encounter with one of the
4   principals of the mail fraud scheme was on October 11, 2006, when the undersigned met
5   with Dennis Emmett in San Raphael, Costa Rica.  Counsel explained to Mr. Emmett that
6   he was representing Henry Walther, that there was a U.S. federal investigation relating
7   to him (Mr. Emmett), James Ray Houston, Sonny Vleisides, and Henry Walther, and
8   that counsel was endeavoring to learn all the facts necessary to adequately defend Mr.
9   Walther.

10   Mr. Emmett agreed to speak with counsel and during the interview which
11   followed and, with the exception of counsel's question asking for an explanation of how
12   the lotteries were actually played, Mr. Emmett answered all questions.  Mr. Emmett did
13   inform counsel that not all money was actually placed in lotteries but didn't know
14   exactly how that decision was made.[5]  Among Mr. Emmett's other statements was that
15   he and James Ray Houston, who goes by the name of "Rex," had begun the lottery
16   business in the early 1990s and had never cheated a player.  He stated that the lottery
17   business was "Rex's brainchild."  He related that the factual statements in the mailed
18   solicitations to potential customers contained information and misrepresentations all of
19   which had been thought up and written by "Rex" (James Ray Houston) and later by
20   Sonny [Vleisides].  According to Mr. Emmett, "they just made it up."  Mr. Emmett
21   explained that after he had split with Rex and Sonny some five years ago, he simply
22   used Rex's work to carry on his end of the business as he was not good at writing the
23   promos himself.  In response to counsel's question as to whether Henry Walther was
24   made aware of the misrepresentations in the solicitations, or that money may not have

25

26   [5] In this regard, Mr. Emmett was asked in a follow-up inquiry by the undersigned
     how much money was actually invested in lotteries and he responded that since the
     undersigned did not represent him, he preferred not to talk about that but "everyone got
27   what they were entitled to."  See attached Exhibit "C."  It is noted that the interview
     summaries which make up Exhibit "C" do not include counsel's independent notes of
28   the interviews.  These notes are available should the court wish to review them.

1  always been played on lotteries, Mr. Emmett responded that he, Rex, and Sonny
2  purposely kept as much information as possible from Henry Walther because they did
3  not wish to lose him as their attorney. He explained that Henry was always "assured"
4  that everything was "completely okay and that there was a European side of the
5  business." According to Mr. Emmett, Henry Walther was told that he was hired to
6  handle American banking and to deal with legal issues which from time to time arose in
7  the U.S. Mr. Walther, Mr. Emmett specifically stated, was never informed of the
8  misrepresentations made to potential lottery players. In response to counsel's question
9  as to whether any specific types of groups, such as the elderly, were targeted for the
10  solicitations, Mr. Emmett answered that this was not done, mailing lists were simply
11  purchased from companies which marketed them publicly. He added that he did not
12  believe there was any group which was more likely to play the lottery than any other
13  group. According to Mr. Emmett, they did not need to target anyone to obtain lottery
14  players as everybody loves to gamble.

15      Following the undersigned's interview of Dennis Emmett in Costa Rica, on the
16  following afternoon undersigned counsel met with Sonny Vleisides in Monterey,
17  Mexico. The meeting took place at a downtown hotel bar and began with Mr. Vleisides
18  asking counsel if he was "wearing a wire." When he was assured that counsel was not,
19  Mr. Vleisides volunteered that his father had advised him not to meet with counsel but
20  that he had decided to do so anyway. During the ensuing discussion, Mr. Vleisides
21  echoed the previous day's assertions of Dennis Emmett that the mailed solicitations to
22  potential lottery players contained representations which were untrue and that his father
23  (James Ray Houston) had authored them and was very good at writing the promos.
24  When counsel asked if Henry Walther had been made aware of the misrepresentations,
25  Mr. Vleisides answered no and that the fact of the misrepresentations had been
26  purposely kept from Mr. Walther.

27      When counsel informed Mr. Vleisides that the U.S. Attorney's Office in Los
28  Angeles was of the view that the funds solicited were not actually placed on lotteries, he

1  responded that considerable money was actually played but that, over time, the concept
2  had evolved into what he termed a "derivative" concept. He explained that the money
3  received from players was simply banked and held for payouts according to actual
4  lottery results and that over the years the payout percentage had been approximately
5  35%. He described the "derivative" concept as akin to how both insurance companies
6  operate or like entities which are self-insured. Mr. Vleisides further offered that no
7  players were ever cheated out of any of their winnings vis-à-vis the lottery results of the
8  games for which they answered solicitations. In response to counsel's inquiry as to
9  whether Henry Walther had ever been informed as to the "derivative" nature in which
10  the lottery businesses operated, Mr. Vleisides answered that Henry Walther had not been
11  so informed and that he (Vleisides) believed that Henry Walther assumed that lotteries
12  were actually played. When counsel asked whether solicitations were purposely sent to
13  the elderly or any other specific group, Mr. Vleisides stated that neither the elderly nor
14  any other group was ever targeted for solicitations and mailings were sent to those on
15  lists which were obtained from vendors on the public market. When counsel asked, in
16  view of Mr. Vleisides' statement that no lottery players had ever been cheated, whether
17  Mr. Vleisides would be willing to come to Los Angeles and explain the derivative
18  concept to the United States Attorney's Office, he stated that he was not willing to do
19  so.[6]

20        In addition to the above-summarized interviews indicating that the Defendant
21  Walther, was, in fact, unaware of the lottery fraud until a point as late as April of 2006,
22  is undersigned counsel's initial encounter with Henry Walther on June 28, 2005. On
23  that date Mr. Walther, following a telephone call asking for an appointment, arrived at
24  counsel's office and introduced himself. He explained that he had been handling some
25  of the financial matters for foreign lotteries businesses, in which he had no personal
26  ownership interest, and inquired as to whether, in the opinion of the undersigned, such
27
28        [6] Attached Exhibit "C" sets forth more fully the interview of Sonny Vleisides.

9

1   was legal and whether he had criminal exposure.  Undersigned counsel opined that since
2   the lotteries were being played outside the country with funds sent outside the United
3   States for games in foreign jurisdictions, it seemed that he did not.  At no time during
4   the June 28th meeting did Henry Walther evidence any knowledge, or even suspicion,
5   that misrepresentations in the solicitation process were taking place or that any type of
6   fraud was involved.  It defies logic, of course, that Mr. Walther would be concerned, and
7   consult an attorney, about whether the lottery structure and concept was legal if he had
8   known that the lottery was illegal in some other manner.  A copy of counsel's notes of
9   the June 28th meeting is attached hereto as Exhibit "D."  The result of the interviews
10  conducted by the undersigned, and of counsel's June 28, 2005, meeting with Henry
11  Walther, lead to the inescapable conclusion that the defendant, precisely as he has
12  consistently contended, was unaware that fraudulent conduct might be involved in the
13  lottery business operated by Sonny Vleisides, James Ray Houston, and Dennis Emmett,
14  until well into 2006.

15      This conclusion is still further supported by an examination of the defendant's
16  e-mails.  Attached as Exhibit "E" are representative examples of the weekly e-mails
17  from his clients in which Henry Walther is informed about "prize money."  The e-mails
18  do not provide evidence of knowing involvement of Henry Walther in fraudulent
19  activity.  The e-mails such as the examples in Exhibit "E" simply reinforce the
20  statements of Sonny Vleisides, Dennis Emmett, James Ray Houston, William Cloud,
21  and Glenda Emmett (Exhibit "S") and the implication from the defendant's June 28,
22  2005, meeting with undersigned counsel, concerning Henry Walther's lack of
23  knowledge of fraud.  Against this background it is difficult to conclude other than that
24  Mr. Walther's criminal culpability should be measured from any date other than April of
25  2006.  No clear and convincing evidence, if any evidence at all, indicates to the
26  contrary.

27
28

1        In the first week of November 2005,[7] Henry Walther recalls a conversation with
2  Sonny Vleisides in which he inquired of him concerning the association of lottery
3  clients with specific drawings and brochure statements concerning funds being held for
4  distribution.  When Sonny Vleisides, while seeming reluctant to elaborate, informed Mr.
5  Walther, in substance, that he need not be concerned about such details, such raised for
6  Henry Walther, the first red flag.  It was during the next four to five months, as can best
7  be estimated, that he began to question the accuracy of statements concerning cash
8  reserves and foreign governmental involvement in various marketing brochures.

9        Such is the point where Henry Walther's criminal culpability began.
10  Rationalizing that the lottery business consisted essentially of gamblers none of which
11  appeared to have been cheated out of winnings, Henry Walther elected to continue with
12  his banking services and to not delve further into the specifics of the lotteries'
13  operations.  In essence, for a period of four to five months, he deliberately chose to not
14  inquire further when he had a duty to do so.

15        From April of 2006 to July of 2006 (when the lottery scheme ceased its
16  operations), as best undersigned counsel has been able to calculate, Henry Walther
17  received some $7,500 per month in fees for his participation in the lottery scheme (by
18  doing routine accounting work) while the businesses took in approximately $1.1
19  million.  A portion of those funds were paid back to lottery players in prize money.  It is
20  the position of the defendant, and that of the drafter of the presentence report, in view of
21  the $1.1 million figure, that the appropriate loss enhancement for the fraud base offense
22  level of 7, should be a 16.  This creates, without reference to other possible adjustments,
23  an offense level of 29 following application of the 6 level enhancement for more than
24  250 victims pursuant to § 2B1.1(b)(2)(C).  Undersigned counsel believes this figure (an
25  offense level of 29) to be a correct one before credit (-3) for acceptance of responsibility
26  and possible credit for a downward role adjustment.  Should counsel, following

27  _____

28        [7] This date has been determined from Henry Walther's passport as the
conversation was one which took place in San Jose, Costa Rica.

1 | assessment of the suggested enhancement issues, and the defendant's role, be correct,
2 | such results in a final offense level of 22 to 26.  Otherwise, the level is either a 30, a 28,
3 | or a 26.

4 |       b)    The Mail Fraud Scheme Was Not Sophisticated

5 |      The Government has suggested to counsel that the defendant's offense level
6 | should be increased by 2 points because the mail fraud scheme was a sophisticated one,
7 | and a substantial part of the scheme was conducted outside the United States.  This
8 | enhancement is the subject of Guidelines §§ 2B1.1(b)(B) and (C).

9 |      Initially, it seems clear that this scheme was hardly sophisticated.  The mail fraud
10 | was a basic misrepresentation/solicitation scheme in which U.S. customers were enticed
11 | into investing money in pooled lottery plays.  All the misrepresentations took place in
12 | this country.  As noted in Section III above, customer checks were cashed in the United
13 | States after being sent to Mr. Walther.  This was because of their more timely
14 | negotiation by American banks and checks were initially mailed outside the country
15 | solely to attempt to legitimize lottery plays which could be considered illegal in the
16 | United States.  In short, the foreign aspect of the mail fraud scheme was neither
17 | substantial, sophisticated, or an integral part of the fraud scheme.  This Guidelines
18 | section is meant to punish defendants who locate fraud schemes on foreign territory in
19 | order to evade law enforcement and such was not the circumstance of the instant cause.
20 | As noted throughout this memorandum, Defendant Walther did not instigate the mail
21 | fraud scheme at issue here, it was only late in the scheme that he became an aider and
22 | abettor who performed basically clerical, accounting and related services, and at no
23 | point did he even know the scheme's scope or details.  The presentence report, in
24 | numbered paragraph 52, agrees with this analysis and also concludes that an offense
25 | level increase is inappropriate.  A § 2B1.1(b)(9) enhancement should not be applied to
26 | this defendant.

27 |
28 |

1

      c)    The Suggested Money Laundering Enhancement

2           The presentence report, in numbered paragraph 42, reasons that a 2 point offense

3    level enhancement, pursuant to Application Note 6 Guidelines § 2S1.1, should be

4    applied because the defendant was convicted under 18 U.S.C. § 1956 (a money

5    laundering count). Undersigned counsel believes that this suggested enhancement is

6    based on a mistaken reading of the Guidelines. While the referenced Guidelines section

7    does call for an "increase by 2 levels," such is for calculating the offense level <u>relating</u>

8    <u>to the money laundering count</u>. In the present case, it is not disputed that the

9    defendant's offense level is at least 29 for the underlying offense (that is, the base level

10    of 7 plus the loss enhancement of 16 for the loss amount, 6 for the presence of multiple

11    victims) for the non-money laundering count without reference to the defendant's role,

12    acceptance of responsibility, or other adjustments. When, as here, there exists more

13    than only a money laundering account, it is necessary, according to Application Note 6,

14    to conduct a Guidelines § 3D1.2 analysis. This latter section applies in situations, as

15    with the present case, where multiple counts are in existence.

16           The § 3D1.2 analysis is as follows: Pursuant to § 3D1.1(e)(1), step one directs

17    that counts resulting in a conviction are to be placed into groups which are closely

18    related. § 3D1.2 places into the same group all counts relating to the same course of

19    conduct. § 3D1.2 specifically sets forth that the counts at issue here [18 U.S.C. § 1341

20    (Guidelines § 2B1.1) and 18 U.S.C. § 1956 (Guidelines § 2S1.1)] are to be grouped

21    together. Such, of course, appears highly appropriate since the defendant's plea

22    agreement in its factual summary, at pages 6-7, specifically sets forth that the basis of

23    the money laundering count was to further the mail fraud scheme. That the two counts

24    to which this defendant has entered his plea are part of the same course of conduct,

25    therefore, appears beyond question.

26           Against this background Guidelines § 3D1.3(a) indicates that when separate

27    counts, as here, are grouped together, the appropriate offense level is that for the most

28    serious of the counts comprising the group. In the case at bar, the most serious count is

1    the mail fraud with its offense level (without adjustments) appears to be a 29.  Because

2    the money laundering count carries an offense level of 25 (this includes the

3    § 2S1.1(b)(2)(B) 2 point enhancement) § 3D1.3(a) pinpoints the total offense level at a

4    29.  Accordingly, a two level Guidelines offense level increase for the money laundering

5    has already been incorporated into the greater mail fraud loss figure and should not be

6    again added to the offense level for the higher offense level fraud scheme.[8]

7              d)    Vulnerable Victims

8         Numbered paragraph 58 of the presentence report recommends that the

9    defendant's offense level be increased by 2 levels, pursuant to Guidelines § 3A1.1(b)(1),

10   because the mail fraud scheme involved vulnerable victims which were "reasonably

11   foreseeable" to the defendant.  The report reasons that because the scheme involved the

12   "reloading" of victims, United States v. Randall, 162 F.3d 557 (9th Cir. 1998), indicates

13   that the 2 level enhancement is well taken.  The Randall facts, however, are

14   considerably different.  There the defendant was convicted specifically as a "reloader"

15   pointedly targeting individuals who were "particularly susceptible."  There is no

16   evidence here that Henry Walther was involved in any manner in targeting anyone who

17   was "particularly susceptible" or, indeed, of targeting anyone.

18        The wording of the referenced Guidelines section is critical.  It requires that the

19   defendant "knew or should have known" that the scheme involved vulnerable victims.

20   United States v. Jackson, 95 F.3d 500, 507 (7th Cir. 1996), for example, teaches that in

21   order to apply a § 3A1.1 enhancement, a sentencing court must find both 1) that a

22   victim of a defendant's scheme was unusually vulnerable in some way, and 2) that the

23   defendant targeted that victim because of his vulnerability.[9]  The Jackson court reasoned

24

25   _____

26   [8] The concept, of course, remains precisely the same even if the court should
     adopt a higher or lower loss figure than that advocated by either the defendant, the
     Government, or the presentence report.

27   [9] See also United States v. Singh, 54 F.3d 1182, 1191 (4th Cir. 1995); United
     States v. Smith, 39 F.3d 119, 124 (6th Cir. 1994); and United States v. Sutherland, 955

28   F.2d 25, 26 (7th Cir. 1992).

                                         14

that the Application Note 2 to the Guidelines vulnerable victim provision helped clarify the "targeting" requirement by directing as follows:

> The adjustment would apply, for example, in a fraud case where the defendant marketed an ineffective cancer cure or in a robbery where the defendant selected a handicapped victim. But it would not apply in a case where the defendant sold fraudulent securities by mail to the general public and one of the victims happened to be senile.

Based on this language, the court concluded that a sentencing court should focus "on whether the defendants <u>targeted</u> vulnerable victims, not whether vulnerable persons just happened to be defrauded." In the words of the court:

> [T]he § 3A1.1(b) enhancement is designed to punish criminals who choose vulnerable victims, not criminals who target a broad group which may include some vulnerable persons.[10]

The Defendant Walther was primarily an accountant not involved in the planning or dissemination of solicitations containing misrepresentations. He played no part in deciding to whom solicitations were mailed or how potential clients were selected. At least four participants in the scheme, Sonny Vleisides, Dennis Emmett, Glenda Emmett, and William Cloud (see Exhibit "C") have indicated that no ethnic, gender, or age group was ever targeted for mailings. Lists were merely purchased from public vendors such as List Counsellors, Inc. which was the primary provider of potential customer names (see attached Exhibit "F"). This was done by a clerical employee in the United States (Glenda Emmett) who handled all the mailings. While undersigned counsel is aware of nothing which indicates that the aged are more vulnerable to games of chance than other gamblers, even if such is the case, this defendant did not target them or have any knowledge that they were targeted by others and the fact that some are included on any customer list which is sold publicly is undoubtedly unavoidable. What does seem to have been targeted by scheme principals was only a large group of those willing to

---

[10] <u>See also</u> United States v. Smith, 39 F.3d 119, 124 (6th Cir. 1994) ("the evidence must show that the defendant knew his victim was unusually vulnerable and that he perpetrated a crime on him because he was vulnerable").

gamble small amounts. Henry Walther's criminal culpability did not even come of age until approximately the last 4 months of a 16 year operation. Prior to that, he had no criminal culpability and subsequent to that there is no indication that he knew or should have "reasonably foreseen" that victims were reloaded. Because the defendant admits he should have known about certain misrepresentations in solicitations does not mean that he similarly should have known that some victims of misrepresentations were reloaded. Henry Walther played no role in soliciting lottery players during his activities as an accountant and check writer. There is simply no clear and convincing evidence that Henry Walther knew or should have known that the offense involved any number of vulnerable victims. To apply this enhancement under these circumstances seems highly speculative. Accordingly, a 4 point offense level enhancement should not be here applied.

        e)     The Defendant's Role

The presentence report, in numbered paragraphs 60 and 61, does not apply a downward role adjustment stating that the defendant has not shown he was substantially less culpable than the average defendant and because he "has not been held accountable for the entire amount of the loss caused by the fraud."

First, the reason he was not held accountable for the entirety of the loss was, as the presentence report itself states in numbered paragraph 49, because he was neither legally, ethically, or morally responsible for it. It would seem that such diminishes his role rather than indicates responsibility outside the language of § 3B1.2.

As a corollary, the defendant's charges include aiding and abetting the substantive mail fraud and money laundering counts. The term "aider and abettor" itself indicates a diminished role and accurately describes that of Henry Walther. The agreed upon factual recitation set forth in the plea agreement shows that he handled the bank accounts relating to funds which were sent to him, did various accounting tasks, and caused checks to be issued as directed by the principals behind the fraud. As discussed above, Henry Walther began an association with the principals which lasted in excess of

16

a decade without him becoming aware that his clients might be running their business in a fraudulent manner. With the business being directed from outside the country, and with the principals purposely keeping information from him, it took Defendant Walther some 15 years, after he had even sought accounting assistance from his son, to finally come to the realization that something might be amiss.

Sentencing Guidelines § 3B1.2 provides for a 4 point offense level reduction, in instances where a defendant is among the least culpable in those involved in the conduct of a group. Application Note 4 to § 2B1.2 pointedly states that:

> Under this provision, the defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as minimal participant.

Such language could not better describe the position of Henry Walther. Not only did it take almost half his professional career to absorb sufficient knowledge of his clients' secret and foreign affairs to himself become culpable, but until the Government's investigation led to circumstances which brought additional information to light, the Defendant did not even know most details of the fraud. He remains even today unaware of the entire scope of the business. Precisely which of his clients did what; complete understanding of the scope of each client's involvement; the specifics of what functions individuals in Europe actually performed vis-à-vis the fraudulent lottery business; how many individuals were involved in the business; how payouts were computed and lotteries actually played; all were outside Henry Walther's scope of knowledge and understanding. He performed an accounting service for a business which he eventually learned included fraudulent aspects. He played no other part and was merely paid on the basis of time and the volume of the services he performed. It is difficult to imagine the profile of a more minimal participant. A downward adjustment for the defendant's role seems clearly appropriate.

17

1      f)      United States v. Booker And Its Progeny

2      The evolution of the law relating to sentencing since United States v. Booker, 543

3    U.S. 220 (2005), has made clear that, whatever the literal Guidelines offense level

4    calculation, courts should not employ a presumption that the non-mandatory guideline

5    range is the reasonable or an appropriate sentence,[11] and "extraordinary circumstances

6    are not needed to justify a sentence outside the guidelines range."[12]  In short, the

7    guidelines are but one of many factors for the court to consider when imposing a

8    sentence and "3553(a)(3) directs sentencing courts to consider sentences other than

9    imprisonment."[13]  The task for the court is to impose a reasonable sentence, based on the

10    individual defendant and the facts and circumstances of the particular case at hand, that

11    is "sufficient but not greater than necessary"[14] to achieve the statutory purposes of

12    sentencing.  In short, where the Guidelines are at odds with substantial justice in a given

13    case, courts are duty bound to reject them in favor of a sentence which gives appropriate

14    weight to all relevant equities.

**IV.**

**THE DEFENDANT'S COOPERATION**

17      The Defendant Henry Walther has been providing assistance to the United States

18    Attorney's Office since a point even before his plea agreement was finalized.  He has

19    undergone lengthy debriefing sessions, agreed to testify whenever needed, traveled

20    outside the United States to Costa Rica and Mexico to participate in activities designed

21    to draw admissions from more significant participants in the crimes charged, and

22    operated covertly in successfully locating defendants outside the country, personally

23    financed attempts to locate the case's remaining defendant who is a fugitive, consulted

24    with the investigative agents during their preparation for trial and debriefings of other

---

[11] See United States v. Gall, 128 S.Ct. 586, 596-97 (2007), and United States v. Rita, 127 S.Ct. 2456, 2465 (2007).

[12] United States v. Ruff, 535 F.3d 999, 1002 (9th Cir. 2008).

[13] United States v. Gall, 128 S.Ct. 586, 602 (2007).

[14] 18 U.S.C. § 3553(a).

18

1    defendants, and (as shown by attached Exhibit "C") was the driving force behind each
2    of the guilty pleas to date in the instant case.  The information provided by the
3    defendant and the identification of witnesses who can corroborate the defendant as to
4    what are essentially confessions made by the three main participants, and an additional
5    minor one, in the crimes charged have made, and will make, the successful prosecution
6    of all significant players in the fraud a virtual certainty.  It is anticipated that a § 5K1.1
7    motion by the Government will set forth the defendant's assistance.  Should additional
8    information be desired by the court, undersigned counsel will be glad to provide it.  In
9    short, the defendant's assistance has been significant and is well worthy of a truly
10   substantial Guidelines offense level reduction, especially so when considered in
11   combination with the bases for departure detailed below in Section V of this
12   memorandum.

13                                              **V.**

14            **DOWNWARD DEPARTURES AND THE APPROPRIATE SENTENCE**

15            a)    Extraordinary Family Circumstances

16            The defendant's wife, Janet, suffers from Type I diabetes.  Her condition is
17   juvenile onset which cannot be controlled by pills or normal medication and she
18   receives insulin injections of changing dosages several times each day depending on her
19   blood sugar level.  Mrs. Walther self regulates this process as much as possible but on
20   occasion has gone into diabetic shock requiring emergency room transport and
21   treatment.  Mrs. Walther must adhere to a strictly monitored diet and eat at regular
22   intervals in order to appropriately schedule her insulin intake.  In conjunction with her
23   diabetic condition, she suffers from high blood pressure.

24            Because of her diabetic condition, Janet Walther cannot see well enough to drive
25   at night and, in that regard, is totally dependent on the defendant.  While at work,
26   Defendant Walther checks on his wife at least twice daily; at 11:00 a.m. and between
27   3:00 and 4:00 p.m.  At night, because it is difficult to decipher her sleep from a diabetic

28

                                                  19

1    coma, the defendant is required to awaken her at four-hour or lesser intervals in order to

2    insure her well being.

3        Attached as Exhibit "G" is correspondence to the court from Janet Walther's

4    attending physician attesting to her severe medical condition and to the importance of

5    the defendant to her avoiding medical emergency on a day-to-day basis. Janet Walther's

6    own correspondence to the court, see attached Exhibit "H," also provides valuable

7    insights into this extraordinary family situation. According to Exhibits "G" and "H,"

8    "Henry checks her physical condition at night at 4-hour intervals, which is very

9    important for her safety" and "I am frightened about the prospect of [Henry] not being

10   here with me, especially now that my condition seems to be getting worse rapidly."

11       As the court well knows, while the Sentencing Guidelines indicate that departures

12   on grounds of family circumstances are not the norm, the courts have uniformly held

13   that "special, unusual, or other-than-ordinary circumstances" may warrant a downward

14   departure,[15] and that the decision to depart downward on this basis is a discretionary

15   one.[16] It is unrealistically difficult to consider Exhibits "G" and "H" and not conclude

16   the family circumstances for Henry Walther are not "special, unusual, or other-than-

17   ordinary."

18       Although the instances are several where family circumstances have been found

19   to justify downward departures, the decision in United States v. Sclamo, 997 F.2d 970

20   (1st Cir. 1993), is highly illustrative. In Sclamo, where the defendant had been

21

22   [15] See, e.g., United States v. Sclamo, 997 F.2d 920 (1st Cir. 1993) (special,
     unusual or other-than-ordinary family circumstances or responsibilities may justify
23   downward sentencing departure); United States v. Johnson, 964 F.2d 124, 128-29 (2d
     Cir. 1992) (extraordinary family circumstances can be a valid reason for a downward
24   departure from sentencing guideline range); United States v. Pena, 930 F.2d 1486, 1495
     (10th Cir. 1991) (there may be extraordinary circumstances where family ties and
25   responsibilities may be relevant to the sentencing decision). Cf. Koon v. United States,
     518 U.S. 81, 94-95 (1996) (sentencing commission does not view discouraged factors as
26   necessarily inappropriate for departure but provides they should be relied upon only in
     exceptional cases).

27   [16] See, e.g., United States v. Shrewsberry, 980 F.2d 1296, 1298 (9th Cir. 1992);
     United States v. Rivera, 994 F.2d 942, 952 (1st Cir. 1993); and United States v. Alba,
28   933 F.2d 1117, 1122 (2d Cir. 1991).

convicted of a drug offense, the court departed downward from the usual guideline
sentence in circumstances where he had been living with a woman and her two children
and had developed a relationship with the son, James. The sentencing court had found
that James, who experienced abnormal aggression and school problems, reacted
positively only to the defendant. The psychologist's report reviewed by the court
indicated that Sclamo played a major positive role in James' therapy, that his presence
was necessary for James' increasing progress, and that removal of the defendant from
the family could trigger a major regression in James' stability and emotional
development. The psychologist recommended that the defendant be allowed to continue
to live at home where he could serve as a positive father surrogate. As a result, the First
Circuit agreed and, after reviewing the relevant case law concluded at page 972 that:

> precedents in which court shave departed downward are very
> much like this one in which there is evidence of an exceptional
> kind of relationship and an exceptional risk of harm . . . if that
> relationship is broken.

Finally, the court concluded that the defendant's relationship to James, despite him not
even being the biological father, was sufficiently extraordinary to sustain a downward
departure.

In the case at bar, the circumstances are far more compelling than those in
Sclamo. First, the Defendant Walther has been for 41 years the head of Janet Walther's
immediate family, a fact which undoubtedly strengthens her dependency on her husband
both physically and emotionally. Second, Janet Walther's condition is far more
physically delicate than the condition of James in Sclamo. Third, the defendant here is
responsible for more than being a positive role model and the possibility of a medical
emergency is constantly imminent. Fourth, the offenses committed by the defendant
here are considerably less serious than the drug offense in Sclamo. Fifth, the Defendant
Walther, independent of his family responsibilities, has been a 45-year community
contributor of remarkable proportions (see § V(4) infra) which contributions remain
ongoing. Sixth, it is beyond dispute that the extraordinarily family oriented defendant

21

here is neither a violent offender nor a narcotics danger (and, therefore, a far lesser risk of recidivism behavior than the defendant in <u>Sclamo</u>) and Henry Walther's financial and other affairs can be easily monitored by a probation officer and an appropriate court order.[17] As a result of the above, it is respectfully requested that this defendant be granted a downward departure because of his extraordinary family circumstances.

       b)    <u>The Loss Calculation Significantly Overstates the Seriousness of This Defendant's Involvement</u>

As detailed in Section III(a) of this memorandum, the appropriate loss calculation relating to this defendant's criminal behavior is just above $1,000,000. This loss figure results in a corresponding offense level calculation of 23 (a base of 7 plus a loss increase of 16). This offense level is then increased by a minimum of 6 levels because the offense involved in excess of 250 victims. The offense level is possibly increased even further by application of the additional enhancements suggested by the Government. Whatever the final advisory offense level, however, such significantly overstates the seriousness of the defendant's involvement in the underlying fraudulent activity.

Initially, it is noted that Application Note 19(C) to Guidelines § 2B1.1 recognizes that:

> There may be cases in which the offense level determined under this guideline substantially overstates the seriousness of the offense. In such cases, a downward departure may be warranted.[18]

In the case at bar, although the victims were numerous, virtually all losses were in extremely small amounts.[19] Because the victims were ostensibly gambling on a lottery payoff, it seems clear that virtually all would have lost their money in any event. As set

---

[17] It is noted that the defendant has been on supervised release for more than 2 years without adverse incident, had no prior criminal record, and has been assisting the Government since October of 2006.

[18] The "Background" section to the Application Notes supports this language in its recognition that "most fraud statutes cover a broad range of conduct with extreme variation in severity."

[19] The average amount appears to have been in the range of $18-36.

1 | forth in Section III above, Henry Walther never became aware that any lottery entry did
2 | not receive appropriate winnings and no evidence exists that they did not. The
3 | previously referenced e-mail traffic (Exhibit "E"), shows clearly that "prize money" was
4 | being disbursed on a regular basis. Other e-mail traffic shows Mr. Walther's practice of
5 | causing money to be returned to those who had complaints. Exhibit "C" indicates that
6 | despite admissions of improprieties by the mail fraud schemes real perpetrators, they
7 | insist that players received mathematically appropriate payoffs. As to the Defendant
8 | Walther, despite reaching the point where he began to question various of the
9 | representations being made to what he believed to be lottery players, it was the apparent
10 | fact that such players were receiving prize payouts which fact caused the defendant to
11 | continue his involvement as an accountant and check preparer. Correspondingly, the
12 | defendant was never made aware of the scope of the solicitation misrepresentations or
13 | the manner in which the lotteries were played, prizes determined, or even the precise
14 | roles or numbers of those involved in Europe and elsewhere. As a result, Henry Walther
15 | appears as no more than an aider and abettor who was himself affirmatively misled by
16 | the real fraud perpetrators. Against this background, it seems clear that the role of
17 | Henry Walther is significantly overstated by the offense level calculation recommended
18 | by presentence report and the United States Attorney's Office.

19 |     As the court is undoubtedly aware, there are numerous cases which have granted
20 | downward departures on equivalent bases. While the cases, of necessity, are fact
21 | intensive, the concept is basic. In United States v. Forchette, 220 F.Supp. 914 (E.D.
22 | Wis. 2002), for example, the defendant was convicted of participating in a fraud
23 | involving the submission of false insurance claims. The court found that the defendant
24 | did not know the true and complete nature of the fraud, that the substantial amount of
25 | the loss was retained by an associate, and that, accordingly, the amount of the loss
26 | significantly overstated the seriousness of the defendant's minor role in the scheme. In
27 | United States v. Desmond, 2008 U.S. Dist. Lexis 19602 (No. 05 CR-792-4, March 11,
28 | 2008), the defendant pled guilty and was sentenced for his involvement in a mail and

1 | wire fraud scheme relating to a multi-million dollar bid for a radiology contract at Cook
2 | County Illinois Hospital. At sentencing, the court found that:

> Desmond was an employee who followed orders of his
> supervisors and played no part in devising the fraud. . . . Nor
> did he have any part in negotiating the illegal side agreement.

5 | As a result, and citing conceptually similar cases, the court concluded that the offense
6 | level determined by the Guidelines substantially overstated the seriousness of the
7 | offense for that defendant. According to the court, "[t]his is particularly so when
8 | Desmond is compared to those who initiated, planned and provided the driving force
9 | behind the fraud. . . ." (emphasis added) To find otherwise, the court added, would lead
10 | to a "manifestly unjust result." The court then sentenced the defendant to a term of
11 | probation, including home detention, and community service.[20]

12 |       c)    Involvement of the Defendant's Son

13 |     Among the number of unique circumstances in this defendant's involvement in
14 | the activity which brings him before the court is the fact that he unwittingly brought his
15 | own son, Scott Walther, into that activity and his son was thereafter indicted.[21]  Scott
16 | Walther is 33 years of age, is single, and is employed at a Santa Barbara, California, law
17 | firm where he does accounting services as an "Enrolled Agent." Scott Walther suffers
18 | from Addison's Disease which, in Scott's case, is a complete degeneration of the adrenal
19 | glands which leave his body devoid of adrenaline. The disease is fatal unless closely
20 | monitored and requires twice daily doses of cortisone; the first, each morning, before
21 | Scott Walther is capable of performing even routine daily functions. In conjunction
22 | with his Addison's Disease, Scott Walther has a lymph node problem which has resulted

---

[20] In United States v. Corry, 206 F.3d 748, 751 (7th Cir. 2000), it was specifically recognized: "That the loss overstates the seriousness of the offense is . . . an encouraged basis for departure."

[21] Scott Walther was one of five defendants indicted in Case No. CR 07-00134 DDP which is a related case pending before this court. On or about March 7, 2008, due to the lack of evidence against Scott Walther, supported by the exculpatory statements related to him by those who were culpable (see Exhibit "C"), on motion of the Government, the indictment was dismissed against Scott Walther.

1   in a growth so near to his spinal cord that it is presently inoperable. Surgery was
2   attempted in 2004 but was unsuccessful due to the danger from the spinal cord
3   proximity. The growth has been closely monitored, and continues to be, since the time
4   of the attempted surgery. The prognosis is unknown.

5      Defendant Henry Walther, since his son's graduation from college, has attempted
6   to assist his son by referring him work whenever possible. Shortly after beginning to do
7   banking and accounting services for Dennis Emmett and James Ray Houston, the
8   defendant, in an effort to provide Scott with extra income, enlisted him to handle a
9   portion of the routine accounting and banking work. Scott had virtually no other
10  involvement with the purported lottery business and followed instructions from his
11  father. As noted above, when Defendant Henry Walther began doing accounting and
12  banking work, for what were his clients, he had no knowledge that the business was
13  being run in a fraudulent manner. The point at which he introduced his son to the
14  business was some half-dozen years before Henry Walther became aware of facts which
15  indicated to him that the lottery business was not as represented. The fact that his son,
16  at one point, was a defendant due to Henry Walther's efforts to do no more than help
17  him, has caused Mr. Walther to suffer far greater moral anguish and remorse than is
18  typical.

19     This was precisely the case as in United States v. Monaco, 23 F.3d 793, 801 (3d
20  Cir. 1994), where the defendant was involved with accounting/billing improprieties to
21  the Department of Defense. In discussing the atypical anguish and remorse experienced
22  by the defendant for "unwittingly mak[ing] a criminal of his child" the court specifically
23  reasoned that in the facts of the case before it where the defendant was a productive
24  member of society and a non-violent offender, "it is entirely probable that Monaco never
25  intended to criminalize his son and was deeply and legitimately shocked and remorseful
26  when it happened." As a result, the court found a downward departure appropriate.

27     The instant case is surprisingly akin to that in Monaco where, at page 801 n. 13
28  the panel noted:

1
2
3

> We have no doubt that Monaco himself knew what he was
> doing was wrong. It is quite possible, and would not be
> entirely surprising, that Monaco had no idea that the favor he
> asked of his son would cause the son to be convicted of a
> federal felony.

4  In Monaco, the defendant asked his son to prepare false labor sheets which Monaco then
5  submitted to the Department of Defense. In the current case, the Defendant Walther
6  never asked his son to do anything inappropriate. Accordingly, Henry Walther is far
7  more deserving of receiving a downward departure for unwittingly involving his son in
8  a federal crime than the defendant in Monaco.

9        d)    The Defendant's Extraordinary Charitable Activities

10        As the court may know, there exist cases such as United States v. Woods, 159
11  F.3d 1132, 1136-37 (8th Cir. 1998), which have found a defendant's charitable activity
12  to be a basis for a downward departure when that activity can be characterized as
13  "exceptional."[22] In Woods, the defendant was awarded a departure for his care of two
14  young women; one of whom was a school drop-out who could not live at home, and the
15  other who was facing legal problems for theft. The defendant was also caring for an
16  elderly friend who resided in a nearby apartment. The court found these charitable
17  activities to be exceptional and granted a downward departure. The Defendant
18  Walther's past and ongoing community contributions summarized here and in attached
19  Exhibit "I," are a universe in excess of those applied in Woods, as well as those noted in
20  accompanying footnote 22. In fact, they well surpass the combined contributions of all
21  these cases. To say that Henry Walther has been, and continues to be, a special
22  community asset is to vastly understate his impact. While raising a family of three
23  children and caring for a wife with severe medical needs, and nurturing a full-time law
24  practice, Henry Walther has for some 30 years regularly devoted as many as 40 hours a

25

26  [22] Departures on the basis of charitable work, when granted have sometimes been
27  considerable. See United States v. Serafini, 233 F.3d 758 (3d Cir. 2000) (3 level
    downward departure); United States v. Crouse, 145 F.3d 786 (6th Cir. 1998) (departure
28  from 30 to 37 months imprisonment to 12 months probation); United States v. DeMasi,
    40 F.3d 1306 (1st Cir. 1994) (downward departure of 29 months).

1  week (a virtual second job) to community projects. Even today, despite the ever-

2  increasing support needs of his wife Janet, he still averages some 8 to 10 hours per week

3  assisting community projects and requests whenever and wherever he is needed. The

4  discussion below, and attached Exhibit "Q," speak to many of Henry Walther's

5  contributions which are literally too voluminous to adequately cover.

6      Henry Walther originally began his community involvement during the mid-

7  1960s when he participated in a project helping developmentally disabled children at the

8  Deverox School for such children in Goleta, California. With various friends from his

9  college fraternity he became a type of big brother to handicapped kids who were taken

10  to ballgames, local restaurants, the beach, and special events. Following his graduation

11  from law school, such projects literally took over his life.

12      Since 1952, Henry Walther has been a member of the Brentwood Presbyterian

13  Church. He currently sings in the church choir as a tenor. From 1969 until 1973 he was

14  a College Group advisor and sponsor for young church members who were capable of

15  college work but needed motivational lifts in fulfilling their potential. In 1971 and 1972

16  he participated in extended work trips (sponsored by the church) to Tijuana, Mexico, to

17  build housing for the needy in that city's "cardboard city" neighborhood. In the 1980s

18  and 1990s, he was a member of the Church Endowment Fund Committee and authored

19  the Church Endowment Trust. He still remains an advisor to the Committee and is

20  called upon on a regular basis.

21      From 1972-1980, Henry Walther was a member of the Santa Monica Jaycees, an

22  organization which is a young adult group for leadership development through

23  community service. He was president of the Santa Monica Jaycees in 1975-76. While

24  active in that group he helped annually to organize and conduct the annual Huck Finn

25  Day which provides fishing and games for community children. Mr. Walther today

26  continues to donate his home for the planning sessions for this event and its

27  accompanying fish fry. His activities while an active Santa Monica Jaycee included

28  visits to the Terminal Island Federal Correctional Institution to conduct special

27

programs with inmates, and the chair of a host of special community events including a program with the Lions Club which recognized the Santa Monica area's Outstanding Young Educator. He was the chairman of the Jaycees' annual night honoring Santa Monica's Boss of the Year. Henry Walther himself was voted the Outstanding First Year Jaycee (District 7) in 1973, the Outstanding Jaycee of California in 1974, and received the Distinguished Service Award in 1975 for exceptional service in Santa Monica.

In 1974, at the request of California Western Law School, he co-authored an article entitled "Inflation and the Progressivity of the Federal Income Tax" which was published in the school's law review.

From 1976 to 2007, Henry Walther was a member of the Santa Monica Rotary Club, an international service organization involved extensively in education-oriented activities such as the sponsoring of student exchange and providing scholarships to the less privileged. Among this club's latest projects was the raising of funds for the construction of a desalinization plant in a small town in the Bahamas where safe water no longer existed due to recent years' hurricanes. As a Rotary member, Henry Walther has also done such things as 10 years of ringing bells and manning Salvation Army Kettles to raise money during the Christmas season and directly participating in numerous fund raisers for local college scholarships. He served as the organization's Vice-President of Programs in 2004 and 2005, as Treasurer in 2003 and 2004, and as Director in 1986 and 1987.

Henry Walther is an active adult leader in Boy Scouts of America. He became an Assistant Scout Master in 1990. From 2000-2007 he has been a member of the Troop Committee (Troop 223 in Pacific Palisades) which sets policy for approximately 120 Scouts and 40 Assistant Scout Masters. He donates the use of his home on Saturdays during the month of June each year to another Pacific Palisades Boy Scout Troop for life saving and swimming merit badges and is active in a program which teaches non-swimmers to swim.

28

1    At Pacific Palisades High School, during 1992-2004, Henry Walther was a

2 member of the school swim team support and fundraising group.  He also volunteered

3 his services to help handle the scoring at Pacific Palisades High School swim meets and

4 to serve as the swim team's statistician.  He hosted team events at his home and

5 personally made a number of financial donations to the otherwise underfunded Pacific

6 Palisades Charter School swim team.  During 1990 until 2003, Henry Walther served on

7 the Pacific Palisades Family YMCA swim team Adult Advisory Committee.

8    The Henry Walther support for the University of California at Santa Cruz swim

9 team from 2003 until the present is also noteworthy.  Because college athletic programs

10 such as swimming are not self-sufficient like football and basketball, such survive only

11 on the contributions of those like Henry Walther.  Since 2003, Henry Walther has made

12 his home available, and arranged for neighbors to do the same, for the student

13 participants and coaches of the UCSC swimming and diving teams (up to 47

14 individuals) for free room and board while the team participates in the two major swim

15 competitions held each year; the California Speedo Cup and the PCSC conference

16 championships.

17    Henry Walther's wife, Janet, is a member and past President of the Los Angeles

18 Founders Chapter of the National Charity League.  Mr. Walther serves annually on the

19 Men's Floor Committee which supports the annual Coronet Debutante Ball honoring

20 young Southern California women who have provided a minimum of six years of

21 volunteer service to the community.  Henry Walther regularly makes his office available

22 for NCL and Coronet Debutante Ball Board meetings which take place 10 or more times

23 per year.  He also provides complimentary business and financial service to NCL

24 whenever called upon which is not infrequently.

25    Henry Walther also volunteers service to the Pacific Palisades Family YMCA.

26 He plans fund raising events and personally has arranged and coordinated YMCA swim

27 meets and serves as a scorer and works on the set-up/take-down crew.  He provided free

28 legal services to the Pacific Palisades YMCA during its real property purchase in

1  Temescal Canyon at Sunset Boulevard to further its expansion. His help was significant
2  in assisting the YMCA to acquire Simon Meadows.

3      Henry Walther has been even more involved in assisting the Santa Monica Family
4  YMCA. At that location, he plans and participates in fund raising activities generally, as
5  well as in its annual sustaining drive. He has been a member of that YMCA's Men's and
6  Women's Breakfast Club since 1972. In 1984 he was that YMCA's Board of Directors'
7  President and is a former trustee of the YMCA Endowment Committee. He is also a
8  current member of the Advisory Board and, on a complimentary basis, consults for the
9  YMCA's yearly non-profit organization tax returns. Henry Walther's time commitment
10  at the Santa Monica YMCA alone averages no less than a dozen hours each month.

11      Henry Walther for over 30 years has been a significant blood donor, and is now a
12  member of the Santa Monica Red Cross's "10 Gallon Club" and a universal donor. On
13  over 100 occasions he has responded to that organization's specific and sometimes
14  urgent requests to him as he has a rare type of blood, O Negative (Quad), which is
15  necessary for many infants who are unable to use other blood types.

16      During the 1970s and 1980s, Henry Walther was a leader in fund raising efforts
17  for the Marquez Elementary School and Paul Revere Middle School and a member of
18  their booster clubs. He was an AYSO soccer coach in the 1980s. At Paul Revere
19  Middle School he led a committee which conducted a massive clean-up and restoration
20  of an on campus land parcel in order that students and classes could be involved in
21  agricultural projects.

22      Henry Walther, since 1984, has been a member of Riviera Lodge 780 of the Free
23  and Accepted Masons, a fraternal non-profit organization which does charitable work in
24  Southern California, provides educational scholarships, conducts childrens' functions,
25  and sponsors a float in each year's Pacific Palisades Fourth of July parade.

26      Henry Walther is currently the alumni treasurer of UCSB Phi Kappa Psi
27  Fraternity which services are donated annually. Similarly, for years he has done

28

1   volunteer tax and legal work for those of limited means who he has met through
2   organizations such as the National Charity League.

3       Last but not least, Henry Walther (and his wife Janet) have charitably contributed
4   to the community in ways which were not generally known and for which no
5   recognition has ever been asked. The Walthers have, over the years, made their home
6   and/or resources available to four young individuals, at least two of whom had nowhere
7   to turn and were on the verge of losing hope. Peter Hopelain was a young man
8   abandoned by his parents. Henry Walther took him in, provided him with room and
9   board, helped him through school, and he is now steadily employed at a local car
10  dealership. Ruffin Settle had attention deficit disorder and a drug abuse problem, his
11  father had left home, and his mother had kicked Ruffin out. Henry Walther took him in,
12  gave him room and board, still counsels him regularly, and today Mr. Settle is residing
13  on his own in Santa Monica having kicked his abuse of narcotics and recently recovered
14  from unrelated medical issues. Susan Hodges was a talented swimmer at Palisades
15  High School who did not reside close to the campus. Her parents were unable or
16  unwilling to transport her to and from the daily swim team practices. The Walthers
17  extended Ms. Hodges both room and board in their home in order that she could
18  participate and compete with her friends on the swim team as well as participate in other
19  school activities. Subsequent to Ms. Hodges, until 2007, Ashley Lambert was taken in
20  by the Walthers. She is the talented daughter of a friend of Henry Walther and Ashley's
21  dream is to become an actress. She had no funds other than those for her acting classes.
22  Once more, Henry Walther provided room, board, and encouragement in order that a
23  young and needy individual of potential can have a fair chance to get ahead in the
24  world. Mr. Walther and his wife recently attended one of her initial professional
25  performances at a nightclub venue in Santa Monica. Letters to the court from Mr.
26  Hopelain, Mr. Settle, and Ms. Lambert are attached hereto as Exhibit "J."

27      The tributes to this defendant in attached Exhibit "K" for his other charitable and
28  more than 20 years of enduring community service tell legions about this defendant.

1    Long time community resident Cheryl Kling, for example, says just this in her letter to

2    the court: "Henry Walther's generosity through his community support speaks to his

3    character." There are few in the community who are characterized as a "Man For

4    Others" or as a "rare treasure" when it came to unselfish and voluntary community

5    service.[23] It is beyond question that the charitable and community contributions of

6    Henry Walther, while simultaneously addressing the plethora of family medical issues

7    set forth in this memorandum, are far beyond those of even the most exceptionally

8    motivated community oriented citizens. His extensive and continuing charitable work

9    can easily be judged to be at least, if not far more, as beneficial to long-term societal

10   interests than virtually any case or combination of cases in the <u>Woods</u> line of downward

11   departure deserving decisions. Accordingly, this factor, against the background of the

12   defendant's limited involvement in the fraud at issue here, and in conjunction with his

13   extraordinary family circumstances and all those points raised in this memorandum,

14   would seem to well justify serious departure consideration for extraordinary community

15   contributions.

16        e)    Combination of Factors

17        While the individual factors discussed above themselves individually provide

18   recognizable bases for downward departure, their combination sets forth a scenario

19   miles outside the heartland of normal circumstances typically involved in fraud cases.

20   This combination presents a compelling case for a substantial downward departure. A

21   combination of factors has long been recognized in this circuit as an appropriate ground

22   for departure.[24] Interestingly, in <u>United States v. Rioux</u>, 97 F.3d 648 (2d Cir. 1996),

23

24        [23] See the correspondence from Attorney Michael K. Lanning and Mrs. Stanley
     Vogel, included in attached Exhibit "K." The Lanning and Vogel letters are the initial
25   two contained in the exhibit.

         [24] See United States v. Cook, 938 F.2d 149 (9th Cir. 1991). See also U.S.S.G.
26   § 5K2.0 Commentary – In United States v. Gonzalez-Bello, 10 F.Supp.2d 232 (E.D.N.Y.
     1998), the court explained:
27

28             Because the Commission operated at a distance from individual cases,
               there is an inevitable clumsiness in its guidelines. Even with all their

                                        32

where the sentencing court had granted a <u>10 level</u> downward departure to probation, the Second Circuit found that a permissible part of a continuation of factors justifying a downward departure may well include charitable contributions. According to the court, at page 663, civic, charitable and public service and similar good works are relevant in determining whether the defendant should receive a downward departure in extraordinary cases when they combine to create a situation that "differs significantly from the heartland of typical cases covered by the Guidelines." In the instant case, the sum of the factors discussed throughout this memorandum group establish a far stronger combination of factors than in any of the cases set forth in this memorandum or in virtually any decisions which have granted downward departures on this basis. As a result, once more it appears that a truly substantial downward departure is justified for this defendant.

## VI.

## **RESTITUTION/FINE**

As the court undoubtedly knows, Sentencing Guidelines § 5E1.1(b)(2)(B) holds that restitution need not be ordered in circumstances, like here, where:

> determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process.

Such appears to be the situation in the present cause. In the case of the Defendant Walther, his criminal culpability attaches primarily to those who entered the advertised lottery pools through solicitations initiated by Dennis Emmett, Sonny Vleisides, and his father James Ray Houston. Not only are the majority of the customers' names and/or addresses not identifiable, but even as to those who are, the losses were primarily in

---

> complexity, the guidelines do not and can not account for all the factors, and combinations of factors, that are properly considered at sentencing. The departure mechanism acknowledges this in determining whether the defendant should receive a downward departure in extraordinary cases when they combine to create a situation that differs significantly from the heartland of typical cases covered by the Guidelines.

33

1  such small dollar amounts, between $18 and $36, that the burden of determining actual
2  losses (many players received paybacks identified as winnings) and implementing
3  resulting restitution payouts to tens of thousands of individuals would appear to be
4  realistically unworkable and far from economically prudent. For these reasons, the
5  instant prosecution is an appropriate case in which to not impose restitution pursuant to
6  § 5E1.1(b)(2)(B). Such is, in fact, the identical conclusion reached by the U.S.
7  Probation Office in numbered paragraph 122 of the presentence report. Counsel notes
8  that the court has also previously reached this conclusion in this case when considering
9  the issue of restitution as to the scheme participant William Cloud at the time of Mr.
10 Cloud's sentencing on July 6, 2009. The same considerations, if not even more complex
11 ones, are in play with the Defendant Walther.

12      As to the fine recommended in the presentence report, it is merely noted that the
13 Guidelines advisory fine amount depends on the court's determination of a final offense
14 level. An offense level of 26 sets forth an advisory minimal fine of $12,500. An offense
15 level of 29, 30, or 31, sets forth advising minimal fine of $15,000. Additionally,
16 equitable considerations also appear relevant. The defendant has already spent some
17 $20,000 or more in documentable funds from his own pocket in attempting to assist the
18 Government. These expenses are primarily the result of travels to Costa Rica with his
19 counsel, and for his counsel's travels to Italy, to Costa Rica (twice), and to Mexico in
20 order to obtain information for the Government and to attempt to locate the most
21 significant of the participants in the fraud scheme. The Government does not dispute
22 these expenditures. It would seem that some credit for such explanation would be
23 clearly appropriate. Further, the defendant has now suffered a felony conviction, has
24 been forced to give up his law license, and, prior to this cause, had a pristine
25 background with incredibly substantial contributions (discussed above) made to the
26 community. This being said, it is clear that the defendant is financially able to pay a
27 fine should the court impose one.

28

34

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## VII.

## **CONCLUSION**

The defendant is a personable, intelligent, 65-year-old family man who has never before found himself involved in criminal activity of any type. He is both contrite and highly self-punishing for his lack of judgment in not coming forward when he realized he had inadvertently become involved in his clients' scheme. Henry Walther is neither a drug user nor a smoker, and is only a social drinker. He has been happily married for more than 41 years to Janet Johnson, has a daughter Kristin Chapin (36) and two sons, Scott (33) and Gregory (25) and was blessed with his first grandchild (a grandson) on November 11, 2009. The defendant has a strong history of positive community involvement and attends to extraordinary family circumstances including life threatening medical problems for both his wife and oldest son. Attached Exhibit "K," from those who know him best, speaks volumes about his character. He is described as having helped many citizens "to lead more productive and safer lives," as someone who has the "immense respect of community leaders," as someone who has demonstrated "the highest level of integrity and honesty," as someone of "excellent character and family values," as a man who is "stellar," and as one "who does not belong in the criminal justice system." Former 23-year Los Angeles Deputy District Attorney and current L.A.P.D. Reserve Specialist John Wilson states that "If ever there was a man that deserved special consideration in sentencing, it is Hank." Henry Walther is clearly no threat to be a repeat offender. He has cooperated with the Government extensively and expended his own considerable funds to do so and such has resulted in the guilty pleas of two of the scheme's principal participants and one of their associates. His cooperation will undoubtedly continue once the remaining defendant is ultimately returned to the United States for trial. No realistic purpose would be well served by the incarceration of Henry Walther.

For all the reasons set out above, it is respectfully requested that the court fashion a sentence which is a reasonable alternative to imprisonment. This defendant does not

35

need to be incarcerated.  One cannot imagine a better candidate for probation than Henry Walther.  Allowing him to continue the needed care for his wife, and to continue his virtual lifetime of community service, is the resolution most beneficial to society. Hank Walther can be supervised by the criminal justice system for whatever period the court views as appropriate.  The defendant's personal correspondence to the court is attached as Exhibit "L."

Dated:  November 18, 2009                    Respectfully submitted,

                                             LAW OFFICES OF JAMES D. HENDERSON

                                             By _____
                                                James D. Henderson
                                             Attorneys for Defendant HENRY WALTHER

# JACK TRIMARCO
## & ASSOCIATES
## POLYGRAPH / INVESTIGATIONS, INC.

*When you need to impress someone with the truth...*

9454 Wilshire Blvd., 6th Floor
Beverly Hills, CA 90212
**(310) 247-2637**
email: jtrimarco@aol.com
www.jacktrimarco.com

CA P.I. # 20970

Edward I. Gelb, Ph.D.
Los Angeles, California

———

Ronald W. Hilley
San Francisco, California

———

Ronald R. Homer
San Francisco, California

———

Richard W. Kiefer
Orlando, Florida

———

William K. Telgen
Dallas, Texas

———

Kenneth A. Vardell
Boulder, Colorado

Mr. Trimarco was the Program Manager for the Federal Bureau of Investigation Polygraph Unit at the Los Angeles Field Office from 1990 until his retirement in 1998 as a Special Agent after 21 years of service. He is the former Inspector General for the Department of Energy Polygraph Program (2000-02) and is currently a member of the Board of Directors and Chairman of the Ethics Committee, California Association of Polygraph Examiners (CAPE). Mr. Trimarco is nationally known and respected for his success as a polygraph examiner. Following his training with the Department of Defense and the F.B.I., he has conducted more than 2,500 polygraph examinations throughout the world.

Among cases when he consulted, or actually conducted polygraph examinations were the Oklahoma City Bombing; The "Unabomber", Campaign Contributions to the Democratic National Committee, Dr. Peter Lee Espionage Case, Marquisha Candler Kidnap/Murder, Rosemary Banuelos Kidnap/Murder; Assassination of DEA Agent Enrique Camarena in Mexico, "Whitewater"; the Dr. Wen Ho Lee Espoinage Case; J.D.L. Odeh Bombing Death; and the World Trade Center Bombing (1993).

During his F.B.I. career, Jack Trimarco also specialized as a Psychological Profiler working with noted author and former head of the F.B.I.'s Behavioral Science Unit, John Douglas. Assistance offered included unknown offender profiles, threat assessments, overall crime analysis, trial strategies, and expert testimony.

Jack Trimarco is recognized as an expert in the field of Polygraphy, Interviewing/ Interrogation. He has taught more than 60 seminars on these topics throughout the United States and has conducted training for the F.B.I. Academy, C.I.A., U.S. Attorney's Office, U.S. Department of Justice, I.N.S., American Polygraph Association (A.P.A.), California Association of Polygraph Examiners (C.A.P.E.), American Association of Police Polygraphists (A.A.P.P.), the Department of Defense Polygraph Institute (D.O.D.P.I.), and many other state and federal governmental law enforcement agencies.

**EXHIBIT** _A_
**PAGE** _37_

| **MAJOR CASE INVOLVEMENT** | Dr. Wen Ho Lee Espionage Case; The "Unabomber"; "Whitewater"; Oklahoma City Bombing; World Trade Center Bombing (1993); numerous cases involving classified foreign terrorists and espionage. "Fed buster"; Princess Cruises Extortion; Gerald Gallegos Serial Killer; Bank of America, Davis, CA hostage standoff; V.A. Hospital, Brentwood, CA hostage standoff; Enrique Camarena assassination; Top 10 fugitive, Claude Dallas; Top 10 Fugitive, Daniel Barney; Charles Keating Fraud Investigation; Bombing of Pan Am Flight 103; Dr. Peter Lee Espionage Case; L.A.P.D. Rampart Scandal. |
|---|---|

| **POLYGRAPH EXPERIENCE** | Former Inspector General, Department of Energy Polygraph Program, Polygraph Unit Chief, F.B.I. Los Angeles Field Office 1991-1998. Conducted more than 1100 polygraph examinations in connection with F.B.I. investigations. Selected by the U.S. Department of Justice and the F.B.I. to conduct polygraph examinations in sensitive intelligence matters and criminal investigations throughout the U.S. and abroad. Formerly held top-secret security clearance. Established private practice in 1998. Conducted more than 60 seminars/presentations on interviewing/interrogation and polygraph related matters throughout the United States. Conducted training at the F.B.I. Academy, C.I.A., and U.S. Justice Department. |
|---|---|

| **POLYGRAPH TESTIMONY AS AN EXPERT WITNESS** | California vs. Renee Lloyd (1993) State of California Superior Court, Rancho Cucamonga, California; U.S. vs. Noe Orozo Viveros (1994) U.S. District Court, Central District of California; U.S. vs. Samson Gillette (1999), U.S. District Court, Central District of California; California vs. Catarino Gonzales (2001) State of California; Superior Court, Los Angeles; State of California vs. Gary Bearman (2003) Superior Court Orange County. |
|---|---|

| **PROFESSIONAL MEMBERSHIPS** | California Association of Polygraph Examiners (CAPE) Board Member, Chairman of the Ethics Committee; American Board of Forensic Examiners, American Polygraph Association (APA); Advanced and Specialized Polygraph Examiner (AAPP); American Association of Police Polygraphists, American Academy of Forensic Sciences, Diplomat, Board Certified Forensic Examiner of the American Board of Forensic Examiners, American College of Forensic Examiners- Lifetime Member, American Society for Testing and Materials (ASTM), National Association of Legal Investigators (NALI), Society of Former Special Agents of the Federal Bureau of Investigation, California Association of Licensed Investigators (CALI), Ventura County Bar Association, Orange County Bar Association, Los Angeles County Bar Association, San Fernando Valley Bar Association, Professional Investigators of California Association (PICA), and Criminal Courts Bar Association (sustaining member). |
|---|---|



EXHIBIT A

PAGE 38

**EDUCATION**

Montana State University at Billings, B.S., Psychology, 1976, High Honors; Montana State University at Billings Graduate School, Psychology (1977); Jacksonville University, Jacksonville, Alabama, attended Graduate School, Psychophysiology, 1990 (no graduate degrees).

**EMPLOYMENT**

United States Air Force (USAF), 1967-71; USAF "Airman of the Year" – Italy, 1968; Yellowstone County Sheriff, Billings, Montana, Patrolman 1971-1973; Detective 1973-78; Federal Bureau of Investigation, Special Agent, 1978-1998; Received numerous commendations for exceptional performance. Nominated twice for F.B.I. Medal of Valor; F.B.I. Polygraph Unit Chief (Los Angeles-Retired); Former Inspector General, Polygraph Program, U.S. Department of Energy-Office of Counterintelligence; Ventura County District Attorneys Office (Forensic Polygraph Examiner); Certified Polygraph Examiner (APA); California State Private Investigator #20970; Ventura County Public Defenders Office, Ventura County Sheriffs Department, Orange County Public Defenders Office, U.S. Attorney's Office, (Central District of California); Federal Public Defender's Office (Central District of California), Oxnard Police Department..

**AREA OF EXPERTISE**

F.B.I. Polygraph Examiner; F.B.I. Hostage Negotiator, F.B.I. Psychological Profiler F.B.I. Defensive Tactics/Firearms Instructor; F.B.I. S.W.A.T. Team Member; F.B.I. Interrogation Instructor and Homicide Investigation Instructor.

**POLYGRAPH TRAINING**

Department of Defense Polygraph Institute, 14-week polygraph course. Attended 49 polygraph training seminars conducted by the F.B.I. or professional polygraph organizations within the United States. Instructed at numerous Federal, State and Local Agencies, National and State Polygraph Associations, private and professiona groups.

**MEDIA EXPERT APPEARANCES**

Over one hundred appearances on national T.V. to include: Dr. Phil, Oprah, Greta Van Sesteran, Nancy Grace, The O'Reilly Factor, Hannity & Combes, Catherine Crier, Good Morning America; (Diane Sawyer) et al.

EXHIBIT____A____

PAGE ____39____

*When you need to impress someone with the truth...*

# JACK TRIMARCO
## & ASSOCIATES
## POLYGRAPH / INVESTIGATIONS, INC.

9454 Wilshire Blvd., 6th Floor
Beverly Hills, CA 90212
**(310) 247-2637**
email: jtrimarco@aol.com
www.jacktrimarco.com

CA P.I. # 20970

January 23, 2007

Edward I. Gelb, Ph.D.
Los Angeles, California

Ronald W. Hilley
San Francisco, California

Ronald R. Homer
San Francisco, California

Richard W. Kiefer
Orlando, Florida

Joseph A. Kenny
Charlotte, N. Carolina

William K. Teigen
Dallas, Texas

Kenneth A. Vardell
Boulder, Colorado

James D. Henderson, Esquire
1919 Santa Monica Blvd. #210
Santa Monica, CA  90404-1970

**Re:  Polygraph Examination of Henry Walther, conducted on January 22, 2007 at Beverly Hills, California.**

Dear Mr. Henderson:

Pursuant to your request, I conducted Psychophysiological Detection of Deception (PDD) Test (polygraph) with the Examinee, Henry "Hank" Walther.  The following is a synopsis of the case, as I understand the facts presented to me:

The Examinee, an attorney, has represented Dennis Emmett, James Ray Houston (aka Rex), and Rex's son who goes by the name of Sonny Velisides (phonetic).

These individuals all reside in Costa Rica and have been purportedly running a lottery business for approximately 16 years. The concept of the business was to mail solicitations to individuals throughout the United States, pool the money sent in by the customers, and play various lotteries around the world.  The U.S. Attorney's office in Los Angeles is investigating this matter as a fraud based on misrepresentations in the mailed solicitations and in the manner in which the funds received were actually handled; that is, the Government believes that it is essentially a ponzi scheme. The Examinee has indicated that he represented the referenced individuals beginning in about 1990 and began doing at least a part of their accounting and banking at about 1998.  The Examinee says that when he became involved with the accounting and banking he did not know that fraudulent conduct by his clients was involved and this was why he agreed to become involved with their financial

EXHIBIT _B_

PAGE _40_

manners. The Government apparently believes that the Examinee knew of and participated in the fraud from its inception. The Examinee strongly denies that claim.

At the conclusion of the pre-test interview, an acquaintance test was conducted. The test was designed to demonstrate to the Examinee and to me that he was a suitable subject for a Psychophysiological Detection of Deception (polygraph) test. Adequate recordings of the Examinee's physiology were obtained during this procedure, and the examination continued. A comparison question test was then conducted using the methods developed and validated at the Department of Defense Polygraph Institute (DODPI).

### Health Statement:

The Examinee claimed to be in good health but does take the prescribed medication Vitorin (mg?) to control cholesterol.

The Examinee further advised that he was in no pain or discomfort at the time of the test. He further claimed to have had approximately 6 hours of sleep during the night of January 21st, 2007.

The examination was conducted on January 22, 2007, utilizing a Lafayette Diplomat I Polygraph Instrument calibrated routinely to factory specifications.

The Examination was video-recorded with the permission of the Examinee.

The technique utilized during the PDD Examination was the standard "Zone Comparison", more specifically identified as the "you phase". The polygraph charts were evaluated numerically, utilizing a 3-point scale. An overall evaluation of -4 is indicative of deception and a score of +4 or higher is evaluated as no deception indicated (truthful). Further, an evaluation of a −3 at any spot (specific question) is indicative of deception

Series I included the following relevant questions, which were reviewed with the Examinee prior to testing:

> A. *Did you know in 1998 that the lottery business was fraudulent?*
> *(Answered: No)*

> B. *Did you know in 1998 that the lottery business run by Dennis, Ray and Sonny was fraudulent?*
> *(Answered: No)*

2

EXHIBIT $\mathcal{B}$

PAGE 41

**_Evaluation:_**

The total cumulative score for Series I relevant questions "A" and "B" is +10 (vertical scoring, 3 charts).

**_Opinion:_**

The results of the Series I examination indicate that Henry Walther was telling the truth when he answered the relevant questions above.

On January 22, 2007, the polygraph charts collected during this examination were faxed to former FBI Special Agent Ron Homer. Mr. Homer was an FBI Polygraph Examiner for ten years assigned to the San Francisco Field Office. Mr. Homer is the past chairman of the ethics committee, California Association of Polygraph Examiners. Mr. Homer determined numerically that the Examinee was non-deceptive.

If I may be of any further assistance, please do not hesitate to contact me.

Sincerely,

Jack Trimarco
Jack Trimarco & Associates

3

EXHIBIT _B_
PAGE _42_

## DECLARATION OF JAMES D. HENDERSON

I, JAMES D. HENDERSON, declare:

The statements set out below in this declaration are true and accurate to the best of my knowledge and belief. If called to testify in this matter I could, and would, testify accurately thereto.

1.     I am an attorney-at-law duly licensed in the State of California and have been counsel for the Defendant Henry Walther since we learned of the underlying investigation in 2006 until the present day.

2.     As a part of my representation of Henry Walther, I conducted a series of interviews both in person and over the telephone with James Ray Houston, Dennis Emmett, Sonny Vleisides, William Cloud, and Glenda Emmett. Various written summaries of those interviews have been attached to this memorandum (the sentencing memorandum of Defendant Henry Walther) and each of these summaries accurately sets forth the substance of the interview reflected and the statements made to me by the individual being interviewed.

The above statements in this declaration are made under the penalties of perjury of the laws of the United States.

Executed this 18th day of November, 2009.

James D. Henderson

**EXHIBIT** _C_

**PAGE** _43_

## MEMORANDUM TO FILE

Subject:     7/8/06 Meeting with James Ray Houston (Rex) and Sonny Vleisides
             (Houston's son)

On July 8, 2006, I met with James Ray Houston (Rex) and his son – Sonny

Vleisides at the temporary bar in the Intercontinental Hotel in San Jose, Costa Rica. The

meeting lasted for approximately 45 minutes. The meeting had been prearranged for me

by Hank Walther. I informed Mr. Houston and Mr. Vleisides that I was there as Hank

Walther's attorney and was attempting to gather facts and information in view of the

ongoing federal criminal investigation in Los Angeles. Mr. Houston offered that meeting

with me was against his better judgment but that they wanted to get information from me

as to what was happening in the investigation in Los Angeles. I responded that the only

real information that I had was that the investigation was in progress and that I didn't

believe it was going away. I said I would be having specific conversations with those

running the investigation when I learned more of the facts and could intelligently respond

to the Government's inquiries. I added that Hank Walther had informed me that they

(Rex and Sonny) were the ones who had all the information and could best help me with

specific facts. I explained that I believed the inquiry could become essentially a

gambling investigation due to the fact that that type of lottery business which my client

was describing to me might be considered illegal in the United States. I also offered that

because the I.R.S. was involved in the investigation that tax returns would undoubtedly

be looked at. I also noted that possible fraud was also being alleged.

At the outset, Mr. Houston stated that if anything was wrong with the business, it

was he who should take responsibility as it was he (Houston) who had set it up even

**EXHIBIT** _C_

PAGE _44_

1

though his son was now running it due to his (Houston's) medical condition. (It is noted that Houston arrived at the meeting in a wheelchair, did not look well, informed me that he was feeling sick, and appeared to periodically nod off during our meeting.) Houston described the operation as a lottery business which pooled the plays of customers who were solicited from mailing lists obtained from companies which sold and rented such lists on the open market. Mr. Houston then asked why the government was investigating fraud when no customers were ever cheated. I responded that apparently they believed that customers might have been cheated or misled to encourage their involvement. Neither Mr. Houston nor Mr. Vleisides responded to this statement.

I next asked if either Mr. Houston or Mr. Vleisides was aware of the United States statute which prohibited lottery advertisements and both stated that they were not. Mr. Houston commented that the business was specifically set up to play <u>foreign</u> lotteries so as not to violate U.S. gaming laws. He explained that this was the reason customer entries were directed to Europe. At this point, I inquired as to what part Henry Walther played in the business and was informed by Mr. Houston that it was "negligible." Houston described Hank Walther's role as merely providing occasional legal services which were not substantial and, for the past several years handling American accounting and banking. Houston stated that Hank Walther was uninvolved in the day-to-day operations of the business, that he was just a lawyer and accountant, and that he had not been made aware of the foreign details of how the business was actually run. At this point, Mr. Houston commented that he was still not feeling well and that he needed to go. I thanked both he and Sonny Vleisides for taking ten minutes to speak with me and inquired of Mr. Vleisides as to whether he could provide me with any written materials



EXHIBIT ___C___

PAGE ___45___

2

which described exactly how the business was run. Mr. Vleisides responded that he could and would drop off the materials at the hotel on the following day or, if necessary, he would e-mail them to me. I gave both Mr. Vleisides and Mr. Houston my business card.

I then asked both Mr. Houston and Mr. Vleisides if they would be willing to come to the United States and explain how the business operated as well as Hank Walther's minimal knowledge and involvement in it. Both responded that they would not.

EXHIBIT _C_

3    PAGE _46_

## MEMORANDUM TO FILE

Subject:        10/2/06 Interview of Sonny Vleisides/Notes

On October 2, 2006, Henry Walther and I traveled from San Jose, Costa Rica, to Monterey, Mexico, where we were met by Sonny Vleisides at the Monterey airport. After Hank Walther and I checked in at our hotel near the airport, the three of us took a taxicab to a downtown Monterey hotel which I believe was a Sheraton. We proceeded to the hotel bar where we sat at one of the tables. No one else was seated nearby.

After we sat down, Mr. Vleisides advised me that his father had told him not to meet with me and Vleisides asked me if I was "wearing a wire." I assured him that I wasn't. He then stated that he had decided to meet with me despite his father's wishes because Hank did not deserve to get in trouble over the lottery business situation. Thereafter I described for him what I had been told on the previous day by Dennis Emmett concerning the false information in the customer solicitations/promos. Mr. Vleisides indicated that this was correct. He stated that his father (Rex) had authored the solicitations, that they did contain representations which were untrue, and that his father was very good at writing the promos. I then specifically asked if Hank Walther was made aware of the misrepresentations, and was told that he was not and that the fact of misrepresentations being used was specifically kept from him.

I next informed Mr. Vleisides that the U.S. Attorney's Office in Los Angeles was of the view that the funds solicited from customers were not actually played in lottery games. Mr. Vleisides answered that considerable money was actually played but that, over time, the concept had evolved into what he termed a "derivative" concept. He



EXHIBIT _C_

PAGE _47_

explained that the money received from customers was simply banked and held for payouts according to actual lottery results and that over the years the payout percentage averaged around 35%. Mr. Vleisides described the "derivative" concept as akin to how insurance companies work or like entities which are self-insured. He continued that no players were ever cheated out of their winnings for the games for which they answered solicitations.

I then directly asked Mr. Vleisides if Hank Walther had ever been informed as to the "derivative" nature of the Houston/Vleisides/Emmett lottery business and Vleisides answered that Mr. Walther had not been so informed and that, for this reason, he (Vleisides) believed Hank Walther assumed that lotteries were always actually played.

I next inquired of Mr. Vleisides as to whether solicitations were purposely sent to the elderly or to any other specific group and Vleisides answered that neither the elderly nor any other group was ever targeted for solicitations and that the mailings were simply sent to those on lists which were obtained from vendors on the public market. At this point, I asked Mr. Vleisides (as I had previously in Costa Rica) if, in view of the fact that no one had been cheated out of their winnings, would he be willing to come to Los Angeles and explain the derivative concept to the United States Attorney's Office, he once more declined.

We next discussed briefly Sonny's background growing up in Kansas City, the fact that he was a Greek citizen, his home in Escazu (Costa Rica), how the "credit" worked which many customers were promised in the solicitations, and the fact that he, his father, and Dennis Emmett would never have been able to pay off a winner who hit a big



EXHIBIT _C_

PAGE _48_

jackpot. In this regard, Vleisides offered that a mathematician had actually been consulted and had informed them that such a possibility was next to impossible.

Following the conversation in the hotel bar, Hank Walther, Mr. Vleisides and I all walked to a nearby restaurant where we had dinner and essentially engaged in small talk until Mr. Walther and I took a taxi back to our hotel. Mr. Vleisides did not take a taxi and, after informing us that he was staying nearby, he walked away from the hotel. A copy of my original notes of this conversation is attached as Exhibit "A."

EXHIBIT ___ C

PAGE ___ 49

3

## MEMORANDUM TO FILE

Subject:        10/1/06 Interview of Dennis Emmett/Notes

On October 1, 2006, I interviewed Dennis Emmett at La Reforma Prison in San Raphael, Costa Rica. I was accompanied to the prison with Mr. Emmett's Costa Rican attorney Rolando Renick as well as Henry Walther. I was introduced to Mr. Emmett as Hank Walther's attorney and I told him that I was attempting to determine all the facts so that I would know how to most effectively represent Mr. Walther.

He initially engaged in small talk and about his case in Costa Rica for which he was in jail. When I eventually changed the subject to the investigation in Los Angeles Mr. Renick excused himself from the discussion. Hank Walther was present during part of the discussion but left at a point when I indicated I would like to speak to Mr. Emmett alone. At this point Mr. Emmett asked to see my business card saying that he wanted to make sure I was not a cop.

In response to my questions which followed, Emmett stated that the whole thing was the brainchild of Rex (James Ray Houston). It was Rex who started the business and he initially did all the promotion/solicitation writing and later Sonny (Vleisides) did the promos. Concerning the information in the promos, according to Mr. Emmett, they (Rex and Sonny) just made it up. Emmett tried once to write a promo but was no good and the promo (which related to a bingo type game) failed. The way the business worked was they obtained marketing lists and then sent out the promos. Checks from customers were then sent to Bill Cloud in Amsterdam and money thereafter was sent to Hank Walther with disbursement directions.

EXHIBIT _____C_____

PAGE _____50_____

1

When I asked Emmett if the money from customers was actually played in lotteries and how much of the money received was actually turned over to Hank Walther, Mr. Emmett responded that I didn't represent him so he didn't want to talk about that but all customers got what they were entitled to. I then told Emmett I needed to know whether all of the money was not invested in the lotteries or if only some of it was and he answered that some of it was and he didn't know exactly how that decision as to how much was made. (It was at this point that I asked Hank Walther to leave so that I could speak privately with Mr. Emmett.) I asked next if Hank Walther was ever told that there were misrepresentations in the promotions or that all the money was not actually invested in lotteries. Emmett said no, that Mr. Walther was always assured that everything was completely okay and that there was a European side of the business. Emmett added that Hank Walther was told he was hired to do some legal tasks and later some accounting/banking.

At this point Dennis asked me my opinion as to whether his ex-wife Glenda or his daughter Carrie were in trouble and we discussed their basically clerical roles in the business. Mr. Emmett stated that they, like Hank Walther, were never informed about misrepresentations in the promos or that money was not actually played in lotteries.

When I asked about his history with Rex and Sonny, Mr. Emmett responded that he had split off from Rex and Sonny approximately five years ago and, thereafter, essentially used three companies (Global Search Network, El Gordo, and NAPS). For the past year, however, he had not been active in the business as he was arrested in the spring of 2005. He noted that his computer contained records from the beginning with Rex and Sonny plus his own records after the split.

2

EXHIBIT __C__

PAGE __51__

I next specifically showed Mr. Emmett various of the promos/solicitations and he reiterated that the factual information was made up. He indicated that after he split from Sonny, he (Emmett) just used Rex's work because of his own lack of ability to write effective promos.

Emmett next inquired of me about his options if he was indicted. I explained that I could not give him legal advice as my allegiance was to Mr. Walther. I did explain my view of some possible options available to him. I offered that the day would probably come when he would have some difficult decisions to make. He said he had no allegiance whatsoever to Sonny (for whom he expressed considerable distaste) and had no desire to return to the United States unless it was necessary to help Glenda or Carrie. Emmett stated that he could give the Government Rex and Sonny "on a silver platter." He asked if I thought he would really be indicted in the United States in view of his incarceration in Costa Rica and I told him that I didn't get to make that decision so I did not know, but I presumed he would be.

In closing, I told Mr. Emmett that it was my impression that the lottery solicitations were about 10% his and 90% Rex's and Sonny's. He replied that this seemed about right. I finally asked about Scott Walther's role in the business and if he (Scott Walther) was aware of the misrepresentations or that not all money was not invested in lotteries. Emmett stated that he had no knowledge of Scott Walther knowing about any of this as Scott just did accounting and related tasks for his father.

At this point Mr. Renick and Hank Walther returned to the discussion and the topic changed back to Mr. Emmett's case in Costa Rica which was apparently on appeal.

3

EXHIBIT _____ C _____

PAGE _____ 52 _____

The entire meeting took approximately 1½ to 2 hours.  A copy of my original notes of this conversation is attached as Exhibit "A."

EXHIBIT _C_

PAGE _53_

## MEMORANDUM TO FILE

Subject:        4/16/07 Telephone Interview of Bill Cloud/Notes

On April 16, 2007, I spoke over the telephone with Bill Cloud.  I called Mr. Cloud from my office and Hank Walther was also on the line.  We reached Bill Cloud in Amsterdam where he lives and works.  This was a 20-30 minute call consisting of considerable small talk about his bar business and life in Amsterdam as well as a discussion which is summarized herein.

Mr. Cloud described his history with the lottery companies, run by his half-brother James Ray Houston (Rex), Houston's son (Sonny Vleisides) and Dennis Emmett as follows:  He (Cloud) handled the banking for the lottery companies for some time.  He did what he described as "processing" and had a "credit card terminal" for credit card payments.  He indicated that the money was actually being invested in lotteries and that this was done from other accounts which were controlled by Rex.  Cloud described Hank Walther as "the lawyer."  He stated that his son Scott did work for Hank.  He also stated that Rex gave orders to Hank just like he did to him (Cloud).  According to Hank, he received approximately 40-50% checks, 20% cash, and 30% in credit card payments and that Hank Walther never saw 50-60% of the money received.  Cloud added that he would send Hank Walther an e-mail indicating how much money was being sent to him until a point when he began sending it to Costa Rica.  Cloud stated that he no longer has the bank account which he used for the processing.

I asked Mr. Cloud about the targeting of customers and he replied that it was his understanding that it was simply a mail order business, no particular group was targeted,

1

EXHIBIT C
PAGE 54

and all winners got paid. He stated that he never heard any discussion concerning targeting.

Cloud added that he had not talked to Rex in two years which was about the time he purchased his bar in Amsterdam.

With regard to the content of the solicitations, Cloud stated that he did see copies of them when they came in but he didn't pay much attention to them – he was just a processor and was never told all the details of the business.

In response to my questioning, Cloud stated that he didn't know of anything which Hank Walther did which was inappropriate or that Hank had knowledge of anything wrong. Cloud explained that lotteries were legal in most places in Europe so he had no problem being involved in this. He said the reason the money was being sent to Europe was because of this (i.e. the legality in Europe) and because he (Cloud) was good at processing and Rex wanted him to have a job. At no point, Cloud stated, was he ever aware of how many people were involved in his half-brother's lottery businesses or the details of how business was done.

At the close of the conversation, I indicated that I might be in Florence, Italy, in the near future and Cloud stated that he would be willing to meet me in Florence to discuss this in more detail. I responded that this might be a good idea and I would let him know. A copy of my original notes of this conversation is attached as Exhibit "A."

2

EXHIBIT C
PAGE 55

**MEMORANDUM TO FILE**

Subject:        5/17/07 Telephone Interview of Bill Cloud/Notes

On May 17, 2007, from my office Hank Walther and I telephoned Bill Cloud at his bar in Amsterdam. The ensuing conversation took place on my speakerphone.

Initially, we discussed that Sonny Vleisides had been arrested in Florence, Italy, and Cloud informed us that he had been previously arrested in Amsterdam and was fighting extradition. We discussed the process generally and Cloud asked me if I could refer him to an attorney in Los Angeles, and I informed him I would have Hank e-mail him two or three names of attorneys I considered to be first rate and experienced in federal criminal matters.

I initially told Mr. Cloud that I had a couple of things I wanted to be sure about; whether or not the money received was actually played on lotteries and the accuracy of the solicitations. About the actual playing, Cloud stated that "I think they played" – "this wasn't my end," he was just a processor – everyone thought they were really playing – Cloud actually got a lottery license in Amsterdam so he would be legal – he opened the mail and had a credit card company, made disbursements and followed orders – at the end he worked for Dennis – he hasn't worked for Sonny for over two years except a couple of credit card processing tasks – he always sent that money to Costa Rica.

Concerning the solicitations Cloud stated that Rex and Sonny put the solicitations together – they were the creators and Dennis worked the computer.

1        EXHIBIT ___C___

PAGE ___56___

When I specifically asked if the solicitations were false, Cloud responded, "most of it I guess – must have made it up or whatever he did – they have all that bullshit in them." Mr. Cloud also noted that Rex put pictures of people on them sometimes. I asked if he knew whether either Hank or Scott Walther had knowledge of this (the "bullshit") and he responded that he had no knowledge that they were aware.

At the close of the conversation, Cloud noted that he was not the one who made payments to winners but was aware of winner payouts of up to $10,000. A copy of my original notes of this conversation is attached as Exhibit "A."

2

EXHIBIT C
PAGE 57

## MEMORANDUM TO FILE

Subject:    4/19/07 Meeting with Sonny Vleisides/Notes

On April 19, 2007, I met with "Sonny" Vleisides at the Gallery Hotel in Florence, Italy.  Sonny arrived with an individual who was introduced as "Marco" and who was described as being with a company with which Sonny was doing business in Italy.  After some small talk and one drink, Marco left in order that Mr. Vleisides and I could talk in private.  We sat at the outdoor café/bar which was a part of the hotel.

After answering questions about the status of the investigation in the United States, I showed Mr. Vleisides copies of the documents which I had been sent by Ellyn Lindsay which she felt were incriminating for Hank Walther and asked for his understanding of what they meant.  (These documents are attached to this memorandum as Exhibits "A" and "B.")  The document which is Exhibit "A," Sonny described as being a result of the fact that shortly after 9/11 the banks were generally rejecting gaming money as a matter of policy.  As a result, many U.S. banks and credit card companies simply refused to handle gaming related funds as a matter of policy and would shut down accounts when it was learned that such accounts were used to effectuate gambling transactions.  The document which is Exhibit "B," according to Mr. Vleisides, was a discussion of a problem with his father with regard to one of the lottery companies and had nothing to do with illegality.  In fact, according to Vleisides, this problem was solved without damage to the operation and everything he (Sonny) did was to protect the integrity of clients' funds.  After looking at the above-noted documents, I read my notes from my April 16th telephone conversation with Bill Cloud which Sonny said were

1

EXHIBIT __C__

PAGE __58__

correct with the exception of the "check" percentage of the business which he (Sonny) thought was more like 60%. A copy of the April 16th Cloud notes is also attached to this memorandum (Exhibit "C").

I next went through a number of e-mails (which are attached as Exhibit "D" and which contain various margin notes made by me at the time of the meeting) and asked Sonny for his understanding of them. Of note were:

(1)     The 12/16/04 e-mail to Zeke (i.e. James Ray Houston) from Henry Walther in which Mr. Walther describes himself as "This is a bean counter, not an attorney." Sonny explained that this was essentially Hank Walther's function throughout his (Sonny's) association with Mr. Walther.

(2)     The 9/22/04 e-mail which describes "letting go" part of the "staff down here in Costa Rica." According to Mr. Vleisides, the total staff, at one point, numbered approximately 50.

(3)     The 2/12/05 e-mail from Sonny to Hank Walther which appears to show reluctance by Hank Walther to be involved if he knew a program had legal problems. Sonny commented that they (he and his father and Dennis Emmett) did not run too much of exactly how their lottery business worked by Hank Walther as they were concerned that they would lose his assistance. According to Sonny, "anything questionable we didn't even tell Hank about because he would have said no. We didn't run anything through him if we thought he wouldn't have liked it." Sonny added that Hank had seen some of the promotions.

EXHIBIT __C__
PAGE __59__

I asked Sonny (separate from the other e-mails) about an e-mail dated 12/22/05 from him (Sonny) to Hank Walther (Exhibit "E"). Sonny said that this was consistent with his previous statement that they didn't want Hank any more involved than necessary. He pointed out the language "you are not the company" which Hank was told should be his response to any complaints Hank might receive personally concerning any of the lottery companies.

Concerning complaints from customers, Sonny stated that there were less than an average of three per year over the past 20 years. He indicated that pay-offs were in the neighborhood of 35% of the money which was taken in.

I also asked Sonny, as I had in Monterey, Mexico, about the customers and the customer lists which were utilized and asked specifically as to "targeting." Sonny responded that there was "no targeting whatsoever" and that customer lists were just rented from companies which marketed them. Sonny emphasized that all winners get paid. He was not able to answer, however, how anyone who might have been lucky enough to win a multi-million dollar prize could be paid from the point the businesses began using what he described as the derivative method of doing business. Sonny informed me that I should check the OSA website/Betslips.com for an illustration of how he, Rex (his father), and Dennis Emmett worked. He also indicated that there were many lottery tickets which were actually purchased.

I commented to Sonny that even if everyone got paid their due winnings, the misrepresentations in the solicitations appeared to be a problem. (I used the phrase "your

EXHIBIT ____C____

PAGE ___60___

3

father's imaginative writing abilities.") Sonny acknowledged that this was true and stated that if it came down to misrepresentations, then he might just as well plead guilty.

At this point, I specifically asked Sonny if Hank Walther was ever told that misrepresentations were made in the solicitations to customers and Sonny answered that he was not and that this is part of what they kept from him. I also asked Mr. Vleisides if he'd been in contact with the Swinks and he said that he had not been recently. He asked if I believed they were cooperating with the Government and I answered that I did. He commented that he did not believe they would hurt him as they enjoyed an extremely close relationship. I indicated that he should not be so sure and he then described how he had previously been in contact with them on a regular basis, that they were good people, and other information concerning his relationship with them.

Finally, I asked about the involvement of Scott Walther in all this and Sonny responded that he didn't deal with him much at all and described Scott as a "helper" for his dad. To the best of Sonny's knowledge, he stated, Scott Walther was unaware about the misrepresentations or anything which might be questionable.

This interview of Sonny Vleisides lasted approximately two hours. At the end of the discussion we discussed whether or not he should surrender himself (I had told him earlier that he had been charged). Sonny stated that he would think about it seriously and offered that this is what he might have to do.

When I left the meeting, Sonny left the outdoor café and went into the bar area inside the hotel.   A copy of my original notes of this conversation is attached as Exhibit "F."

EXHIBIT ___C___
PAGE ___61___

4

## DECLARATION OF GLENDA EMMETT

I, GLENDA EMMETT, declare as follows:

I am the former wife of Dennis Emmett who has been indicted in Case No. CR 07-134 before the Honorable Dean D. Pregerson, United States District Judge in the Central District of California. The statements set out below in this declaration are true and accurate to the best of my knowledge and belief and if called to testify in this matter I could, and would, testify competently thereto.

1.      For approximately 10 years through late 2006, I performed various clerical tasks on behalf of my former husband Dennis Emmett who resides in San Jose, Costa Rica. Dennis Emmett and I were divorced in 1999, and I presently reside in Canoga Park, California.

2.      The tasks I was asked to do and performed for my former husband included various matters relating to mailings concerning what was represented to me as a business which pooled customer money to be played in lotteries throughout the world.

3.      Although it was not I who handled the actual renting of the customer lists which were utilized for mailings, it was my understanding that the customer lists were rented on the open market from businesses which supply such lists and that the lists were generic in nature and available to anyone who wished to utilize them to receive mailed solicitations.

4.      The lists which I viewed, in fact, contained no more than names, street addresses, and the city, state, and zip code in which the potential customer resided. No ages, ethnic group, or any other identifying information was ever included.

5.      During my work for my former husband's lottery business, I had the opportunity to speak and communicate on a number of occasions with Henry Walther who also performed

1

EXHIBIT _C_

PAGE _62_

services at the direction of my former husband and his one-time partner James Ray Houston, as well as Mr. Houston's son, Sonny Vleisides.

6.      At no time did my former husband, Henry Walther, or anyone else ever say or do anything which indicated that potential customer/client lists were obtained or utilized which targeted the elderly, the infirm, or any other group which would or might be particularly susceptible to mail order solicitations.  In fact, the customer lists with which I dealt appeared to me to be totally generic acquisitions.

7.      At no time during my communications with Henry Walther did I ever hear him say (or see him do) anything which indicated to me that he believed the lottery business run by my former husband, Mr. Houston, and Mr. Vleisides, to be anything other than a totally legitimate one; a belief which I also shared.

The above statements set forth in this declaration are made under the penalties of perjury of the United States of America.

Executed this _____ day of _____, 2008, at Canoga Park, California.


_____
GLENDA EMMETT


Acknowledged as correct but refused to sign on advice of counsel

EXHIBIT _C_

PAGE _63_

2

6/28/05

World News .. co

3 Clients in Costa Rica
Dennis (Global Search Netmate)
Sonny (World Expert Fund)
Rex. (U.S.A. 21)

Bill (Rex bill
in Amsterdam
# saw to Bill

PH
Amarkes

Direct mailing for foreign lotteries
mailys brochat world — majority in U.S.
by post card — sell us 7 postage stamps &
we'll set you on our list
people and on small amounts  ) ($ to America
cash, credit cards & checks        (a bit to CR.)

I wrt no $29,000 week for 1 client

revouted back to Hank

proof in lotteries is purchased
pool

no intent on companies

cell 310
261-835-2

HENRY W. WALTHER
ATTORNEY AT LAW

DEERING, WALTHER & SANDS
THIRD FLOOR
2530 WILSHIRE BOULEVARD
SANTA MONICA, CALIFORNIA 90403

TELEPHONE
(310) 453-1941
FAX (310) 829-2148
E-MAIL greenfish@earthlink.net

J. Roman
213/612-0020

EXHIBIT D
PAGE 64

Sonny  W 866/978 6134
H 506/289-3802

| Re: List of Bills for Week | Page 2 |
| --- | --- |

```
>>after you have left. I want to be current on work and in a tranquil
>>mood when you arrive.
>>-----------------------------------------------------------------------
>>PAYMENTS - 01/24/2004
>>- - - - - - - - - - - - - - - - - - - - - - - - - -
>>---> PRIZE CHECKS THIS WEEK: $1,285
>>- - - - - - - - - - - - - - - - - - - - - - - - - -
>>GSN:
>>Legal          $406.41 (01/10 thru 01/14)
>>Richard                $1,500
>>Jim (postage) $3,000   Wire
>>Jim services  $4,120.96 Mail Check
>>Astro         $2,500
>>-----------
>>NAPS:
>>Legal          $364.08 (01/10 thru 01/14)
>>MDC            $4,000  <---Mail to Astro
>>Jim (postage) $2,000   Wire
>>B of A Prize Act     $1,000   TRANSFER
>>Picasso Press $427.59 (invoice: 19364)<---Mail to Astro
>>-----------
>>NJI:
>>NJI - Panama  $500     Wire
>>-----------
>>END
>>-----------------------------------------------------------------------
>>Will be setting up a $2M wire for Columbia with GSN funds that come in on
Wed
>>AND probably making at least "a token" to Tension on Thr. Jim did it to me
again.
>>We probably will also need to do some pre-planning on Friday. Hope for
another
>>good day tomorrow. I think it is possible?????????
>>-----------------------------------------------------------------------
>>
>>
>>
>>
>>
>>
>
>
>
>
```

EXHIBIT ___*E*___

PAGE ___65___

**Re: Payments**                                                                 **Page 1**

| | |
|---|---|
| **To:** | "Henry W. Walther" <greenfish@earthlink.net> |
| **From:** | gonzoro <gonzoro@racsa.co.cr> |
| **Date:** | Mon, 21 Jun 2004 16:15:10 -0700 |
| **Subject:** | Re: Payments |

```
      4,323.79  sending 6-18
      4,853.84 sending 6-22
       3,449.01 sent 6-21        6498516581
```

Above is 3 deposits with tracking # that left today, you should receive WED.
Tom forgot to send me report for today but Bill did say that it was $12M+,
I assume that it will ship tomorrow - should be mostly NAPS. Tomorrow is
the big GSN day. You should have all 3 deposits in by Friday. I expect
total to be $35M - $40M.

de

>Dear Dennis:
>       There were laege NSF's in GSN, which takes the balance to negative
$4.64 when all bills are paid.  There is
>plenty of float, and I will hold mine.  One was a deposit correction debit
for $548.50 which means that the tape was
>wrong, and the other was one for $977.00.  I'll keep my eye out for the
large one when it comes back and let you
know.
>               Hank
>
>
>On Mon, 21 Jun 2004 15:00:45 -0700, gonzoro wrote:
>
>>You are correct on the NAPS, I am just used to seeing only 1 per week, I
don't even use a calculator.
>>I just put in the deposit into the paid in Quick,  do a * .05 and use that
result. Sorry that I missed that. de
>>
>>>Dear Dennis:
>>>     Will take care of these today.  Wires will go out tomorrow.
>>>     On the NAPS legal, we need to adjust for the $7690.32 that was
omitted from the prior week.  I added it to the
>>>Monday daily, but in fact it was deposited the prior week and not paid
for.  I believe the correct amount for this week
>>>should be $991.71 with the adjustment from Monday.  Double check to see.
>>>               Hank
>>>
>>>
>>>On Sun, 20 Jun 2004 19:18:09 -0700, gonzoro wrote:
>>>
>>>>----------------------------------------------------------------------
>>>>PAYMENTS - 06/21/2004
>>>>- - - - - - - - - - - - - - - - - - - - - - - - - - -
>>>>----> PRIZE CHECKS THIS WEEK: $1,676
>>>>- - - - - - - - - - - - - - - - - - - - - - - - - - -
>>>>GSN:
>>>>Legal          $1,828.26  (06/14 thru 06/18)
>>>>Richard        $1,500
>>>>LCI       $3,854.41 (Invoices: 29696,29719,29713,29707,29701,29709)
>>>>LCI       $2,542.49 (Invoices: 29728,29740,29735,29730,29737,29726)
>>>>MDC       $4,000  (Mail to Astro)
>>>>Cerro          $7,000  (Banco Nat'l wire)     EXHIBIT   E
```

| payments | Page 1 |
|---|---|

**To:** "Henry W. Walther" <greenfish@earthlink.net>
**From:** gonzoro <gonzoro@racsa.co.cr>
**Date:** Sun, 26 Sep 2004 15:35:56 -0700
**Subject:** payments

```
------------------------------------------------------------------------
PAYMENTS - 09/27/2004
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
---> PRIZE CHECKS THIS WEEK: $1,632
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
GSN:
Legal           $1,282.02 (09/20 thru 09/24)
Richard              $1,500
LCI - ILIS           $5,237.49  (29970,29971,29972,29975,29978,
     29979,29980,29981,29982,29983,29985,29986,29987, )
Cerro           $4,400  (Banco Nat'l wire)
Don             $880
-----------
NAPS:
Legal           $773.67 (09/20 thru 09/24)
B of A Prize Act     $2,000   TRANSFER
SMS (transfer)  $2,000   TRANSFER
Picasso Press   $1,967.99 (invoice: 18682)<---Mail to Astro
MDC             $7,500  <---Mail to Astro
----------
END
```

EXHIBIT _E_
PAGE _67_

**Re: DHL 7874 in**                                                                                     **Page 1**

To:        "Henry W. Walther" <greenfish@earthlink.net>
From:      gonzoro <gonzoro@racsa.co.cr>
Date:      Fri, 01 Oct 2004 19:31:32 -0700
Subject:   Re: DHL 7874 in

```
--------------------------------------------------------------------------------
PAYMENTS - 10/04/2004
- - - - - - - - - - - - - - - - - - - - - - - - - - - -
---> PRIZE CHECKS THIS WEEK: $1,391
- - - - - - - - - - - - - - - - - - - - - - - - - - - -
GSN:
Legal          $961.12 (09/27 thru 10/01)
Richard               $1,500
-----------
NAPS:
Legal          $1,242.44 (09/27 thru 10/01)
SMS (transfer) $2,000  TRANSFER
CitiCards             $7,500  <--- Mail to Astro
-----------
NJI:
Legal          $242.29
-----------
EU:
Legal          $0.15
------------
WVS:
Legal          $6.60
-----------
END

>Dear Dennis:
>       If you can email me the rest of Monday's list tomorrow, Saturday, I
can write the checks to go out Monday
>before I leave.
>               Hank
>
>
>On Fri, 01 Oct 2004 14:34:19 -0700, gonzoro wrote:
>
>>Are you going to be in town Sat & Sun?
>>
>>de
>>
>>>Dear Dennis:
>>>     OK.  I'll set them up.  If I get them properly funded today, they
will go out Monday.  If not, Tuesday for sure.  I'll
>>>ask Bill where he wants his funds to go.  He changes every so often.
Thanks for doing this in advance.
>>>               Hank
>>>
>>>
>>>On Fri, 01 Oct 2004 13:38:31 -0700, gonzoro wrote:
>>>
>>>>Jim $9M from GSN
>>>>Bill $5M from NAPS
>>>>
>>>>Just hope that LCI does not email me any invoices today.
>>>>I think I am OK. It is Friday and very close to 5pm EST.
```

EXHIBIT *E*

PAGE *68*

| Payments | Page 1 |
|---|---|

**To:**      "Henry W. Walther" <greenfish@earthlink.net>
**From:**   gonzoro <gonzoro@racsa.co.cr>
**Date:**   Sun, 24 Oct 2004 14:59:04 -0700
**Subject:** Payments

```
The payments depend on DHL coming in today.
It was in the U.S. on Sunday, so I expect it.
--------------------------------------------------------------------------
PAYMENTS - 10/25/2004
- - - - - - - - - - - - - - - - - - - - - - - - -
---> PRIZE CHECKS THIS WEEK: $1,263
- - - - - - - - - - - - - - - - - - - - - - - - -
GSN:
Legal             $597.55 (10/18 thru 10/22)
Richard                  $1,500
LCI - ILIS               $7,888.51 (30136,30137,30139,30141,30142,30143,30144,
       30145,30146,30147,30135,30154,30156,30157,30158,30160,30161)
SMS (transfer)  $2,000   TRANSFER
Columbia wire   $2,000
B of A Prize Act         $1,000   TRANSFER
U.S. Bank Prize Act      $2,000   TRANSFER
-----------
NAPS:
Legal             $231.15 (10/18 thru 10/22)
Jim (postage)   $9,000   Wire
----------
END
```

EXHIBIT ___E___

PAGE ___69___

| Re: Payments | Page 1 |
|---|---|

**To:**    "gonzoro" <gonzoro@racsa.co.cr>
**From:**  "Henry W. Walther" <greenfish@earthlink.net>
**Date:**   Mon, 01 Nov 2004 12:52:09 -0800
**Subject:** Re: Payments

Dear Dennis:
      The DHL came in, so I will take care of all of these today, Monday,
and let you know when they go out.
      On the legal for GSN, I think the Monday deposit of $7023.41 was
omitted from the calculations, and the
correct legal should be $1121.72.  Check it out and let me know.  There are
enough funds, anyway.
            hank


On Sun, 31 Oct 2004 10:57:52 -0800, gonzoro wrote:

>Payments depend on DHL - looks on schedule.
>-------------------------------------------------------------------------------
>PAYMENTS - 11/01/2004
>- - - - - - - - - - - - - - - - - - - - - - - - - - -
>---> PRIZE CHECKS THIS WEEK: $1,227
>- - - - - - - - - - - - - - - - - - - - - - - - - - -
>GSN:
>Legal          $770.54 (10/25 thru 10/29)
>Richard                $1,500
>MDC            $2,000  <---Mail to Astro
>CitiCards              $3,000  <--- Mail to Astro
>Jim services   $5,176.16 Mail Check
>-----------
>NAPS:
>Legal          $859.45 (10/25 thru 10/29)
>CitiCards              $2,000  <--- Mail to Astro
>Jim (postage)  $9,000  Wire
>-----------
>NJI:
>Legal          $193.57
>NJI - Panama   $1,000  Wire
>-----------
>EU:
>Legal          $165.56
>------------
>WVS:
>Legal          $2.70
>-----------
>END
>
>
>

EXHIBIT *E*

PAGE *70*

| **Payments** | **Page 1** |
|---|---|

| | |
|---|---|
| **To:** | "Henry W. Walther" <greenfish@earthlink.net> |
| **From:** | gonzoro <gonzoro@racsa.co.cr> |
| **Date:** | Sun, 07 Nov 2004 14:40:52 -0800 |
| **Subject:** | Payments |

```
--------------------------------------------------------------------------
PAYMENTS - 11/08/2004
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
---> PRIZE CHECKS THIS WEEK: $1,160
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
GSN:
Legal          $1,280.24      (11/01 thru 11/05)
Richard        $1,500
MDC            $5,000  <---Mail to Astro
Jim (postage)  $9,000  Wire
CitiCards      $2,000  <--- Mail to Astro
Cerro          $5,000  (Banco Nat'l wire)
-----------
NAPS:
Legal          $612.89 (11/01 thru 11/05)
LCI  - WVS     $8,361.83 (Invoices: WVS July 2004)
SMS (transfer) $2,000  TRANSFER
----------
END
```

EXHIBIT ____ E ____
PAGE ____ 71 ____

**PAYMENTS**                                                      **Page 1**

| | |
|---|---|
| **To:** | "Henry W. Walther" <greenfish@earthlink.net> |
| **From:** | gonzoro <gonzoro@racsa.co.cr> |
| **Date:** | Sun, 14 Nov 2004 12:06:15 -0800 |
| **Subject:** | PAYMENTS |

```
--------------------------------------------------------------------------------
PAYMENTS - 11/15/2004
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
---> PRIZE CHECKS THIS WEEK: $1,429
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
GSN:
Legal          $1,159.41 (11/08 thru 11/12)
Richard             $1,750
MDC            $8,000  <---Mail to Astro
Bill           $5,000  (wire)
Don            $1,010
-----------
NAPS:
Legal          $604.31 (11/08 thru 11/12)
Jim (postage)  $9,000  Wire
SMS (transfer) $2,000  TRANSFER
----------
END
```

EXHIBIT  E

PAGE  72

| payments | Page 1 |
|---|---|

**To:** "Henry W. Walther" <greenfish@earthlink.net>
**From:** gonzoro <gonzoro@racsa.co.cr>
**Date:** Sun, 21 Nov 2004 17:08:19 -0800
**Subject:** payments

```
------------------------------------------------------------------------------
PAYMENTS - 11/22/2004
- - - - - - - - - - - - - - - - - - - - - - - - - - - -
---> PRIZE CHECKS THIS WEEK: $1,604
- - - - - - - - - - - - - - - - - - - - - - - - - - - -
GSN:
Legal          $861.32 (11/15 thru 11/19)
Richard                 $1,500
Jim (postage)  $9,000   Wire
Astro          $3,672
-----------
NAPS:
Legal          $355.05 (11/15 thru 11/19)
Jim services   $4,802.76      Mail Check
----------
END
```

EXHIBIT _E_

PAGE _73_

| payments | Page 1 |
|---|---|

**To:** "Henry W. Walther" <greenfish@earthlink.net>
**From:** gonzoro <gonzoro@racsa.co.cr>
**Date:** Mon, 29 Nov 2004 11:28:35 -0800
**Subject:** payments

```
You should get TWO DHL's today that will cover
all these expenses. Any word on the 'NEW" bank
account? We have been working "a lot" on this.
----------------------------------------------------------------------------
PAYMENTS - 11/29/2004
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -
---> PRIZE CHECKS THIS WEEK: $1,578
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -
GSN:
Legal           $341.72 (11/22 thru 11/26)
Richard             $1,500
LCI             $5,594.39 (invoices: 30494,30502,30489,30501,30495,
     30488,30500,30487,30499,30486,30482,30485,30498,30493).
Jim (postage)   $9,000  Wire
CitiCards           $5,000  <--- Mail to Astro
Astro           $4,344
-----------
NAPS:
Legal           $355.05 (11/22 thru 11/26)
MDC             $5,000  <---Mail to Astro
Jim services    $3,202.73 <---Mail Check
----------
END
```

EXHIBIT E
PAGE 74

| payments | Page 1 |
|---|---|

**To:** "Henry W. Walther" <greenfish@earthlink.net>
**From:** gonzoro <gonzoro@racsa.co.cr>
**Date:** Sun, 05 Dec 2004 14:02:18 -0800
**Subject:** payments

```
Thinking about closing out WVS??????????
DEPOSITS: Aug $107 / 9-3 $132 / 10-7 $54
Bank charges: 11-2 $8 / 11-17 $14 / 12-5 $8
Next week would be 3 months from last deposit.
---------------------------------------------------------------------------
PAYMENTS - 12/06/2004
- - - - - - - - - - - - - - - - - - - - - - - - - - -
---> PRIZE CHECKS THIS WEEK: $1,071
- - - - - - - - - - - - - - - - - - - - - - - - - - -
GSN:
Legal             $1,596.44 (11/29 thru 12/04)
Richard                 $1,500
Jim (postage)   $9,000  Wire
U.S. Bank Prize Act     $1,000   TRANSFER
-----------
NAPS:
Legal             $719.40 (11/29 thru 12/04)
Jim services    $5,136.55 Mail Check
----------
NJI:
Legal             $132.29
Don               $4,598.37
-----------
EU:
Legal             $116.78
Astro             $2,537
-----------
END
---------------------------------------------------------------------------
```

EXHIBIT E
PAGE 75

| payments | Page 1 |
|---|---|

| | |
|---|---|
| **To:** | "Henry W. Walther" <greenfish@earthlink.net> |
| **From:** | gonzoro <gonzoro@racsa.co.cr> |
| **Date:** | Mon, 29 Nov 2004 11:28:35 -0800 |
| **Subject:** | payments |

```
You should get TWO DHL's today that will cover
all these expenses. Any word on the 'NEW' bank
account? We have been working "a lot" on this.
-----------------------------------------------------------------------------
PAYMENTS - 11/29/2004
- - - - - - - - - - - - - - - - - - - - - - - - -
---> PRIZE CHECKS THIS WEEK: $1,578
- - - - - - - - - - - - - - - - - - - - - - - - -
GSN:
Legal           $341.72 (11/22 thru 11/26)
Richard              $1,500
LCI             $5,594.39 (invoices: 30494,30502,30489,30501,30495,
      30488,30500,30487,30499,30486,30482,30485,30498,30493).
Jim (postage)   $9,000  Wire
CitiCards             $5,000  <--- Mail to Astro
Astro           $4,344
-----------
NAPS:
Legal           $355.05 (11/22 thru 11/26)
MDC             $5,000  <---Mail to Astro
Jim services    $3,202.73 <---Mail Check
----------
END
```

EXHIBIT *E*

PAGE *76*

| Withdrawal of $500 for USA21 ACCT: 2097863522 | Page 1 |
|---|---|

| | |
|---|---|
| **To:** | "Henry W. Walther" <greenfish@earthlink.net> |
| **From:** | "Zeke in CR" <rex@slophog.org> |
| **Date:** | Thu, 23 Sep 2004 05:16:56 -0600 |
| **Subject:** | Withdrawal of $500 for USA21 ACCT: 2097863522 |

HANK...

This is a          WITHDRAWAL INSTRUCTION...

With USA21 .... folks do not get sent a bunch of small prize checks....
Instead the small prizes accumulate in their account
and when they want, they make a withdrawal from the acct bal.... the minimum
is $500.  That make it easy for all of us.


This is the first $500 withdrawal.... just send a ck and mark it as a usa21
account withdrawal.  Send by regular mail.


SEND TO:

 GEORGE MEEKS
10411 SCENIC VALLEY DR.
Valley Springs, CA  95252


amount $500.


rx

EXHIBIT    6

PAGE    77

*Printed For: "Henry W. Walther" <greenfish@earthlink.net>*

| payments | Page 1 |
|---|---|
| **To:** "Henry W. Walther" <greenfish@earthlink.net> | |
| **From:** gonzoro <gonzoro@racsa.co.cr> | |
| **Date:** Mon, 07 Mar 2005 05:55:12 -0800 | |
| **Subject:** payments | |

```
--------------------------------------------------------------------------
PAYMENTS - 03/07/2005
- - - - - - - - - - - - - - - - - - - - - - - - - - -
---> PRIZE CHECKS THIS WEEK: $823
- - - - - - - - - - - - - - - - - - - - - - - - - - -
GSN:
Legal           $880.22 (02/28 thru 03/04)
Richard                 $1500
Jim (postage)   $5,000  Wire
LCI - ILIS              $4,827.48 (invoices: 30319,30324,30333,30328,
        30329,30330,30320,30325,30326,30321,30331,30332 )
CitiCards               $4,000  <--- Mail to Astro
Don             $563.95
-----------
NAPS:
Legal           $255.77 (02/28 thru 03/04)
SMS (transfer)  $2,000  TRANSFER
Jim services    $1,816  Mail Check
----------
NJI:
Legal           $134.20
-----------
EU:
Legal           $173.18
-----------
END
--------------------------------------------------------------------------
```

EXHIBIT _E_

PAGE _78_

| Total for Funds & NY7 | Page 1 |
|---|---|

| | |
|---|---|
| **To:** | "Hank" <greenfish@earthlink.net> |
| **From:** | <gemmett1@ix.netcom.com> |
| **Date:** | Sat, 18 Jun 2005 11:32:28 -0700 |
| **Subject:** | Total for Funds & NY7 |

Dear Hank

Check for Funds & New York 7 were all drawn on US Bank.

Funds total:  $1,125.00 (approx 40% cash)

Plus I had to issue 2 checks for NY7.  These were winners
from back on April 5 & April 8.  I don't know if Sandra
forgot to give them to Dennis or Dennis forgot to send them
to me.  Regardless, when the people got their monthly reports
they were winners & had not received their checks.

2 New York 7 checks @ $100.00 each = $200.00
   (these will difinitely be cashed)

Total = $ 1,325.00

Glenda

EXHIBIT E
PAGE 79

Home   About Us   Customer Service   FAQ   My Account   Reading Room   View Cart       Login: |

Not a member? Learn mo

Enter Company Name

**Companies:** U.S., Public, Worldwide    **Find Jobs:** U.S.    **Browse:** Industries, Publishers, News    **Resources:** Business, C

Company Profiles > Find Companies > Allentown, NJ > Business Services > Advertising & Marketing > Direct Mail Advertising Services > Mailing list mana
> List Counsellors, Inc Company Profile

# List Counsellors, Inc

3 S Main St, Allentown, NJ 08501-1615, United States  (Map) (Add Company Info)

**Phone:** (609) 259-0600
**SIC:** Direct Mail Advertising Services
**Line of Business:** Direct Mail Advertising Services

*Ads by Google on Direct Mail Advertising Services†*

Mailing Services Direct Mail & bulk mail services Your source for mail in So. Calif.

Email Campaign Management Corporate Email Marketing System Create, Deliver, Track, Analyze

Targeted Email Marketing Leading Provider of Email Marketing Solutions, Strategy, & Services.

†The ads are not affiliated with List Counsellors, Inc

### Detailed List Counsellors, Inc Company Profile
This company profile is for the private company List Counsellors, Inc, located in Allentown, NJ.
List Counsellors, Inc's line of business is direct mail advertising services.

Add info **to the List Counsellors, Inc profi** (Learn More)

**Find** reports and article List Counsellors, Inc

**Find other** List Counse Inc **companies**

**More Companies in:** This Industry Allentown, NJ

**Find** Jobs in Allentown,

#### Company Profile: List Counsellors, Inc

**Year Started:** 1991
**State of Incorporation:** NJ
**URL:** N/A
**Location Type:** Single Location
**Stock Symbol:** N/A
**Stock Exchange:** N/A
**Also Does Business As:** N/A
**NAICS:** N/A
**SIC #Code:** 🖼 View Details
**Est. Annual Sales:** 🖼 View Details
**Est. Employees:** 3
**Est. Employees at Location:** 3
**Contact Name:** Donna Mallison
**Contact Title:** President

**Mailing Services**
Direct Mail & bulk mail services Your source for mail in So. Calif.
www.DirectConnectionMail.com
**Email Campaign Management**
Corporate Email Marketing System Create, Deliver, Track, Analyze
www.icongo.com
**List Management**
Strategy and creative services Download Free Email Marketing Guide
www.eROI.com
**Send HTML Emails Yourself**
Professional layout and tracking without programming. Try it free!
www.imninc.com
                                              Ads by Google

*Data above provided by D&B.*

#### Additional Information on List Counsellors, Inc

##### Have some Information to add about List Counsellors, Inc?
Manta allows *you* to make additions and corrections to the information available for the *List Counsellors, Inc* company profile. »Learn More

EXHIBIT F
PAGE 80

**Looking for reports & articles on List Counsellors, Inc?**

Manta also provides financial reports, credit reports, news articles, and market research reports on List Counsellors, Inc.



Manta's Premium Reports Assist With:

- History Reports and Management: identify key principals and board leadership, executive contacts
- Company Fundamentals: background, overall business operations, benchmark against competition
- Financial Research: credit score reports, payment history, financial rating, validate credit worthiness of potential customers
- Business Analysis: assess the performance of potential partners, uncover legal issues before a deal is made
- Dozens of other business-critical insights

Copyright 2007 Dun and Bradstreet, Inc. All Rights Reserved.



Copyright 2007, ECNext, Inc. All Rights Reserved   Updated Privacy Policy
Refund Policy   Contact Us   Advertise on Manta   Terms & Conditions   Site Map   Manta Partners

EXHIBIT F
PAGE 81

PACIFIC MEDICAL & NEPHROLOGY ASSOCIATES, INC.
## EARL M. GORDON, M.D., F.A.C.P.
2001 SANTA MONICA BOULEVARD, SUITE 765W
SANTA MONICA, CALIFORNIA 90404
TELEPHONE: (310) 453-4599

INTERNAL MEDICINE • NEPHROLOGY • HYPERTENSION

June 8, 2007

The Honorable Dean Pregerson
United States District Judge
Central District of California

Dear Judge Pregerson:

Janet and Henry Walther have been patients in this office for over 15 years. They have always been extraordinarily considerate and cooperative patients. They and their children comprise a very fine family. Janet and Henry have been very active in a variety of community and charity activities, including the public school system at all levels, the YMCA, and Boy Scouts. Henry has provided volunteer legal services.

Janet and Henry have been married 39 years and have had a very close marriage. Janet has been an insulin-dependent diabetic for 47 years, since age 15. For diabetic patients, it is felt important to achieve tight blood sugar control in order to prevent future cardiovascular complications. Janet currently injects herself with insulin 4 to 5 times daily, depending on her need. With the use of insulin, there is the necessary risk of low blood sugar reactions, which Janet has had on many occasions. Janet relies on the presence of Henry with her in bed at night to monitor her and to protect her from the consequences of nocturnal low blood sugar reactions. Henry checks her physical condition at night at approximately 4-hour intervals, which is very important for her safety. He is able to recognize these reactions, immediately awaken her, and provide her with juice. On at least two occasions, Henry has had to take her to the emergency room. Without this assurance, Janet will be forced to allow her average blood sugar to run higher, which would be medically undesirable. In addition to her diabetes, Janet has recently also developed worsening hypertension, with associated symptoms including palpitations and dizziness. She has needed Henry's assistance to drive her to physician appointments.

It is my hope you will consider these special circumstances when deciding the details of the plea agreement with Mr. Walther.

Sincerely yours,

Earl M. Gordon, M.D.

EMG:klf

EXHIBIT G

PAGE 82

10-26-09.

Patient's wife's condition remains the same

JANET WALTHER

October 19, 2009

The Honorable Dean D. Pregerson
United States District Judge
Central District of California

Dear Judge Pregerson:

I have been married to my husband, Henry William Walther, for 41 years. We are the same age and, prior to our marriage, we attended Brentwood Presbyterian Church, Paul Revere Jr. High School, University High School and UCSB at the same time. We became particularly good friends at church where we both attended confirmation classes, became members and were active in the youth groups, volleyball league and music programs.

We were married there and our family continues to be active members. Henry (Hank) sings with the Men's Ensemble group and has advised the Endowment Committee. For many years I was on the Children's Work Committee and served on the Youth Music Committee, directed Vacation Bible Camp one summer, and, with Hank's participation, we have been active with most of the youth programs. Our three children were baptized, confirmed and active participants in Sunday School, Vacation Bible Camps, Advent Workshops and music programs at Brentwood Presbyterian.

Hank has always been a devoted, caring, kind, considerate, thoughtful, helpful, sweet, honest, supportive, Christian, loving husband. He has never treated me with anything but respect. He is an incredible father and role model for our children. He has worked so hard to provide for us. He has always cared for me in a very gentle and sensitive manner, always wanting me be happy, healthy and comfortable.

My parents always considered him the best son-in-law they could have ever asked for and knew he took good care of me. As they aged and needed help, he was always there for them. After my mother's passing in 1999, my dad wanted to continue traveling as he and my mother had done, but he needed more help. Hank forfeited work and other obligations to go on trips with my dad and me and give him the personal help he required. He would also often stop at his house on his way to and from work to check on him and help him out. My dad looked forward to his visits that always included commentary regarding sports, particularly the Dodgers and U.S.C.

I have been a Type 1 diabetic for over 49 years. I am meticulous about blood sugar monitoring, but there is no way to maintain it perfectly. Even during our college years, Hank had to occasionally come to my apartment when my roommate called him to help me when I had insulin reactions. I have always kept my blood sugar abnormally high when going to bed for the short periods of time when he is out of town as I fear having a reaction and not waking up. Having it high for long periods of time damages my health.

More recently, my vision has been impaired and I have had many more insulin reactions as well as very serious blood pressure problems as I am scared to death about my son and my husband's horrible situation. He has to check on me several times each night and in the morning to make



sure I am all right. I am usually very self-sufficient but I am frightened about the prospect of him not being here for me, especially now that my condition seems to be getting worse rapidly. I am concerned that I may be unable to monitor my condition properly without my husband's presence. Dr. Gordon, my internist, is very worried that I will be at increased risk without him being here to assist me as needed, especially during the night. Stress causes severe consequences for diabetics.

He has always been discreet about his clients and, in regard to his clients in Costa Rica, I knew that, as an attorney, he had to go there to do "due diligence" regularly to make sure their business was being handled according to the law. Until more recently, I did not know exactly what their business entailed. I do remember that several years ago, Hank brought up to me that he was concerned about their business and wanted to get legal advice regarding it. He called our neighbor, a criminal attorney, to get a reference for someone to see. After getting legal counsel, he told me that the legal work and banking services he was providing for the Costa Rican businesses were, indeed, legal according to the information he knew or had. I remember that he was glad to know that what he was doing was within the law. He, obviously, had no idea at that time that the clients were conducting a fraudulent business, as he would not have been involved!

Even as he faces this terrible situation, he has been honest and straightforward with me, our children, my family (he no longer has any close relatives), business associates, community service associates and our friends and neighbors. He continues to give time to charitable entities and to help people out. He is the most wonderful, kind and caring person I know and I love him dearly.


Sincerely,    Janet Walther

Janet Walther


EXHIBIT ____4____

PAGE ____84____

1005 GLENHAVEN DRIVE • PACIFIC PALISADES, CA • 90272
310-459-1762 • FAX 310-459-8773

## Henry W. Walther
## Community Service

1. Devereux School for developmentally disabled children in Goleta - 1964-1966.
2. Brentwood Presbyterian Church – member since 1952
   a. College Group advisor/sponsor – 1969 to 1973
   b. BPC Endowment Fund Committee – authored Endowment Trust
   c. Tijuana, Mexico: Casa de Todos, work trip to build homes for cardboard city residents - 1971
3. Santa Monica Jaycees
   a. President – 1975-76
   b. Huck Finn Day – annual community event - fishing and games for community children
   c. Visits to Terminal Island correctional facility for special programs for inmates
   d. Constitution Day Parade
   e. Chair of many other special community events
   f. Outstanding Young Educator presentation with Lions Club
   g. Bosses' Night honoring Boss of the Year in City of Santa Monica
   h. Outstanding first year Jaycee – District 7 in 1973
   i. Outstanding Jaycee – District 7 in 1974
   j. Distinguished Service Award, 1975 – honoring one person annually for exceptional service in Santa Monica during the year
4. California State Jaycees
   a. State Vice-President – Metro (large chapters) 1976
   b. Outstanding Jaycee – California (SPARK Award) 1975
5. Coauthor of law review article "Inflation and the Progressivity of the Federal Individual Income Tax," published in California Western Law Review - 1974
6. Santa Monica Rotary Club
   a. Kettle Day – Salvation Army
   b. Vice President, Programs 2004-2005
   c. Treasurer 2003-2004
   d. Director 1986-1987
   e. Chair, Volleyball 1997-2007
7. Boy Scout Troop 223
   a. Assistant Scout Master – 2000
   b. Troop Committee – 2000-2007
   c. Boy Scout Troop 23 – donate facilities for teaching non-swimmers to swim, Swimming and Life Saving Merit Badges work
8. Palisades High School Swim Team
   a. Parent Support Group and fundraising
   b. Set-up and scoring at meets with other high schools
   c. Statistician for team
   d. Host for special events
   e. Financial donations
   f. Complimentary preparation of non-profit organization tax return



EXHIBIT ___I___
PAGE ___85___

9. University of California, Santa Cruz men and women's swim team and Diving team - 2003 – 2007
    a. Host at home and financially pay for entire team (36 to 75) and coaches (3 to 4) semi- annually for dinner, sleepover and breakfast
10. National Charity League, Los Angeles Founder Chapter
    a. Men's Floor Committee – Coronet Debutante Ball honoring young women for 6 years of community service in the southern California area
    b. Provide forum for NCL Board meetings as needed
    c. Provide complimentary business and financial advise as requested
11. Pacific Palisades Family YMCA
    a. Volunteer work - real property purchase – Temescal Canyon
    b. Swim meets
        i. Set-up and take-down and management help for inter-Y meets
        ii. Scoring for meets
    c. Fund-raising for Y and swim teams
12. Santa Monica Family YMCA
    a. President - 1984
    b. Endowment Committee – current member
    c. Advisory Board – current member
    d. Fund-raising – current and past annual sustaining drive
13. Santa Monica Red Cross
    a. Blood donations for over 30 years – 10 gallon club
    b. Rare type of blood – O Negative (Quad) – used for any infant
14. Marquez School
    a. Halloween Festival fund-raising event set-up, work and take-down
    b. Other fund-raising and miscellaneous help
15. Paul Revere Jr. High School
    a. Science and agricultural restoration committee
16. Life member - Riviera Lodge No. 780 – Free & Accepted Masons
17. AYSO Soccer – Assistant Coach in 1980's
18. UCSB Phi Kappa Psi Fraternity – present alumni treasurer
19. Volunteer tax and legal work for people without means
20. Teen-agers in need
    a. Room and board and guidance
        i. Peter Hopelain
        ii. Susan Hodges
        iii. Ruffin Settle
        iv. Ashley Lambert

EXHIBIT ____I____
PAGE ___86___



PORSCHE

THIS HONORABLE DEAN D. PREGERSON
UNITED STATES DISTRICT JUDGE
CENTRAL DISTRICT OF CALIFORNIA

McKenna Porsche

10830 Firestone Blvd.
Norwalk, CA 90650

(562) 868-3233 Fax: (562) 345-7364
mckennaporsche.com

DEAR JUDGE PREGERSON

I am currently the youngest parts and service director for Porsche in the country. I race cars, achieving rookie of the year and highest scored schooling in ten years. In addition, I sit on an advisory board for a hybrid car design company. But most importantly, I am happy with myself. I make the people around me laugh and I make them think. Having this success has not always been the case in my life and one person I have to thank is Hank Walther. My name is Peter Sutton Hopelain and I have been asked to write about Hank.

I met Hank when I was 13 years old through his son, Scott. My first memory of him was 'this guy has a cool stereo in his Cadillac'. I was a very impressionable child. Soon after meeting the Walther's, my parents decided to put all of their efforts into a spiritual journey and allow god to raise me. It wasn't the Cadillac or cool stereo that drew me to Hank, he was someone I felt I could trust after being abandoned by my own parents. Having no real desire to go home, the Walther's always made me feel welcome in theirs. At the time this isn't really something that I was cognizant of, but after a few years it would become what I would call home.

Instead of attending the local high school, I was sent to boarding school due to my problematic behavior. Scott was the one I called when I needed to connect with my friends and catch up on the happenings of the neighborhood. If Scott were not available, Hank, Janet, Kristen or Kurt would talk with me. At the time it seemed trivial to talk to someone's dad for a minute, but in hindsight it was something comforting while in a foreign environment. I was asked to leave the school after a short period. Upon return, life at home with my parents grew weirder and worse causing me to distance myself from everyone. I spent about five years blowing off life and all the responsibilities that go with it. Once again, looking back at that period, the Walther's house was the constant. It was always important for me to stop by the Walther's house or building and say hi.

Because my sisters were concerned with my well being due to my drug use and living in my parent's environment, I went to live with my sister in Missouri. After 6th months of excessive drinking, I decided to return to California where I proceed to go off the deep end with my alcohol and drug abuse, finding myself living in a park in Santa Cruz. I called the Walther's house and explained the situation to Janet. She said she would talk to Hank and to call her back in a couple of days. I did not feel I had that much time and called back the next day. Hank answered the phone and laid down the rules. No drugs, no girls, no parties in the house. Either school or get a job, and most of all, I had to have a plan. In return, I could have a roof and some food. This was a very hard time for me. I didn't recognize who I was, didn't understand responsibility. I remember very clearly some defining moments during that first stay in the Walther house. I figured these people could never want to hurt me, contrary to what I was accustom to. This was the point in my life where sitting at the dinner table in the kitchen and talking to Hank, I figured out what I should do with my life. I decided with a love for cars and a knack for business, I would combine the two. Hank helped me decide what I should do first. I enrolled in school to a technician and hated it. After bumbling around, I was nudged by the Walther clan. Some memorable words that stay with me to this day are 'if you can sweep floors, then there is a job out there'. So I did, sweeping floors for Santa Monica Toyota. When I had finally made enough money to move out, I was trying to thank them and they said the best thank them was showing them I will do well.

The next stage in my life was marriage. My parents almost didn't come to my wedding because they didn't approve of the guest list. However, it was more important to me the Walthers attend because I felt they had more invested in my well being. I moved back up to LA for a job. It was never offered, it was understood that I would stay with the Walthers until I found a house to buy.

I came to a realization a few years later while trying to help my parents with their financial woes. I didn't need it, I didn't need them, and they have only held me back. I realized that over all the years of trying to find myself, being super cool and super ridiculous, I knew where my home was it was with the Walthers

My life has been filled with adversity. It has been Hank's ability to inspire and lead by example that I attribute my health and well being to. I have every intention of being in hank's corner good, bad, or ugly and stay there because in a time of reflection he has always been in mine.

PETER HOPELAIN

EXHIBIT J
PAGE 87

PREMIER
DEALER

**WILLIAM RUFFIN SETTLE**
**11327 GLADWIN STREET**
**LOS ANGELES, CALIFORNIA 90049**

June 8, 2007

The Honorable Dean D. Pregerson
United States District Judge
Central District of California

Dear Judge Pregerson:

I am writing to tell you about the friendship and support shown to me
by Henry Walther over the past 16 years. His eldest son and I met in 1991
in High School; we were on the varsity swim team together and had a close
relationship. My father was not around and there were many times I went to
Mr. Walther for fatherly advice and guidance, I respected him, his family
and valued our friendship immensely. Mr. Walther and his family opened
their home to me on a consistent basis not only in the years I attended high
school, but to this very day. He has treated me not just as a friend of his
sons, but as a valued family member throughout all these years.

In my years of knowing Mr. Walther, this generosity and camaraderie
I speak of has been extended time after time. In fact Mr. Walther has given
the same treatment without hesitation to all the people in his sons circle and
everyone I met thru the Walther's consequently since then. I have been
fortunate to experience this acceptance, continual aid, and guidance. Mr.
Walther's treatment of me and what I have witnessed him do for others will
always influence the way in which I treat my family and friends.

Unfortunately, a few years after graduating, I developed a substance
abuse problem and made some very poor choices. Subsequently abandoned
by my family, I had no one. I was eventually arrested on February 25, 1995
at the age of 20, and had no one in my immediate family to turn to. I made a
collect phone call to Mr. Walther from LA County Jail, and in the same
manner of caring, he proceeded to post a substantial bail to secure my
release to his custody. He trusted in me when no one else would, asking
only that I abide by his terms and conditions, he gave me the guidance and

EXHIBIT __J__
PAGE __88__

trust which I desperately needed. Upon my release, I had nothing, Mr. Walther provided me with food, shelter, clothing and friendship. He even went to the lengths of personally driving me to my appointed court dates.

In April 1999, I had a stroke from a brain hemorrhage, and subsequent neurosurgery. After 5 years of rehabilitation, I had almost regained the full use of my right side. In 2005, I was hospitalized once again; this time for an additional brain injury from being a victim of a violent assault and robbery. This assault resulted in a re-expression of the physical paralysis. However, now I have been informed not to expect to ever fully recover and in addition to the physical disabilities, I have mental disabilities due to the brain trauma. With no idea of what to expect for my future, and concern for the injuries I suffered, I called Mr. Walther. I asked him for yet another avenue of guidance, he gave freely the opportunity to defend my rights as a. victim in a civil suit, and offered his help in defending me. Mr. Walther has been a continual help and comfort, I feel very fortunate to know Mr. Hank Walther, and hope that I will continue my friendship with him for many years to come.

Now I am 32 years old and due to the stroke and brain trauma, I have had help writing this letter, but the sentiments are mine alone.

Respectfully,

William Ruffin Settle

June 5, 2007

The Honorable Dean Pregerson
United States District Court
Central District of California

Re:  Henry Walther

Dear Judge Pregerson:

My home is in Santa Barbara, California.  I have been the houseguest of Janet and Henry Walther for most of the spring this year, 2007, in Pacific Palisades.  This has been a great personal help to me and has been of their free will in order to assist me in my new acting career.  With this assistance, I have been able to attend classes in the Los Angeles area with David Mamet, a well-known playwright, screenwriter, director and producer in the theatrical industry.

It has been helpful to my chosen career, and I appreciate their courtesy.

Very truly yours,

Ashley Lambert

EXHIBIT J
PAGE 90

*National Charity League*

### LOS ANGELES FOUNDER CHAPTER

5000 HOLLYWOOD BOULEVARD  LOS ANGELES, CALIFORNIA  90027-6104
TELEPHONE 323-665-5981  FAX 323-665-0851
NationalCharity@sbcglobal.net
TAX ID NUMBER 95-1756421

September 28, 2009

*The Mother Daughter Charity*
*Sponsor of Ticktockers*

FOUNDER PRESIDENT
MRS. PAUL WILLIAM LAWRENCE

BOARD OF DIRECTORS

MRS. STANLEY WILLIAM VOGEL
   President

MRS. JAMES HASSENFRATZ
   Vice President
   Ticktocker Patroness Coordinator
MRS. CHRISTOPHER CURRY
   Vice President
   Provisional Coordinator
MRS. GREGORY THORPE
   Vice President
   Adult Group Coordinator
MRS. JAMES BAILEY
   Vice President
   Junior Charity League Coordinator
MRS. OWEN FROST
   Recording Secretary
MS. MARY ANNE ATKISSON
   Corresponding Secretary
MRS. JOHN GOSCH
   Treasurer
MRS. CHARLES E. WASHBURN, JR.
   Parliamentarian
MRS. JOSEPH APONTE
   Director
   Coronet Debutante Ball
MRS. RANDY RHODEN
   Director
   Membership
MRS. KEITH L. MACKIE
   Director
   NCL-FFC
MRS. JOHN BOWLES
   Liaison-FFC Board
MRS. PHILIP ALFORD
   Director
   Ways and Means
MRS. WILLIAM B. WITTE
   Advisor

ADVISORY BOARD
*MRS. MERLIN MICHAEL WITTE
   Chairman
*MRS. CHARLES R. COLWELL
*MRS. WILLIAM CHARLES DORAN
*MRS. BURTON L. FLETCHER
*MRS. REX HOWARD FOUNTAIN, JR.
*MRS. PHILIP SCHUYLER KAMM, JR.
*MRS. EDWIN KOLL
*MRS. DWIGHT R. LINDHOLM
*MRS. DAVIS NEWTON LOTT
*MRS. NEIL O. McGOVERN
*MRS. VICTOR MONTALBO
*MRS. EASTHOPE NORATO
*MRS. STANLEY WILLIAM VOGEL
*MRS. HENRY WILLIAM WALTHER
*MRS. WILLIAM B. WITTE
*MRS. RAYMOND ZICKFELD
*Past President Founder Chapter

Dear Judge Pregerson,

I am the current president of National Charity League, Los Angeles Founder Chapter. I have known Janet and Henry Walther for over twenty years and worked closely with Janet within the organization. Janet is a past president of NCL, LA. She is currently serving as president of the Coronet Debutante Ball, a mother-daughter philanthropic event celebrating a young-woman's entry into society and a culmination of six years of community service in the Los Angeles area.

Henry is a rare treasure with respect to community service in the Los Angeles metropolitan area. He was the presenter of the Coronet Debutantes in 1994, and continues to be involved with the Ball annually as a member of the men's floor committee. Last year he was advisor to the presenter. Janet and Henry have, out of the goodness of their hearts, repeatedly opened their home for charitable endeavors.

On two occasions, including this year, Henry has kindly volunteered to drive to Palm Desert to pick up one of our elderly members, Vera Handley, so that she could attend the luncheon for the new Debutantes at the Bel-Air Country Club. Without Henry's assistance, Mrs. Handley would not have been able to attend.

Henry will again be serving on the men's floor committee this year at our Ball scheduled for November 28th.

I respectfully request that you take Henry's decades of community service into account when your decision is made.

Sincerely,

Mrs. Stanley W. Vogel (Gloria)

EXHIBIT __K__

PAGE __91__

*Sponsor of National Charity League - University of Southern California Teacher Center*

LANNING & PETERSON
ATTORNEYS AT LAW

MICHAEL K. LANNING*
JAMES R PETERSON*
MELISSA P. YOUNG

*A PROFESSIONAL CORPORATION

11777 SAN VICENTE BLVD., SUITE 750
LOS ANGELES, CALIFORNIA 90049

TELEPHONE
(310) 820-1600

FAX
(310) 820-5400

June 12, 2007

The Honorable Dean D. Pregerson
United States District Judge
Central District of California

Re: Henry Walther

I have known Henry Walther for the past twenty years as a dedicated, caring and effective Scout Leader and a family friend of the highest integrity.

For the first ten years of my association with Hank, he served as an Assistant Scoutmaster of our Scout Troop of some one hundred boys. During that time, he specialized in assisting with the camping program, particularly the High Adventure Program. Our High Adventure Program is the most demanding and in need of skilled and caring volunteers. Twice, Hank served as an adult leader on seventy-five mile plus hikes in New Mexico over twelve day periods. He was also one of the adult leaders on a three week European tour including one of the Danish National Jamborees. This extremely rewarding trip for our youth, but very difficult for adults, involves touring in the major cities of western Europe and then tenting in the challenging weather of northern Denmark. Hank has also served as a leader on backpack trips in the High Sierra, the Sawtooth Mountains of Idaho, and in all of our local mountains. These expeditions often lasted for two weeks and included river raft trips and other strenuous activities. In all of this service to our community's youth, Hank gave of his outdoor skills, his patience and caring for young people in a very skilled and empathetic manner, and particularly modeled his lifestyle of honesty, caring for others, and adhering both to Scouting's rules, the rules of the areas in which we visited, and the commonsense rules of anyone who wishes to survive and teach others to survive in the wilderness.

Possibly Hank's crowning gift to the young men with whom he associated, was his leadership on a very challenging eighty-three mile canoe trip in the Boweron wilderness, five hundred miles north of Vancouver, Canada. I believe that Hank's commonsense and persistence in the face of poor decisions made by a fellow leader literally saved the lives of some in the expedition.

Henry Walther has continued his service to Scouting after his sons became Eagle Scouts, assisting both sons as Sea Explorers, one of the groups for older Scouts. Hank has also continued to serve on our Troop Committee, assisting with our annual auctions, and making himself available for select trips when other leadership was difficult to secure. In all this, he has simply been a "Man for Others".


EXHIBIT K
PAGE 92

Finally, as an attorney for the past forty-nine years, I believe that I have had some experience in judging character, particularly the component of honesty. I firmly believe that if Hank Walther told me that he knew or did not know something, that I could rely upon that statement as true. In countless situations over the last twenty years, I have tested that theory and found it to be absolutely true. Therefore, if Henry Walther told me that he was connected to an enterprise that turned out to include criminal activity, but did not know of that activity, I would believe him. I might be disappointed that he had not discerned the necessary facts to make a better judgment, but I would not conclude that he had intentionally broken the law.

I would certainly be available to answer any questions in that area about which Your Honor might wish to inquire.

Yours very truly,

Michael K. Lanning
Attorney at Law



# FirST PreSBYTerian CHurcH oF newHaLL

At First Presbyterian Church we invite people to follow Jesus Christ in a community where we
EXALT God in Worship, EMBRACE one another in love, ENCOURAGE spiritual growth,
and EQUIP every person for ministry in the church and world.

June 6, 2007

The Honorable Dean Pregerson
United States District Judge
Central District of California
San Rafael, CA 94901

Your Honor:

I am writing this letter on behalf of Henry (Hank) Walther. Having served as Associate Pastor
of Brentwood Presbyterian Church for almost 18 years, I have known the Walther family for
approximately 20 years. In that time I can speak very highly of the civic concern and character
of the whole Walther family. When I first came to the church in 1986 the Walthers opened
their home in Pacific Palisades to a weekly Junior High Bible Study. Their family was involved
in all children's activities of the church and each of the three children completed Confirmation
Programs and were confirmed as part of three generations of the family actively involved in the
Church. Indeed, Hank and Janet met in the high school department of the church. Janet's fa-
ther Russell Johnson was a respected educator and Principal in the LAUSD for many years and
was an active, respected, highly decorated leader in Boy Scouts of America for 65 years. With
the family's support I was fortunate to officiate as the cleric at both boy's Eagle Courts and
Scott's honor Court for the highest award available in Sea Explorers.

Hank has served the church faithfully as a sponsor of the college age group at BPC in the
1970's. He became involved in 2nd grade Sunday School in 1952, and has been a member of
the church for 50 years. He led a volleyball league that met at the church throughout the 80's.
He wrote the Endowment Trust for BPC and was on the Endowment Committee for years in the
1990's. In addition, he would sing faithfully in the men's chorus every summer, and in the
choir on special occasions.

In addition to serving the church, the Walther's demonstrated to their children the need to be
involved in civic activities and by their example, their daughter became President of the Santa
Monica Junior Chamber of Commerce. I was blessed to officiate at her wedding. All this re-
veals the character of a man and his family that I believe is stellar and would ask for your con-
sideration of his character in making your judicial decision.

Sincerely,

*William Barnes*

Rev. William Barnes
Pastor

EXHIBIT    K
PAGE    94

24317
Newhall
Newhall
California
Avenue
91321
P:661.259.0555
F:661.259.8054
www.presby-newhall.org
presby2@pacbell.net



# *Rotary Club of Santa Monica*

PO Box 586 · Santa Monica, CA 90406-0586 · 310.917.3313
rotaryclubofsantamonica.org
Meets Noon Every Friday · Service Since 1922
Riviera Country Club · 1250 Capri Drive · Pacific Palisades

June 12, 2007

The Honorable Dean D. Pregerson
United States District Judge
Central District of California

Subject: Letter of Reference for Henry W. Walther

Dear Mr. Pregerson;

I have known and worked with Hank Walther since I joined the Rotary Club of Santa
Monica over 20 years ago. Hank has consistently been an active and positive leader in
the club. He has held positions as Director in 1986-87, Treasurer 2004-04 and Vice
President in 2004-05. These are elected positions representing the vote of our 160 plus
members. He has also participated on and headed a number of committees including
Craft Talks, Spiritual Emphasis, Athletics and Volleyball. I played with and against Hank
a number of years on Rotary volleyball teams and respect his honesty and
sportsmanship. Hank and his wife Janet hosted Japanese Rotary exchange students
for several weeks in the 1980's. Last year Hank led our efforts to review and update the
Bylaws and Policies & Procedures for our Club.

In all of my personal and professional dealings with Hank, I have consistently observed
the highest level of integrity and honesty.

Sincerely,

*Jim Dyer*

Jim Dyer
President,
Rotary Club of Santa Monica

EXHIBIT K
PAGE 95



**1332 Sixth Street  P.O. Box 1160 Santa Monica, CA., 90406**
**phone 310.393.2721  fax 310.451.9906  www.ymcasm.org**

OFFICERS  President - Ray Carriere, Vice President - Gerald Bruver, Secretary - Ross Furukawa, Treasurer - Don Cohen

**BOARD OF DIRECTORS**

Roy Almeida
Curtis Baer
Judi Barker
Jeanne Barnard
Mike Cortrite
Tony Cristiano
Myung Deering
William Frank
James Haljun
Alonzo Hill
Jeffrey Jarow
Richard Lawrence
Marvin Levin
Fabian Lewkowicz
Steve Litvack
Patty Loggins Tazi
Diane Margolin
Montrose McCormick
John McIntire
Jean McNeil Wyner
Greg Naylor
Skip Rimer
Karl Schober
Russ Warner

**ADVISORY BOARD**

Michelle Adelson
Donna Alvarez
Vivian Arterbery
Russell Barnard
Linda Bozung
Rosalio Casillas
Grace Cheng-Braun
Roma Cockins
George Collins
Robert Crosby
Ron Davis
John Gilmore
Shawn Hakansson
Dale Humphrey
Herb Katz
Jeff Klocke
Tom Larmore
Paul Leoni
Connie Maguire
Dorothy Menzies
Greg Mullen
Dave Nelson
Eric Parlee
Herman Pass
Harold Quigley
Phillip Sanchez
Jeff Segal
Wendell Shirley
Henry Shishmanian
Nathaniel Trives
Mike Vaughan
Henry Walther

**EMERITUS**

Frank Blenkhorn
Deane Funk
Frederic McNairy
William Mortensen
Robert Moore
James Mount
Lowell Patton

June 12, 2007

The Honorable Dean Pregerson
United States District Judge
Central District of California

Dear Judge Pregerson,

Henry Walther has been actively involved with the Santa Monica Family YMCA for over 30 years. He first joined the YMCA Advisory Board in 1974 while also serving as the President of the morning Y's Men's Service Club. Henry also was the moving force behind Bingo at the Y, a fundraiser developed and operated by the Y' Men's Service Clubs, which was a major fund raiser to subsidize our YMCA operation during the 1980's and 1990's.

Henry served a two -year term as the President of the Board of Directors from 1982 to 1983. Most presidents serve only a one-year term. However, this was a critical time for our YMCA as we embarked on the first phase of our three-phase capital expansion project and Henry was heavily involved in the campaign project. He was a very capable president and directly contributed to our over all growth.

He is a decent individual with good character. I know him to always be sincere, loyal and trustworthy. He has always had the YMCAs best interest in mind. As a trustee for over 20 years, he drafted the Declaration of Endowment Trust Fund for the YMCA. Henry chaired our Annual Fundraising campaign in 1980 and he continues to play an important role as a campaigner in our annual sustaining drive.

He has been very faithful and loyal to the YMCA over the past 30 years. He takes his responsibilities seriously and is someone I can always call on for assistance.

Sincerely,

Tara Pomposini
General Director & CEO

EXHIBIT _k_
PAGE _96_

The Honorable Dean D. Pregerson                              June 12, 2007
United States District Judge
Central District of California


Dear Judge Pregerson:

My name is Lionel G. Ruhman; a builder, residing in the Pacific Palisades since 1965 with my wife Elza.

I am writing this letter on behalf of my friend, Henry "Hank" Walther. I met Hank in 1978, as a fellow Santa Monica Rotarian, and we have noticed other common interests, Freemasonry, church activities, Boy Scouts, YMCA, and the Junior Chamber of Commerce.

During my year 2004-2005, as President of the Santa Monica Rotary Club, Hank served with distinction as Vice President, responsible for programs and speakers. He also completely revised the Clubs policy and procedures manual, as well as assisting me with parliamentary and procedural issues.

July 4, 2005 Palisades Americanism Parade, he organized and drove an open top automobile with the Santa Monica and Pacific Palisades Rotary Presidents.

He is a highly revered lifetime member of the Rivera Masonic Lodge #780, and in 1975, he won the Santa Monica Distinguished Service Award of the Junior Chamber of Commerce.

I know him to be active in his church, he is an assistant Scout Master of Troop 223. He is also Past President of the Santa Monica YMCA Board of Directors, as well as serving as Past President of their Y's Men's Breakfast club, a YMCA support group.

He and his wife Janet were very active in the Pacific Palisades public school system, where their three children attended, and were high achievers receiving scholarships. Their daughter, Kristin, this year received the Santa Monica Distinguished Service Award. Their son, Gregory received the US Navy Award for achievement upon graduation, won a Masonic Lodge College scholarship, and had perfect attendance during his entire 12 years in the unified district public school system. Their son, Scott is an Eagle Scout, and received the Quarter Master award, the highest rank in Sea Scouting. He has continued to volunteer time for scouting and Rotaract in Santa Barbara.

Lastly, Hank and his wife Janet, (an accomplished builder) over 20 years ago took into their home and family a young man without family and mentored, educated and loved him as their own. This young man is now a first class builder, cabinet maker and finish carpenter, admired by all members of the craft.

Your Honor, I thank you for your indulgence of my lengthy letter of testament in favor of my friend. If he has any faults whatsoever; it might be that he is very trusting of friends, relationships and associates. In some situations this may not always be favorable. Please be lenient if you can.

Trusting that justice with mercy will be rendered, I remain,

Respectfully,

*Lionel G. Ruhman*

Lionel G. Ruhman

EXHIBIT     K
PAGE     97

# JOHN R. WILSON
## ATTORNEY AT LAW

16800 EDGAR STREET
PACIFIC PALISADES
CALIFORNIA 90272
(310) 454-5602
(310) 230-8768 (FAX)
e-mail: jrwil@irwcomputers.com

P.O. BOX 217
JUNE LAKE
CA. 93529
(760) 648-7096

June 12, 2007

The Honorable Dean Pregerson
United States District Judge
Central District of California

Re: United States vs. Henry Walther

Dear Sir,

I am an Attorney licensed to practice in the State of California and admitted to the Central District of the United States Courts. I have a triple "A" rating with the California State Bar and was a Deputy Los Angeles City Attorney – Criminal Division - for over 23 years. I have also practiced with the defense bar for several years.

I have been a Scout Leader in Pacific Palisades for over 48 years and I am currently a Reserve Specialist with the Los Angeles Police Department.

I tell you this history in hopes that my words will weigh well on that which I am about to represent to you: I have known Henry (Hank) Walther since the mid 1980's. Our relationship was mostly in Boy Scouting where he served with distinction as an Assistant Scoutmaster while his boys were on the road to Eagle Scout. I have found him to be diligent, hard working and supportive in every way.

Henry Walther's reputation in our community was at the highest level, helping in numerous youth groups, swim teams and charitable organizations. I have never had any question about his trustworthiness, loyalty to family, associates and friends and his honesty.

In the matter before the bench, and true to his nature, Henry Walther has accepted responsibility for his actions. He has agreed to assist the U.S. Attorney in the prosecution of this case and to help right his wrong. I make a point of this because this really is Hank Walther. In my opinion, he is honest and accepts responsibility for his and others actions to a fault. I do not think there is a mean or dishonest bone in Hank Walther's body.

In all the years I have known Hank Walther, he has never lied to me, stretched the truth or misrepresented any issue that we discussed. He has always been candid and open with me as a good friend should be. I am thus shocked and dismayed at the indictment before you and even more shocked that he has entered a plea before you.

EXHIBIT K
PAGE 98

Page 2 of 2 Letter to the Honorable Dean Pregerson 6-12-07

It is with every fiber in my legal body that I ask that you find compassion and leniency for Henry (Hank) Walther. If ever there was a man that deserved special consideration in sentencing, it is Hank. I do not ask this only because Hank is a good friend. I base my plea to you upon my over 2,000 jury and court trials, handling tens of thousands of criminal cases, confronting, talking with and counseling numerous criminals that flow through our system.

Henry (Hank) Walther does not belong in the Criminal Justice System. Knowing the Walther family as well as I do, Hank's acts, in my opinion, were naïve and foolish and lacking in cerebral evaluation but lack the criminal mind set.

If I can be of further service to the Court, please feel free to call upon me.

Thank you for your consideration.

John R. Wilson
Attorney at Law
State Bar #048882

EXHIBIT K
PAGE 99

# Richard Bea Wilken                          AIA-FAIBD

A          R          C          H          I          T          E          C          T

The Honorable Dean D. Pregerson                                    June 19, 2007
United States District Judge                              Re: Henry W. Walther
Central District of California

Dear Judge Pregerson:

       I would like to take this opportunity to give my highest unqualified support and personal testimony on behalf of my friend Henry W. Walther.

       I have known "Hank" as he is called by all his friends for over 25 years. We met when our wives each served as President of the Palisades Jr. Women's Club and members of Los Fortunas – both service clubs generating financial support for local schools and worthy community charitable projects. Over the years, Hank and Janet have generously donated their time and hosted numerous charity events and club wide functions at their home.

       Hank and his two sons have been a big part of the local Boy Scout Troop 223, both boys (Scott and Gregory) with Hank's guidance and support achieving scouting's highest rank of Eagle. Hank often volunteered adult supervision on many week long troop back packs in the California Sierra's and at the Philmont Scout Ranch in New Mexico. Hank has donated countless hours, days and weeks sharing his love of nature and passing on camping skills with hundreds of young scouts besides his own children. Hank presently serves on the Troop 223 Committee donating his time in providing leadership and direction in the long term planning for the safe and ethical development of the youth of our community. Through the years of working with Hank in scouting, while on a camp outs or counseling a problem youth, I have always admired the calm mature yet fun loving example he has provided for the young men in the troop.

       In addition to Boy Scouts, Hank has provided years, no decades of support and guidance with his children's involvement in competitive swimming on the YMCA, high school and College team levels. His unselfish support in helping his children, and their fellow team members, reach championship form is a testament to his love and dedication to his family and their friends. The Walther's always house his son's entire college team when they are in town.

       Hank has distinguished himself in volunteer service to the greater community welfare by personal involvement and financial support to many local service organizations.   Hank is or has been active in the Santa Monica YMCA Breakfast Group, received the Distinguished Service Award from the JC's, served as an officer to the Santa Monica Rotary Club, financially supported the Santa Monica Boy's and Girl's Club and numerous other worthy causes.

       In closing, I request your kind consideration of the above facts as my unqualified personal testament as to Hank's quality of character, his dedication to community service, his service to youth, his generous support to charities, his loyalty to his friends and love of his wife and children. In short – this is a good man who deserves compassion in this time of need.

Respectfully:

*[signature: Richard Bea Wilken]*

**Richard Bea Wilken AIA-FAIBD**
Past president - Pacific Palisades Civic League
Past President - Pailsades Optimist Club
Past and current President - Palisades Lutheran Church          EXHIBIT  K
Troop 223 Assistant Scout Master (16 years)
Pacific Palisades Honorary Town Sheriff                              PAGE  100

---

R. B. Wilken  16777 Edgar Street  Pacific Palisades, California 90272-3226   310 454-4809  FAX 310 454-7307

February 1, 2009

Dear Judge Pregerson,

We have been next door neighbors of the Walthers for 36 years. Hank has always been helpful whether it is our home or theirs - like pitching in to help my husband clear our hill after the fire to more exciting things like helping to put up the huge flag pole in their backyard.

All through the years, their home has been a place for kids from Pali High to the Boy Scouts earning merit badges.

Hank always set aside one day a week to have lunch with his ageing parents when they were alive. He also spent lots of time with his young kids.

All through the years, the glad times and sad times, Hank was always there for us. In June, 2003, my husband had a seizure at Corpus Christi Church and was in Berkley East Convalescent Hospital in Santa Monica until his demise in December, 2007. Since I don't drive anymore and I went every day to be with my husband, I could always count on Hank to drive me or pick me up at the hospital. He is always there to help everyone in the community.

He takes out my trash cans every week and brings them in at night. He helps me with yard work when I ask him and with other household things I need help with.

I lost my daughter, Betty Jo, in July, 2007 and Hank and Janet hosted a luncheon after the services at my home.

I recently fell at home and fractured my pelvis and Hank and Janet were here to help me.

When you live next door to someone for 36 years, it is hard to pick out all the nice things Hank has done for us through the years. I rely on him and need him to continue to help me.

Very truly yours,

Maryrita E. Binczak
Maryrita Binczak

EXHIBIT _____ K _____
PAGE _____ 101 _____

American Red Cross of Santa Moni
1450 11<sup>th</sup> St
Santa Monica, Ca 90401
310-394-3773



American Red Cross of Santa Monica

June 8, 2007

RE: Henry W. Walther

The Honorable Dean Pregerson
United States District Judge
Central District of California

I am writing to behalf of Henry W. Walther, in support of his request for
leniency in sentencing in his pending court matter.

Henry is a valuable member of our Red Cross volunteer team here in Santa
Monica and his absence from our program would be a significant loss to our
chapter and to our community.

Since 1974 when he began his affiliation with our chapter as a member of
our Board of Directors, Henry has become a truly valuable assist in our
operations. As a volunteer leader, disaster responder and blood donor,
Henrys' actions over the years have helped many local citizens to lead more
productive and safer lives.

As a leadership volunteer Henry has and continues to play an important role
in ensuring we can fulfill our mission of responding to both local and national
disasters. As a disaster volunteer, Henry helps to make sure local residents
who are burned out or otherwise displaced due to local disaster are taken
care of. Henry's commitment and caring for others reflects the highest credit
to himself and his spirit of compassion for others.

In addition to these efforts, Henry holds a distinct honor of having donated
over 40 units of blood in the last 30 years. While that effort alone makes
Henry a very special member of the community, even more importantly is the
fact that Henry's blood type (o-) makes his blood very valuable in an of itself.

As you may know, this blood type is considered a universal donor. This
means that his blood is compatible with virtually all blood types.

EXHIBIT __K__
PAGE __102__

*June 8, 2007*
*Page 2*

It is in fact the most valuable blood donation we receive. It is this blood type that is most often used to save the lives of those who suffer traumatic illness and injury. Even more remarkably, Henrys' blood is doubly special because it lacks a specific antigen that allows it to be used for special need transfusion including newborn babies.

If Henry were to be incarcerated obviously he would not be available to continue his volunteer efforts here at the Red Cross. Henrys' departure form our volunteer staff would not only reduce our mission effectiveness but literally would reduce our ability to provide lifesaving blood transfusion products when it is needed most.

I can see not purpose to be served in incarcerating Henry but can see much harm that will be done to the community. I thank you for your consideration of this of this request to keep Henry in the community where he has and continues to help so many of his fellow citizens.

Sincerely,

John M Pacheco
Executive Director

*Together We Prepare*

EXHIBIT    K
PAGE    103

## KURT PLEVKA
## GENERAL CONTRACTOR

License # 555691

June 10, 2007

The Honorable Dean D. Pregerson
United States District Judge
Central District of California

Dear Judge Pregerson,

I have lived with the Walther family for over 21 years.
I had been hired by Henry Walther to help supervise and construct a new home addition he and his wife, Janet, were doing as owner/builder in order to accommodate their third child. I had previously done some home repairs for them. At the time, I did not have a place to live. Henry (Hank) volunteered to let me stay at his home during construction on his house. He allowed me to get my things out of storage and stay in the family room.

After completion, I continued to stay at their home. During the following years he encouraged me to go to school to get my G.E.D. He then guided and supported me while I studied and went to school to get my California State Contractors License.

With his many years of and continuing guidance, I have developed honest and sound business practices and a very strong work ethic. He continues to help me, guide me, counsel me and encourage me to relate positively with people and to be ethical and make sound business decisions. He also supports my personal desire to be the craftsman I want to continue to be. I consult with him on a daily basis.

I am content in what I do and who I am and owe a great deal of this to his character. He continues to be a role model and father-figure in my life. I know him better than my own father who lives in the East and that I seldom see. I consider him to be my dearest friend.

Please honor my sincere request to keep Henry at home in Pacific Palisades where he can continue to mentor me and also help our local community through his service. He is so generous with his time in helping local youth, swim team events, Boy Scouts, neighbors, schools and so many other things in the Palisades and Santa Monica area.

Sincerely, *Kurt Plevka*

**1005 GLENHAVEN DRIVE • PACIFIC PALISADES, CA • 90272**
**PHONE: (310) 453-3622   •   FAX: (310) 459-8773**

EXHIBIT K

PAGE 104

15278 Friends Street
Pacific Palisades, CA 90272

June 12, 2007

The Honorable Dean Pregerson
United States District Judge
Central District of California

Dear Judge Pregerson:

I am writing this letter in support of the character of my friend and fifteen year acquaintance, Henry Walther. Mr. Walther and I met as parents and assistant scout masters for Boy Scout Troop 223 in Pacific Palisades. Mr. Walther's younger son, Greg, is the same age as my own son. In addition to innumerous campouts, backpacks and scout meetings where Mr. Walther was always a willing volunteer and leader, I was privileged to attend the international Danish Jamboree with him and his son. This was a three week ordeal involving touring Europe for ten days with 35 boys culminating in a ten day Jamboree with 20,000 scouts from around the world in a cow pasture in Denmark.

I give you this information as a background to establish that I have spent considerable time getting to know Mr. Walther and his family in various and sometimes trying circumstances. I will not bore you with the 12 points of the Boy Scout Law, but I will attest to the fact that Mr. Walther has always embodied them all. I would trust, and have trusted, Mr. Walther with my children in any situation. I know Mr. Walther to be a man of true character in the Boy Scout tradition of character.

After our two younger sons achieved the rank of Eagle Scout, in 2001, Mr. Walther stayed on with the Boy Scout Troop as a volunteer member of the Troop Committee, which I also was a member of, serving as Committee Chairman for several years. We are both still on this committee which serves the 100 to 120 boys in the Troop as well as serving as the liaison between the Troop and the sponsoring organization, the St. Mathew's Episcopal Church. Mr. Walther's work on this committee was both tireless and committed for the sake of boys and their families.

I can only tell you that when the Department of Justice's Press Release became public about the charges against Mr. Walther and his son there was wide spread disbelief among all of us that know the family in Pacific Palisades. I urge you to consider his excellent character and family values.

Sincerely,

*Andrew L Breech*

Andrew L. Breech,
Troop 223 Committee Member

EXHIBIT K
PAGE 105

June 9, 2007

The Honorable Dean Pregerson
United States District Judge
Central District of California


Dear Honorable Pregerson,

I am writing this letter on behalf of Henry Walther as to the type of individual he is based on
past relationships with my parents as well as with our family through school and Boy Scout
activities.

I reviewed the Press Release dated May 11, 2007 and was shocked regarding the allegations
as this is extremely out of character based on my past association with Henry Walther. My
first reaction was that these allegations could not possibly be true and despite the severity of
this situation there must be another side to the overall picture of what occurred.

My parents initially worked with Henry Walther in 1983 when he set up our family trust and
did their estate planning. I have since gotten to know Henry and his wife Janet after I was
married and began residing in Pacific Palisades in 1982.

Their youngest son and our son were active in the local Boy Scout troop and Henry was very
involved as an assistant Scoutmaster. Both of his sons achieved the rank of Eagle Scout and
Henry is still on the Troop 223 Committee.

He and his wife, Janet, were very active at Palisades Charter High School. Whether assisting
with painting the school gym or assisting with getting new carpet in the College Center,
Henry and Janet Walther were always there to offer their support. Janet was very active in
the school Booster Club, which supports additional programs that are not funded through the
school budget. She hosted numerous events at their home to support this organization. They
were the team parents of the swim team through the 1990's until 2003. Currently Janet is the
community liaison for the proposed Pali Swim Center at the high school and is working with
the schools administration and LAUSD. Although their children have graduated they are still
very active in their support of the school.

Henry Walthers generosity through his community support speaks to his character. His
willingness to state that he "knew or should have known" about the illegal activity speaks to
his integrity to accept consequences. I would hope that the final outcome will take this into
consideration.

Sincerely,

Cheryl L. Kling
890 Oreo Place
Pacific Palisades, CA 90272

K
106

MICHAEL HIGBY

Tuesday, June 05, 2007

The Honorable Dean Pregerson
United States District Judge
Central District of California

Your Honor:

It has been my pleasure to know Mr. Henry "Hank" Walther since 2001. I became acquainted with Mr. Walther through my association with the Santa Monica Junior Chamber and my friendship with his daughter, Mrs. Kristin Walther-Chapin.

Mr. Walther is viewed as one of the more successful alumni members of the Santa Monica Junior Chamber. Mr. Walther and his wife have been exceedingly generous over the years in their support and contributions to the organization. In addition to regularly offering his beautiful home as a location for the group's charitable events, Mr. Walther has frequently and for years made his office space available to the Junior Chamber. In a major metropolitan area like Los Angeles, it is often a challenge for non-profit organizations to find working space at an affordable rate. The Walther Family has consistently provided such without any requesting any compensation. This has allowed the Junior Chamber to be able to more effectively achieve its mission of developing young leaders and helping to meet very important community needs.

For several years I had the opportunity to serve the California Junior Chamber organization including being elected its President in 2004. During that time I was acquainted with many members of our alumni; contemporaries of Mr. Walther who held him in extremely high esteem. Similarly I have met many community leaders in the Santa Monica area who have demonstrated immense respect for Mr. Walther.

I have not had the opportunity to work with Mr. Walther on a professional or business level; however it is my view that he is a solid and very successful member of the business community. It is my honor and duty to vouch for his personal character and his dedication to the well-being of others.

Most sincerely yours,

Michael E. Higby
Past President, California Junior Chamber
Junior Chamber International Senator 65392

EXHIBIT ____K____

PAGE ____107____

LAW OFFICES
# PHILIP J. LONGO
A PROFESSIONAL CORPORATION
509 BRINKERHOFF AVENUE
SANTA BARBARA, CALIFORNIA 93101
TELEPHONE (805) 963-6551
FACSIMILE (805) 963-2562
www.longolawoffices.com
EMAIL: info@longolawoffices.com

DANA F. LONGO
ATTORNEY AT LAW

PHILIP J. LONGO, C.P.A.
ATTORNEY AT LAW
(1933-2001)

SCOTT H. WALTHER
ENROLLED AGENT

MELINDA H. RIPPBERGER
PARALEGAL

July 24, 2007

The Honorable Dean D. Pregerson
United States District Court
Central District of California

Dear Judge Pregerson:

I am writing this letter of reference for my father, Henry W. Walther. From the beginning of my memories my father has taught me honesty, ethics, humor, kindness and reverence. He pushed me to be the best, introduced me to scouting, encouraged learning and good study habits. Always a role model, I praise his accomplishments, respect his judgment and follow his direction.

It is difficult to write a letter of recommendation for ones father: where do you start, childhood? Adolescence? Teenage years? When I was a child he used to take my sister and me out every Sunday during the summers. We would have an allowance that we would earn or lose based on our choices. Whatever was left at the end of the summer we could keep and spend wisely. During these lessons we would talk about ideology, test our math skills, history, number games and local folklore.

When I was in Boy Scouts on backpacking trips we would go fishing where he taught me survival and how to catch the biggest fish through patience and technique. He pushed me to be the best; in Sea Scouts, he and my grandfather would always help me with ideas for the programs, trips and events. He would always be the first to donate his time and know-how for anything I was involved in. It's amazing how much he gives back to the community. That's his way. I believe my sister, brother and myself all have absorbed his way of thinking.

As I grew older he entrusted me with more responsibility. Always fair but definitely firm, if you make a mistake, take responsibility, fix it as best as possible and move on. I made plenty of mistakes; coming home after curfew, forgetting homework at Palisades High School, etc. I still carry that with me every day in my professional career.

Mr. Henry Walther's moral character is second to none. Through community involvement, charitable work, professionalism and a great personality my father epitomizes a great man. He has not only taught me how to be a good human being but also how to give back and share what I can to those who do not. Without his guidance, my brother, sister nor myself would be where we are today.

Sincerely,

EXHIBIT     K

PAGE     108

Scott Henry Walther

The Honorable Dean D. Peterson                                          July 25, 2007

United States District Judge

Central District of California


Your Honor:

I am writing to you on behalf of my father, Mr. Henry Walther, and the kind of person he is. In business he is a very clear and concise person so I have a unique perspective of seeing him at home everyday. He gardens in the mornings before work and always remembers to say 'good night' in the evenings. Between those hours he is hard at work making sure he accomplishes something.

He is a traditional man who retains his traditional and Christian values. He remains active in Brentwood Presbyterian Church by performing in the men's ensemble choir and attending many of the other activities and events there. For instance every Easter he joins in with the entire church for the "Hallelujah Chorus." His devotion to God is also seen every holiday when he insists on leading the prayer at the dinner table. We sit and eat dinner together as a family just about every night to home cooking prepared by my mother. This way we are a close and stable family. However I see the most notable of his devotion in his dedication to the lives of his children.

The fondest memories are the high adventure trips he has taken me on through the Boy Scouts. He was a key chaperone on trips to Europe, Canada and backpacking in New Mexico. On our Europe trip he led a small group of scouts home after being split up and stranded in Europe for over a day traveling from airport to airport. He finally made sure that we had a place to sleep that extra night and negotiated for the hotel's restaurant to remain open for us, nothing four fifteen year old boys could manage.

It has also amazed me how involved he has gotten in my swimming activities. When I swam at Palisades High School he calculated the scores for every duel meet and assisted in planning our victory in the city section swimming finals in 2002. He still remembers most of my times for every year I have been swimming. He may not have been at the end of my lane cheering for me at times, but instead he was making sure the meet ran smoothly and that everything was correct.

My father is a very generous man who looks out and makes sure the best can happen. He plans every last detail to make sure his endeavors are a success and his family is happy.

- Gregory W Walther

*[signature]*

EXHIBIT ___K___

PAGE ___109___

*You are cordially invited to attend*
*the presentation of the*

## Santa Monica Jaycees
### Distinguished Service Award

*Thursday, September 18, 2008*



*Luncheon*

Hosted by the
### Lion's Club

IHOP Meeting Room ~ 1920 Santa Monica Boulevard
(on the corner of 20th and Santa Monica Boulevard)
**Twelve o'clock noon**
$20 per person

*Dinner*

Hosted by Kristin Chapin
at the home of Janet and Henry Walther

### 1005 Glenhaven Drive
### Pacific Palisades

*Six o'clock Cocktails ~ Seven o'clock Dinner*
$40 per person


EXHIBIT K
PAGE 110

**JOHN R. WILSON**
ATTORNEY AT LAW

16800 EDGAR STREET
PACIFIC PALISADES
CALIFORNIA 90272
(310) 454-5602
(310) 230-8768 (FAX)
e-mail: jrwil@irwcomputers.com

P.O. BOX 217
JUNE LAKE
CA. 93529
(760) 648-7096
(760) 648-7920 (FAX)

June 29, 2009

Mr. & Mrs. Henry Walther
1005 Glenhaven Dr.
Pacific Palisades,
Ca. 90272

Re: Thank You

Dear Janet and Hank,

Many thanks for once again hosting our Cubs, Webelos and Scouts in you great pool. We have an expanded program and we needed every moment of those four weekends in that pool.

Our Scouting program seems to get stronger every year because of great people like the two of you.

Once again, many thanks.

John R. Wilson
Scoutmaster

EXHIBIT  K
PAGE  111

# JOHN R. WILSON
## ATTORNEY AT LAW

16800 EDGAR STREET
PACIFIC PALISADES
CALIFORNIA 90272
(310) 454-5602
(310) 230-8768 (FAX)
e-mail: jrwil@irwcomputers.com

P.O. BOX 217
JUNE LAKE
CA. 93529
(760) 648-7096
(760) 648-7920 (FAX)

April 23, 2009

Mr. and Mrs. Henry Walther
1005 Glenhaven Dr.
Pacific Palisades.
Ca. 90272

Re: Scouts Swimming

Dear Janet and Hank,

Once more Troop 23 asks your permission to use you great pool for swimming and life saving starting Saturday May 30, 2009 from 8 a.m. to 11:15 a.m. and continuing June 6 and June 13th.

The Troop has traditionally donated something to help with the heating bill and we would be more than willing to continue that practice. Just let me know what we can help with.

I, personally, greatly appreciate your support and willingness to host our Scouts.

Very truly yours,

John R. Wilson

Cc Andrea Bostick – Committee Chairwoman

EXHIBIT _K_
PAGE _112_

*The Santa Monica Jaycees Presents Its*

# Diamond Plus
# Anniversary Gala

10/4/08
Hank received
JCI Senator award
Janet received
Outstanding Support



*Celebrating Over 75 Years of Service*

## October 4, 2008

EXHIBIT    K
PAGE    113

# Henry "Hank" Walther:
# Santa Monica's Newest JCI Senator

Hank Walther has proven himself to be the picture of what a Jaycee is all about. During his years as a Jaycee, he worked hard as Chapter President, Internal Vice President, and the first California Jaycees Metropolitan Chapter Vice President, among other positions and awards. While he was President, the chapter chartered two new chapters in the area. And that's just the tip of the iceberg. Although it's been almost 30 years since he "aged out," he continues to make a difference to the Santa Monica Jaycees and the Jaycee movement in general.

Hank has generously donated his time and resources to our chapter without hesitation. While all of these things are certainly of value, perhaps the most valuable assets Hank brings to the Santa Monica Jaycees are his mentorship and his wisdom – and the way he goes about sharing them.

Talking Jaycees with Hank inspires you to go out and do more, recruit more, make even more of an impact. He understands that the world is a different place, filled with different people, made up of generations raised to value different things – and he works with members to succeed within what is – and not measure our success based solely on what was. He still has an excitement and fire about this organization that is truly contagious. He cherishes his time as a Jaycee and does all he can to ensure those who have come after cherish their time, too.

From offering his home to his office building to his wisdom to even his children, Henry "Hank" Walther has made an impact on our chapter for well over 35 years. His leadership and compassion for the Jaycees has set the precedent for all those who have come after him. He is a true mentor, continuing to inspire the emerging leaders of today's Santa Monica Jaycees not just in their roles within the chapter, but as they grow out of the chapter and move on to other things. He is everything we envision a JCI Senator to be and we are thrilled to present him with this honor.

*108*
*received*
*Senator award*
*received*
*Life Supporter*

# 2007 Distinguished Service Award

*Honoring Santa Monica's Outstanding Young Person*

September 18, 2008

*Past recipient of Santa Monica Junior Chamber Distinguished Service Award*

Presented by
*Santa Monica Junior Chamber*



Santa Monica
Junior Chamber of Commerce


EXHIBIT __K__

___115___

## Past Recipients

| | | | |
|---|---|---|---|
| 1931 | Robert Wilson | 1975 | Henry Walther |
| 1932 | Justin Kennedy | 1976 | Charles G. Fuller |
| 1933 | Chet Stole | 1977 | H. Nick Holt |
| 1934 | Clarence Michel | 1978 | Charles Wood |
| 1935 | C.W. McInery, Jr. | 1979 | Martin P. Sanders |
| 1948 | Richard Stewart | 1980 | Vince Muselli |
| 1949 | Vincent Simpson | 1981 | John Meneley |
| 1950 | Ev Ross | 1982 | Patrick W. Barrett |
| 1951 | Joseph L. Walling | 1983 | Chris Harding |
| 1952 | Frank Blenkhorn | 1984 | John Doust |
| 1953 | Herb Spurgin | 1985 | Kevin Reid |
| 1954 | George Cobley | 1986 | Josh Palazzolo |
| 1955 | Robert Stillwell | 1987 | Mark Harding |
| 1956 | Fred McNairy | 1988 | Craig Smith |
| 1957 | Robert Sievers | 1989 | Jeanine Dalis Klima |
| 1958 | L. Wayne Harding | 1990 | Edward Guerboian |
| 1959 | C. Dean Funk | 1991 | Dan Kingsley |
| 1960 | James B. Reidy, Jr. | 1992 | Craig Mordoh |
| 1961 | Jerry Condon | 1993 | Karen Luebke Jardine |
| 1962 | Paul Priolo | 1994 | Thomas J. Mortensen |
| 1963 | Robert Meyer | 1995 | Erik Brandin |
| 1964 | Robert Moore | 1996 | Juan Villagomez |
| 1965 | Harold R. Luebke | 1997 | James Parr, Jr. |
| 1966 | William S. Mortensen | 1998 | Michael Chesser |
| 1967 | B. Thomas Barnard | 1999 | Trevor Broderick |
| 1968 | William Crookston | 2000 | Steven B. Chapin |
| 1969 | C. Timothy Corliss | 2001 | Karen Bauer |
| 1970 | Hudson Decray | 2002 | Kathy Irby |
| 1971 | Frank Jamison | 2003 | William Dawson |
| 1972 | John Bourget | 2004 | Jeffrey Rohwer |
| 1973 | Martin Gottlieb | 2005 | Joanna Morales |
| 1973 | Robert Nittinger, Honorary | 2006 | Kristin Chapin |
| 1974 | John Kingsley | | |

EXHIBIT K
PAGE 116

# Order for the Worship of God



*Tenor in
chancel Choir
at church*

## Brentwood Presbyterian Church

A welcoming community committed to joyfully celebrating
God's love as known through Christ
purposefully nurturing individual growth,
and generously serving the needs of others.

K
117

## Chancel Choir

**Soprano**
Laura Broadie
Connie Dishington
Julie Field
Ginny King
Susan Kohler
Cara Miller
Candy Nash
Beverly Nikolic
Vivian Pablo
Jaimie Pajion-Keppel
Kelsey Walker
Janet Werier
Diane Wildhaber

**Tenor**
Paul Blount
Michael Fiorina
Tom Graham
William Gurfield
Bruce Johnson
John Motz
Michael Pantaleo
Scott Smith
Bob Tonkin
Henry Walther

**Alto**
Jean Abbott
Nancy Acheson-Smith
Julie DeVaux
Karen Kaplansky
Kimberly Harrison
Barbara Ihde
Aleta Knight
Toni LaMonica
Katheryne Levin
Cheryl Ann McNulty
Shirley Newman
Sigrid Russ
Alisa Smith

**Bass**
Owen Christensen
Per Curtiss
Bruce Gossard
Bill Growdon
Craig Ihde
Mike Ishler
Richard Kitzrow
Robert Messinger
Ed Moy
Norm Peterson
Leo Press
Tim Reynolds
Ivan Tether
Gordon Treharne
Ed Zajac



EXHIBIT K
PAGE 118

# Santa Monica Family
# Y.M.C.A.

*Past President*
*of Santa Monica*
*Family YMCA.*

## 2<sup>nd</sup> Annual

## Past President's Luncheon

*The Marina Del Rey Hotel*
*October 12, 2008*

EXHIBIT ___K___

PAGE ___119___

## Past Presidents

| | | | |
|---|---|---|---|
| 1927 | Dr. C. H. Lewis | 1972-74 | Dr. Robert Wallin |
| 1928 | O. J. Fleming | 1975-76 | Maurice Buerge |
| 1929-32 | Dr. H.E. Morse | 1977-78 | James Mount |
| 1933-35 | Dr. Cyril J. Gail | 1979-80 | Lincoln C. Vaughn |
| 1936-42 | Dr. D. A. Murray | 1981 | Max Larson |
| 1943-44 | Glen Thompson | 1982-83 | Henry W. Walther |
| 1945 | Tom Mawhinney | 1984-86 | Lowell T. Patton |
| 1946-47 | Russell Hart | 1987 | R. James Cayton |
| 1948-49 | Herbert Goldsworthy | 1988-89 | Duane Nightingale |
| 1950-51 | Ralph Lamb | 1989-90 | Marvin E. Levin |
| 1952-53 | Leo A. Carter | 1991-92 | Curtis H. Baer |
| 1954-55 | Ward R. Dudley | 1993-94 | Paul A. Leoni |
| 1956 | Dr. E. S. Mortensen | 1995-96 | Richard E. Lawrence |
| 1957-58 | Dr. Emil O. Toews | 1997 | John McIntire |
| 1959-60 | Frederic M. McNairy | 1998 | Linda Babcock |
| 1961 | Wayne Higbee | 1999 | Greg T. Naylor |
| 1962 | Roy E. Naylor | 2000 | Jacqueline Y. Kittaka |
| 1963 | H. Thomas Hodges | 2001 | James Haljun |
| 1964 | Rupert Haley | 2002 | Nathaniel Trives |
| 1965 | Dr. Harold Bartley | 2003 | George Collins |
| 1966 | Dr. George Drake | 2004 | Dave Nelson |
| 1967 | Dr. Robert A. Moore | 2005-06 | Jean McNeil Wyner |
| 1968-69 | Lewis Bushman | 2007 | Ray Carriere |
| 1970-71 | Dr. Archie Morrison | 2008 | Don Cohen |

### Event Committee

Raymond Carriere, Event Chair

Richard Lawrence        Paul Leoni
Steve Litvack        Patty Loggins Tazi
Montrose McCormick    Jean McNeil Wyner
Tara Pomposini



*8/6/09*
*Master of Ceremonies*
*@ YMCA*
*50th Anniversay*
*Event*

# Santa Monica
# Y's Mens' & Womens'
# Breakfast Club

## Installation &
## 50th Anniversary

### Thursday, August 6, 2009

EXHIBIT K

PAGE 121

# Program

Master of Ceremonies . . . . . . . . . Hank Walther

Flag Salute . . . . . . . . . . . . . . . . . . Dawn Sturgill

Y's Mens' & Womens' Grace (opposite page)

Invocation . . . . . . . . . . . . . . . . . . Kingsley Fife

### Dinner is served

### Induction of new members

50th Anniversary Remarks . . . . . J.R. Holdeman
Regional Director
Pacific Southwest Region

Installation of Officers . . . . . . . . . . Bruce Trent
Immediate Past Regional Director
Pacific Southwest Region

Comments . . . . . . . . . . . . . . . . . Steve Litvack
Past President

Rosey Casillas
President

This evening is dedicated to those who have
given of themselves to make this
organization and the world a better place.



EXHIBIT  K
122

## _The Golden Eagle_

_The Golden Eagle Club is comprised of dedicated supporters of Western Los Angeles County Council, Boy Scouts of America. The members of the Golden Eagle Club believe deeply in the fundamental values of Scouting and is represented by concerned individuals, businesses, and organizations who have chosen to make an investment in helping shape tomorrow's leaders through their financial support._

---

**The Scout Law**

**A Scout is…Trustworthy, Loyal, Helpful, Friendly, Courteous, Kind, Obedient, Cheerful, Thrifty, Clean, Brave and Reverent.**

---

_"The goodness of a person and of the society he or she lives in often comes down to very simple things and words found in the Scout Law. Every society depends on trust and loyalty, on courtesy and kindness, on bravery and reverence. These are the values of Scouting, and these are the values of Americans."_

President George W. Bush

EXHIBIT ___K___

PAGE ___123___

Holiday Carpet & Floor
Covering
Kenneth R. Beck
Tejas Underground, LLC
John M Bohn
Bohn Bros.- Moultrie, Inc
Latitude 33
Robert Francis Murphy
Thomas Steinke
Seltzer, Caplan, McMahon,
Vitek
Melvin Wynn
Los Angeles Times
Peter Charles Sheridan
Ross Harrop
Donald W Hoffman
Denise Capri
Kenneth L Simpson
Mills Whitney
Jania Garcia

### *Golden Eagle Level*
Always Vending
Arthur J. Gallagher
Foundation
Babcock Design
Bassenian/Lagoni Architects
Casey Sayre & Williams Inc
Chaparral Construction
Corporation
County of Los Angeles,
County Auditor-Controller
Concrete Coring Company
Fremont General Corp.
Geocon Incorporated
Hamer Toyota, Inc.
Keyes Motors
Sandler & Rosen
Westrend Electric, Inc.
Disney Worldwide Outreach
Earl B Gilmore Foundation
First Federal Bank of
California
Gamma Holdings
Harley Davidson Of
Lancaster
Kohler Co.
Korek Land Company, Inc.
Medical Group of Encino,
Inc.
MS Concrete Co., Inc.
Pacific Resistor Co
Pyramid Pipe & Supply
R.S. Hoyt Jr. Family
Foundation
Riviera Lodge No. 780 F. &
A.M.
RMT Ceramic & Stone
Rotary Club - Santa Monica
Schott & Lites
Sikand Foundation, Inc.

Steve Boyce Tile
West Coast Arborists, Inc.
Woodhull Family Foundation
Michael William Arlen
Wayne R Bailey
Keith Barker
Margaret Beckendorf
Mike Cantalano
Michael Chandler
Peter Cheung
Glen Clancy
Gregg Taylor Coccari
Lenny Coltun
Francine R Conte
Steven Robert Cowley
Robert Dale Crockett
Philip De Toledo
Richard H Dinel
William H Doheny
Richard K. Eamer
Michael Escobedo
Hearst Family
B D Fischer
Barry J Fisher
Derek Fortin
Kris O Friedrich
Everett Owen Frost
Brendan Haig Gallaher
Richard Thomas Gallo
Jack L. Gard
Jolyon Gissell
Leona Goldring
John E Goodloe
Arthur Ervin Hammarlund
Violet Hanna
Roy E Hanson
George A Harris
Lee N Harrison
Michael K Henderson
Stuart S Hillman
Janice Ho Oei
Harlan R Hogue
Victor Hsu
George William Hunt
Bill Hussey
Christopher J. Irvin
Taylor Jenson
David Kahn
Clifford Kahn
Skip Kamm
Marty A Kasman
Christopher Paul Kearley
Steve Kelleher
Harry S Khan
Jerome Klein
Peter Kuyper
Larry Lafata
Karin L Larson
Richard C Larson
Douglas Perry Lasater
Richard J Lauter

Robert B Levey
Tony Litman
Larry Lynch
Jon C Mackenzie
Alan A Mangels
William S Martin
Mary & Dana Martin
Joe J. Mason
David Mastalsk
Anthony P Mazzarella
Nancy McDonald
Ron Mercado
Lura Meyer
Jim Mnoian
Dave Moore
William Moran
Henry L Mowry
Richard G Newman
Janice Oei
W Harold Petersen
Melvin Plutsky
Clark Willard Porter
Dave Powers
Richard Riordan
Glenn Sartain
Hamlet Shirvani
Tarek A Shraibati
Stephen M Simon
Eric M Singer
Robert M Sinskey
George Michael Soneff
Richard E Sparks
Barry M Speyer
Craig Arden Stephens
James Stevenson
Isaac D Sudit
Ronald E Swanson
Jerome S Tamkin
Barbera Hale Thornhill
Michael Tinger
George Tomlanovich
Douglas G Trewhitt
Elizabeth Thornton Troy
Henry W Walther
John & Joan Weaver
Susan Marie Wegleitner
Tony Wiener
Gale T Williams
James Q. Wilson
William W Wilson
Richard Wirthlin
Richard C Wise
Benson Won
Thomas Avery Wood
Cynthia Zicker

*Thank
You!*



International Ys-Clubs 07-00070 SLP12 Document 35 Find 08/25/08 Page 127 of 138



# SEA BREEZE

### Y's Men's Breakfast Club of Santa Monica

➤ OUR MOTTO ➤

*"To acknowledge the duty that accompanies every right"*

Meetings: 1st and 3rd Saturdays, 7:30 am at the Santa Monica YMCA, 1332 Sixth Street, Santa Monica

| | | |
|---|---|---|
| Volume No. XXVI1  No. 38 | Santa Monica, California | July 12, 2008 |

## MEETING THIS SATURDAY JULY 26TH 7: 30 A.M.
### SANTA MONICA YMCA
### 1332 SIXTH ST.
### SANTA MONICA 90401

**PROGRAM:** Not yet formalized, but sure to be a good one.



**LAST MEETING:** Big turnout with 24 members and guests enjoying a great program and a fine breakfast. Special guests included **Helen Hewitt, Becky Mejila, Ho Nguang,** and **Jack.** President **Steve Litvack** received overwhelming applause for his announcement that the YMCA Board had officially moved to consider reopening **Camp Big Bear.** Generous fines were offered by **Terry Green, Art Verge, Hank Walther** and **Victor Newlove** for being late, taking a trip to Oregon, a 40th Anniversary and a new grandchild in that order. **Don Hedge** delighted everyone with bills for quarterly dues.
An outstanding program on *Community Policing* was presented by **Captain Wendell Shirley** and **Sergeant Brent Crafton** of the Santa Monica Police Department The City has been divided into eight separate, identifiable areas in order to bring closer and more responsive service to each area. A really fine program arranged by **Curt Baer.**

## RAWUKA  SERVICES.
Services for Y's Men club member **Andy Rawuka** will be held this **Thursday, July 24th,** at The Santa Monica First United Method Church, 1008 11th Street, Santa Monica, at 11 **A.M.** Anyone wishing a ride can call Jim Lunsford at 310-392-1579. The Church is located  at the corner of Washington Avenue and 11th Street.

## REGIONAL CONVENTION SEPT. 26-28 PALM DESERT
The Regional convention has been scheduled for Friday, Saturday and Sunday in Palm Desert. These are very informative sessions and the weather is nice then. Anyone interested in attending should contact  President **Steve Litvack** for more information



## TEST YOUR CAMP KNOWLEDGE

***Camp Big Bear*** is:

| | | |
|---|---|---|
| 1. In the mountains. | T | F |
| 2. At the Lake. | T | F |
| 3. Good for kids. | T | F |
| 4. Presently closed. | T | F |

Three or more correct makes you eligible to help.

EXHIBIT K
PAGE 125

| President | 1st Vice Pres. | 2nd Vice Pres. | Secretary | Treasurer | Editor | YMCA Liaison | Past President |
|---|---|---|---|---|---|---|---|
| Steve Litvack | Curt Baer | Jim Lunsford | Dawn Sturgill | Don Hedge | Lou Lunsford | Jim Casalor | Terry Green |



# SEA BREEZE

## Y's Men's Breakfast Club of Santa Monica

➤ OUR MOTTO ➤

*"To acknowledge the duty that accompanies every right"*

Meetings: 1st and 3rd Saturdays, 7:30 am at the Santa Monica YMCA, 1332 Sixth Street, Santa Monica

| Volume No. XXVII No. 38 | Santa Monica, California | September 13, 2008 |
|---|---|---|

## MEETING THIS SATURDAY SEPTEMBER 20TH 7:30 A.M.
### SANTA MONICA YMCA
### 1332 SIXTH ST.
### SANTA MONICA 90401

**PROGRAM: "Deep Sea Fishing with Hank Walther."** A rare chance to experience the joys of deep sea fishing described by one of the true local experts in the field. **Hank Walther** really knows the Southern California scene. This is a great time to invite a guest. This program especially hooked by **Terry Green**.

**LAST MEETING:** Good turnout for the **Lion's Club's Pancake Breakfast** with about 14 members and guests making the 3 block trek on foot from the **YMCA** to the **Boys and Girls Club** to join the several members already there in their capacity as Lion Club Members. Always a really great time.

**READ YOUR *WINDJAMMER***
The Evening Club's Bulletin, *The Windjammer*, is printed on the back of this bulletin.

## PAST PRESIDENT'S LUNCH
**RAY CARRIERE** reminds everyone of the **Past President's Luncheon** set for **Sunday, October 12 at the Marina Del Rey Hotel** fro 11:30 AM to 2 PM. Honorees will be **James Mount** and **Marvin Levin**. Cost is $100. Please contact **Ray Carriere (310-260-5908)** for details. He assures that this is an outstanding and fun time.

## REGIONAL CONVENTION SEPT. 26-28 PALM DESERT
Again,there is still an opportunity for someone to attend the Southwest Regional convention in Palm Desert Friday thru Sunday, September 26-28. Anyone who might be interested can contact President **Steve Litvack** for more information. If you go you get to do a program on your experience.

## NEXT MEETING: Next regular
meeting will be in 2 weeks, **Saturday, October 4th,** at the the YMCA.



EXHIBIT ___ K ___
PAGE ___ 126 ___

| President | 1st Vice Pres. | 2nd Vice Pres. | Secretary | Treasurer | Editor | YMCA Liaison | Past President |
|---|---|---|---|---|---|---|---|
| Steve Litvack | Curt Baer | Jim Lunsford | Dixon Stureell | Don Hedge | | | Terry Green |



# SEA BREEZE

### Y's Men's Breakfast Club of Santa Monica

➡ OUR MOTTO ➡

*"To acknowledge the duty that accompanies every right"*

Meetings: 1st and 3rd Saturdays, 7:30 am at the Santa Monica YMCA, 1332 Sixth Street, Santa Monica

| Volume No. XXVII  No. 38 | Santa Monica, California | September 27, 2008 |
|---|---|---|

## MEETING THIS SATURDAY OCTOBER 4TH 7:30 A.M.
### SANTA MONICA YMCA
### 1332 SIXTH ST.
### SANTA MONICA 90401

**PROGRAM:** This week's speaker will be **Ho Nguyen**, Director of the *Santa Monica Historical Society Museum* which will be opening soon in new facilities at the Main Library. The Museum is going to be a significant addition to Santa Monica's cultural inventory and this is a great opportunity to learn all about it. Don't miss. This program arranged by **Curt Baer.**

**LAST MEETING:** Really enthusiastic turnout to see and hear **Hank Walther's** excellent program on fishing. Turns out there's a lot more to it than just dropping a hook in the water. **Hank** outlined everything from the importance of the proper equipment and its correct care to the best place to stand on the boat. An outstanding program.
**Phyllis Morrison** was complimented on the article about her in the paper and President **Steve Litvack** reported receiving a Thank You note from **Y's Men International** for the club's donation to the **Alexander Fund.** (See below) Donations were made in honor of various football teams including **Curt Baer** for USC, **Terry Green** for UCLA and **Ray Carriere** and **Victor Newlove** for Notre Dame. Reportedly **Curt** wants his back.
**Kingsley Fife** told of an Alaskan football practice being canceled due to a Polar Bear on the field.

## PAST PRESIDENT'S LUNCH
**RAY CARRIERE** reminds everyone of the **Past President's Luncheon** set for **Sunday, October 12 at the Marina Del Rey Hotel fro 11:30 AM to 2 PM.** Honorees will be **James Mount and Marvin Levin.** Cost is $100. Please contact **Ray Carriere (310-260-5908)** for details. He assures that this is an outstanding and fun time.

## WHAT IS THE ALEXANDER FUND?
The *Alexander Scholarship Fund* (ASF) started in 1954 at the Y's Men's International Convention in Lansing, Michigan. Money had been collected to have a famous painter do a portrait of Judge Paul William Alexander, the founder of Y's Men. He felt it was a waste, but agreed to sit for a renowned photographer at a lesser cost. Leftover monies, amounting to about $900, started this program of Y'sMen International.

The purpose of the ASF is to promote the training of YMCA staff and/or those seeking to become YMCA staff members. It's aim is to alleviate the desperate shortage of YMCA professionals by: (a) encouraging young people in the various countries to take on this responsibility and (b) making financial contributions towards their training.

Who benefits from ASF? 1. Persons already employed by the YMCA who need a grant to increase their training and proficiency. 2. YMCAs seeking training Staff. 3. YMCA members who are better served by professionally trained leadership.

**Courtesy Whittier Y's Men's Club**

## NEXT MEETING:
Next regular meeting will be in 2 weeks, **Saturday, October 18th**, at the the YMCA.

President   1st Vice Pres.   2nd Vice Pres.   Secretary   Treasurer   Editor   YMCA Liaison   Past President



Case 2:07-cr-00070-RRB   Document 35   Filed 11/18/2009   Page 132 of 138

# SEA BREEZE

*Y's Men's Breakfast Club of Santa Monica*

↠ OUR MOTTO ↞

*"To acknowledge the duty that accompanies every right"*

Meetings: 1st and 3rd Saturdays, 7:30 am at the Santa Monica YMCA, 1332 Sixth Street, Santa Monica

| Volume No. XXVI1 No. 38 | Santa Monica, California | November 12, 2008 |
|---|---|---|

## MEETING THIS SATURDAY NOVEMBER 15th 7:30 A.M.
SANTA MONICA YMCA
1332 SIXTH ST.
SANTA MONICA 90401

## PROGRAM: Coming Up!

## PAST PRESIDENTS LUNCH
Reports from those attending the Past Presidents Lunch on October 25th say it was well attended and lots of fun.

## COMING SOON ! ! !

Probably Dec. 20th: Christmas Party

June 2009: 50th Anniversary

## Overheard at Table 2 Last week:

Y'sMan 1: " Have you noticed what great shape Bob Coulter is in ? "

Y'sMan 2: " Yes. he is. And you know he's an octogenarian. "

Y'sMan 1: " Oh I don't believe that !. I've seen him eating bacon and sausages lots of times. "

**LAST 2 MEETINGS:** We have had two excellent meetings in a row( three if we go back to Hank Walther;s classic Fishing demonstration) so this week should be no exception.

The October 18th meeting was led by **President Steve Litvack** who discussed the recent meeting at Camp Big Bear and the evolving camp plans and paid a fine for having his picture in the paper at the ceremony dedicating the new Boys and Girls Club at John Adams Middle School. **Phyllis Morrison** has become a columnist for the *Santa Monica Star*. The program, especially arranged by **Terry green,** was a description of life in a Mideast orphanage by **Dawn Sophia** at Stone Avenue Elementary School, who worked in a program for under-privelaged children of the world. She was escorted by her friend **Steve Doucette** who went to John Muir Elementary, John Adams Middle School, SamoHi, and UCLA.

The November 1st Meeting was presided over by **Rosey Casillas** in the absence of President **Steve.** T he program, arranged by Curt Baer, was demonstration of the YMCA's *Youth in Government* program by about 20 participants from SamoHi and Saint Monica's. The group is attending the YIG conference in Sacramento and sponsoring bills on cigarettes, revolving doors and plastic bags. The program is directed **Audrey Myers Hollis** and was arranged by **Curt Baer.**

Special part of the meeting was having **Grace Jacobs** back. **Grace** has been visiting her daughter for a while.

**Terry Green** paid a fine for having his picture and comments printed as part of a full page ad in the local paper.

**NEXT MEETING:** Saturday, December 6th

| President | 1st Vice Pres. | 2nd Vice Pres. | Secretary | Treasurer | Editor | YMCA Liaison | Past President |
|---|---|---|---|---|---|---|---|
| Steve Litvack | Curt Baer | Jim Lunsford | Dawn Sturgill | Don Hedge | Jim Lunsford | Jim Casalor | Terry Green |



# SEA BREEZE

## Y's Men's Breakfast Club of Santa Monica

➤ OUR MOTTO ➤

### *"To acknowledge the duty that accompanies every right"*

Meetings: 1st and 3rd Saturdays, 7:30 am at the Santa Monica YMCA, 1332 Sixth Street, Santa Monica

| Volume No. XXVII  No. 38 | Santa Monica, California | April 28, 2009 |

---

## MEETING
## THIS SATURDAY
## MAY 16TH
## 7:30 A.M., 2009

SANTA MONICA YMCA
1326 SIXTH ST.
SANTA MONICA 90401

**PROGRAM:** Actual details have not yet been finalized, but it's sure to be a good one. Don't miss.

**LAST MEETING:**. One of the best was the general consensus by those attending. Several very good fines for all kinds of reasons. **Hank Walther** displayed photographs of several very large fish caught on a recent lake fishing trip.
Guest speaker was **Rose Dosti** who described her rise in the newspaper world from always wanting to be a reporter, through working at Time-Life as a college student while attending Colombia University, to working for Chef Leoni;s Cooking school and all the way to the L.A. Times where she became a staff writer in several categories. Unfortunately she feels newspapers are facing hard times because younger people just don't read newspapers as much as former generations.

## SUSTAINING DRIVE WINDING DOWN

### BUT NOT TOO LATE TO TAKE PART

The 2009 YMCA Sustaining Drive is now winding down but their still time to make your commitment if you have not yet done so. Steve Litvack and Victor Newlove are both Drive Chairman who can be contacted.



*"OK, Zukutu — that does it! Remember, those who live in grass houses shouldn't throw spears."*

---

| **President** | **1st Vice President** | **Secretary** | **Treasurer** | **Editor** | **YMCA Liaison** | **Past Pres** |
|---|---|---|---|---|---|---|
| Steve Litvack | Curt Baer | Dawn Sturgill | Don Hedge | Jim Lunsford | Jim Casalor | Terry Gre |



EXHIBIT ___K___

PAGE ___130___

December 4, 2008

Dear Hank,

Thank you for assisting Chuck
and the entire Ball Committee with
the details and experience necessary
to make the 2008 Ball a success!
Your generous involvement made
everything flow effortlessly, and
everyone seemed to enjoy themselves.
Thank you for being a part of
our success.        Fondly,

Carroll Mc Eachern

EXHIBIT K
PAGE 131




Vera Handley
44189 Elba Ct.
Palm Desert, CA 92260

BERNARDINO CA 924
20 AUG 2009 PM 3 L

USA 44

Mr. and Mrs. Henry Walther
1005 Glenhaven Drive
Pacific Palisades, CA. 90272



Thanks so much

K

PAGE 132

Hi!   Thank you again for ALL
you did to get me to our
60th Debutante Announcement
Luncheon and for your kindnesses
throughout that special day. It
meant so much to me! You are
the best of friends; God Bless You!

V.

Dear Janet and Hank,

Your kindness is greatly appreciated

with LOVE,

Vera

EXHIBIT __K__

PAGE __133__

November 2, 2009


The Honorable Dean D. Pregerson
United States District Judge
Central District of California

Dear Judge Pregerson:

I am fully responsible for my association with my former client's fraudulent business. There was a time when I should have known that my trust in their original business was misplaced, and my failure to act properly at that time was incorrect and became criminal conduct, to which I did plead guilty.

I now realize that at times I am too trustworthy of people and a poor judge of character. I made a poor business decision in the context of the facts I had available to me. I am sorry and distraught for this conduct.

Involvement in the criminal process has been a very humbling and traumatizing experience for me. I enlisted the help of my own son and thus got him involved in the business process with this former client. My son's participation was a terrible situation for which I feel daily regret. The time between my guilty plea and my pending sentencing has been one of deep personal pain for me, and I have had ample time to reflect on what a man should do when he has made a mistake.

I have been honest and forthright with my family, business associates and friends during this difficult process. I continue to be active in various areas of community service while retired as I have been for my entire adult life. It seems the appropriate thing for me to do as service to humanity is the best work of life.


Cordially,

*Henry Walther*

Henry Walther


EXHIBIT _L_

PAGE _134_